UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JACOB PEREZ,

                               Plaintiff,
                                                              **REPORT AND**
            -against-                                         **RECOMMENDATION**

CAROLYN W. COLVIN, Acting                                     14 Civ. 9733 (VB)(JCM)
Commissioner, Social Security Administration,

                               Defendant.
-------------------------------------------------------------X

To the Honorable Vincent L. Briccetti, United States District Judge:

        Plaintiff Jacob Perez ("Plaintiff"), *pro se*, commenced this action pursuant to 42 U.S.C.

§ 405(g), challenging the decision of the Commissioner of Social Security ("the

Commissioner"), which denied Plaintiff's application for Supplemental Security Income ("SSI"),

finding him not disabled.  Presently before this Court is the Commissioner's motion for

judgment on the pleadings to affirm the Commissioner's decision pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure ("Rule 12(c)"). (Docket No. 19).  Plaintiff has not filed a cross-

motion.  For the reasons below, I respectfully recommend that the Commissioner's motion

should be granted.

## I.  BACKGROUND

        Plaintiff was born on September 4, 1973. (R.[1] 123).  On September 7, 2011, Plaintiff filed

an SSI application, alleging that he became disabled and was unable to work as of May 9, 2011

as a result of depression, emotional stress, and post-status hernia surgery. (R. 123, 158).  The

Social Security Administration ("SSA") denied Plaintiff's application on November 1, 2011. (R.

_____

[1] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social
security benefits, filed in this action on June 3, 2015, with a supplementary filing of omitted sections on the Court's
Electronic Document Filing System on July 8, 2016. (Docket No. 13, 22).

63).  Plaintiff appealed the denial and, on April 4, 2013, Plaintiff appeared before Administrative

Law Judge ("ALJ") Hilton R. Miller. (R. 26-60).  Vocational Expert Esperanza DiStefano also

appeared and testified. (R. 50-59).  ALJ Miller affirmed the denial of benefits on April 12, 2013.

(R. 8-21).  On November 17, 2014, the Appeals Council denied Plaintiff's request for review. (R.

1-4).  Thereafter, Plaintiff appealed the SSA's decision by submitting his complaint in the

present action to the *Pro Se* Office of this Court on December 1, 2014. (Docket No. 2).  In April

and May 2015, Plaintiff mailed three records of medical visits to the Court. (Docket No. 24).

The Commissioner filed a motion for judgment on the pleadings under Rule 12(c) on February

26, 2016. (Docket No. 19).  Plaintiff did not oppose the motion or cross move.  Other than the

complaint and these medical records, Plaintiff has not filed anything with the Court in

connection with this matter.

## A.  Plaintiff's Medical Treatment History

The administrative record contains medical records from treatment that Plaintiff has

received for his psychiatric conditions, hypothyroidism, hypertension and hernia repair.

## 1.  Records Regarding Plaintiff's Psychiatric Conditions

Admission records from Daytop Village, Inc. dated May 25, 2011 listed no co-existing

psychiatric disorder. (R. 262).  The records also indicated that Plaintiff reported no history of any

mood altering substance or alcohol use. (R. 274).  He said his hobby was working out. (R. 295).

In his health assessment, he stated that he had no issues with his health with the exception of

headaches in the summertime and depression following the death of his mother. (R. 308-09).  He

was working as a porter at Hunter College and was enjoying the work. (R. 313).  He reported

discomfort around groups of people, but was sleeping better on Remeron. (R. 313).

Treatment records from Lincoln Medical and Mental Health Center dated July 12, 2011 noted Plaintiff's psychiatric condition of depression since his mother passed away in August 2010. (R. 229).  Dr. Rakeshkumar Mistry found that Plaintiff's depression was secondary to bereavement and that he had a PHQ-9 score of 3, indicating mild depression. (R. 230).  Plaintiff reported that he was under the care of a psychiatrist and was taking antipsychotic medication. (R. 249).  He attended group therapy sessions at Daytop Village on June 10, June 17, June 24, June 27, July 1, July 11, July 18, July 25, August 8 and August 15, 2011. (R. 319, 322, 324, 327, 330, 333, 335-36, 340, 342).  Records from additional thirty-minute individual sessions at Daytop Village from June to August 30, 2011 noted that Plaintiff was in housing court dealing with back rent owed from when he was incarcerated and his mother passed away, that he had sought permission from his parole officer to travel to Puerto Rico, and was seeking supervised visits with his daughters. (R. 316, 317, 321, 326, 329, 332, 338, 339, 341).  Drug tests from this period showed negative results. (R. 361-75).

Treatment records from Lincoln Medical and Mental Health Center from October 24, 2011 noted Plaintiff's depressive disorder. (R. 470-75).  On that date, he denied substance abuse and stated that he never heard voices until his mother's passing. (R. 560).  His toxicology report showed a positive result for cocaine. (R. 560).  He was found to be psychiatrically stable for discharge and was not given medication as he last refilled his prescription on July 23, 2011. (R. 560-61).

Dr. Jorge Kirschtein completed a functional assessment form on November 30, 2011. (R. 402).  He diagnosed Plaintiff with bipolar disorder II, obsessive compulsive disorder, and attention deficit disorder to be ruled out. (R. 402).  He said that Plaintiff was temporarily

unemployable for ninety days, but he also noted that he had seen Plaintiff for an intake only and that Plaintiff was having a mixed mood reaction to Remeron. (R. 402).

Treatment records from January, April, and June 2012 list depression and bipolar disorder, but indicate that both were stable and that Plaintiff had a PHQ-9 score of 2. (R. 580, 584, 589). Additional records from April 2012 indicated that Plaintiff exhibited poor impulse control, but noted that it was not a gross impairment. (R. 507-08). He showed no gross impairments in cognitive functioning and demonstrated an euthymic mood. (R. 508). He denied the use of alcohol, drugs or cigarettes. (R. 509). He reported that he was studying refrigeration, but that he was failing his classes and would not graduate. (R. 510). Dr. Marieliz Veronica Alonso diagnosed Plaintiff with a mood disorder, adjustment disorder to be ruled out, depressed mood with bipolar disorder to be ruled out, and impulse control disorder. (R. 510). He was discharged and advised to continue to take Remeron (referred to as Mirtazapine) for his depression and insomnia. (R. 510). A treatment record from April 17, 2012 noted Plaintiff's positive toxicology screen for cocaine. (R. 585).

Mental Health Clinician Thomas McCarry prepared a psychosocial report of Plaintiff on June 13, 2012. (R. 457-61). At the evaluation, Plaintiff reported that since he had been discharged from prison he had been depressed most days, had had auditory, visual and tactile hallucinations of his mother, saw shadows, felt fear of being in crowds, had paranoid delusions including thoughts that the television/radio were directly communicating with him, and had been excessively washing his hands. (R. 457). He also indicated he had symptoms of post-traumatic stress disorder ("PTSD") following an incident involving physical abuse in prison. (R. 457). He said that he was working part-time. (R. 458). Mr. McCarry assessed that Plaintiff had schizoaffective disorder, PTSD, and hypothyroidism, and gave him a global assessment of

functioning at a moderate level of 60. (R. 461).  He noted that Plaintiff declined available

psychotherapy services and sought medication management only. (R. 461).  A treatment record

from June 15, 2012 showed another positive result for cocaine use, although Plaintiff stated that

he never used cocaine. (R. 580).

On June 30, 2012, Plaintiff presented at Lincoln Medical and Mental Health Center with

an altered mental status. (R. 480-86).  According to Emergency Medical Services ("EMS"),

Plaintiff's girlfriend found him dancing with a disoriented, altered mental status. (R. 553).

Plaintiff tested positive for cocaine and benzos. (R. 484).  A brain scan showed normal results.

(R. 487).

Mr. McCarry provided a Medical Source Statement dated July 19, 2012. (R. 634-38).  He

noted that Plaintiff had attended walk-in screening and psychosocial assessment sessions on May

25, 2012 and June 13, 2012. (R. 634).  He diagnosed Plaintiff with schizoaffective disorder,

hypothyroidism, and social withdrawal, and gave him a global assessment of functioning of 60.

(R. 634).  He noted that Plaintiff did not have reduced intellectual functioning, but that he had

moderate limitations in his activities of daily living, in maintaining social functioning, and in

concentration, persistence, or pace. (R. 635).  He also noted no episodes of decompensation. (R.

635).  He found Plaintiff to be seriously limited, but not precluded from remembering work-like

procedures, understanding, remembering, and carrying out very short and simple instructions,

maintaining attention for two hour segments, maintaining regular attendance and being punctual.

(R. 636).  He also found that Plaintiff would be unable to meet competitive standards in a

number of the work activity categories: sustaining an ordinary routine without special

supervision; working in coordination with or proximity to others; completing a normal workday

without interruptions; performing at a consistent pace without an unreasonable number of rest

periods; accepting instructions and responding to criticism; getting along with peers; responding appropriately to changes in routine work setting; and dealing with normal work stress. (R. 636). On average he estimated that Plaintiff would be absent more than four days per month. (R. 637).

Following the ALJ's decision, Plaintiff supplemented the record to include a medical source statement from Dr. Virginia Contreras dated November 13, 2013. (R. 646-50).  Dr. Contreras noted that she had seen Plaintiff monthly from June 24, 2013 to November 13, 2013. (R. 646).  She diagnosed Plaintiff with bipolar disorder, depression, antisocial personality, and a thyroid disorder. (R. 646).  She indicated that he had moderate limitations in activities of daily living and maintaining social functioning, with a marked limitation in concentration, persistence or pace. (R. 647).  She said that he had had no episodes of decompensation. (R. 647).  She found that Plaintiff's abilities were limited but satisfactory in the categories of remembering work-like procedures, understanding, remembering, and carrying out very short and simple instructions, and maintaining attention for two hour segments. (R. 648).  She found that he was seriously limited but not precluded from the following categories: maintaining regular attendance and being punctual; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others; completing a normal workday without interruptions; performing at a consistent pace without an unreasonable number of rest periods; accepting instructions and responding to criticism; getting along with peers; and responding appropriately to changes in routine work setting. (R. 648).  She anticipated that he would miss about four days per month because of his impairments. (R. 649).

## 2. Records Relating to Plaintiff's Thyroid Condition and Hypertension

A comprehensive medical summary from the New York State Department of Correctional Services dated March 7, 2011 noted Plaintiff's sole diagnosis of hypothyroidism.

(R. 205-07).  Treatment records from May to August 2011 from Lincoln Medical and Mental

Health Center indicated that Plaintiff was taking Synthroid daily for his hypothyroidism and his

examinations resulted in normal findings and no documented symptoms. (R. 229, 236, 245, 465-

66).  Regarding his hypertension, the records reflected that Plaintiff was previously treated with

hydrochlorothiazide, but that he had a normal blood pressure reading on July 12, 2011. (R. 229).

A record from January 18, 2012 noted Plaintiff's blood pressure of 129/84, and stated that

Plaintiff would continue to diet and exercise. (R. 588).  Plaintiff's hypothyroidism was stable on

Synthoid at that appointment. (R. 588).  Records from April and June 2012 show continued

Synthroid use to control his hypothyroidism, and no treatment for hypertension. (R. 580, 584).[2]

## B.  Consulting Physicians

The administrative record contains evaluations by two consulting physicians.

## 1.  Dr. Ammaji Manyam

Dr. Ammaji Manyam conducted an independent medical examination on October 21,

2011. (R. 376-379).  Plaintiff stated at the examination that he was diagnosed with emotional

stress, depression and anxiety since 1998. (R. 376).  He reported his hernia surgery in 2007 and

stated that he had high blood pressure and a history of asthma, for which he had not received

treatment. (R. 376).  He denied any history of abusing illicit drugs. (R. 377).  He reported that he

cooked seven times a week and cleaned once a week. (R. 377).  Dr. Manyam noted that he

appeared to be in no acute distress and his findings were all normal. (R. 377-78).  He concluded

that Plaintiff had no limitations for physical activities of standing, sitting or walking a long time,

bending, carrying and lifting weights, climbing stairs, pushing, and pulling. (R. 379).

---

[2] The record also documents Plaintiff's surgical repair of his right inguinal hernia and umbilical hernia on January 4, 2008. (R. 252).

**2.  Dr. Dmitri Bougakov, Ph.D.**

      Dr. Dmitri Bougakov, Ph.D. conducted a psychiatric evaluation on October 21, 2011. (R. 380-83).  At the evaluation, Plaintiff reported that he had seen a mental health specialist at Daytop Village, Inc. until May 2011, but that he was not currently seeing a mental health specialist. (R. 380).  He said that he ran out of his prescribed mirtazapine two days prior to the evaluation, and he reported difficulty failing asleep, dysphoric moods, loss of interest, low energy, concentration difficulties and a diminished sense of pleasure. (R. 380).  He reported talking to his mother, who passed away. (R. 380).  He stated that he was able to dress, bathe, and groom himself, that he managed his own money, took public transportation, and cleaned the house when he needed to. (R. 382).  He indicated that his stepfather came to check on him. (R. 382).  Dr. Bougakov concluded that Plaintiff could follow and understand simple directions and instructions, could perform simple tasks, maintain attention, concentration and a regular schedule. (R. 382).  He reported that Plaintiff was limited in his ability to learn new tasks and perform complex tasks, but that he could make appropriate decisions. (R. 382).  He found that Plaintiff had mild limitations in his ability to deal with others and stress and that his difficulties were related to psychiatric symptoms. (R. 382).  His diagnosis was depressive disorder with some psychotic features, learning disorder not otherwise specified, low average to borderline range intellectual functioning, asthma, hypertension, hypercholesterolemia, and abnormal thyroid function. (R. 382-83).  He found that Plaintiff's psychiatric and cognitive problems did not appear to be significant enough to interfere with his ability to function on a daily basis. (R. 382).

**C.  Residual Functional Capacity ("RFC") Assessment**

      The record contains a Psychiatric Review and Mental RFC Assessment, dated October 31, 2011, by E. Kamin. (R. 384-400).  After reviewing the medical evidence in Plaintiff's file,

the analyst concluded that Plaintiff had organic mental disorders and affective disorders, but that these disorders did not meet the criteria for the listings (R. 384-87). Regarding the "paragraph B" criteria, the analyst noted that Plaintiff had mild limitations in activities of daily living and in maintaining social functioning, with moderate limitations in maintaining concentration, persistence or pace. (R. 394). The review found no episodes of deterioration. (R. 394). The analyst found no evidence of the "paragraph C" criteria. (R. 395). In the Mental RFC Assessment, the consultant noted no marked limitations, although there were some moderate limitations. (R. 398-99).

**D. Testimony during April 4, 2013 Hearing before ALJ Miller**

Plaintiff and Vocational Expert Esperanza DiStefano testified at the April 4, 2013 hearing before ALJ Miller. (R. 28-60). Plaintiff testified that he last worked in 2000 as a helper cleaning elevators until he was fired for "slacking off." (R. 30-31). He said that since then he has made money by selling drugs because he was unable to find work. (R. 32). When asked what impairment prevented him from working, he said that he was scared when he was around people. (R. 32). He also testified that he had thyroid problems, experienced frequent dizziness from his medication, and had had two hernia operations. (R. 33-34). He told the ALJ that he had hallucinations, seeing his mother and feeling people grabbing him. (R. 37). He intimated that his psychological conditions were worsened by a traumatic abusive incident while he was in prison. (R. 38). Regarding his activities of daily living, Plaintiff testified that he took public transportation when he had to, spoke with his friends over the phone, and lived on his own. (R. 40-42). When asked about his history of substance abuse, Plaintiff said that he had last used cocaine a year and a half prior to the hearing. (R. 44). The ALJ asked Plaintiff about his limitations. Plaintiff initially said that nothing would prevent him from doing a job such as

cleaning, which did not involve being around people, however, upon further questioning by his attorney he clarified that he, in fact, would not be able to do that job because he frequently cries. (R. 44, 48).  He said that he was limited to lifting about twenty to thirty pounds because of his hernia surgeries. (R. 45).  He said that he walked about a mile on days when he had doctor appointments, which he had every two months for his thyroid condition, every two weeks with his psychiatrist and every week with his therapist. (R. 46).  He said that he had been seeking psychiatric services since he was in prison. (R. 46-47).  He said that he frequently cries when thinking of his mother, who passed away in 2010. (R. 48).  Plaintiff's representative clarified that Plaintiff was alleging the severe impairments of schizoaffective disorder, PTSD and hypothyroidism. (R. 49).

The vocational expert, Ms. DiStefano, testified as well.  The ALJ asked Ms. DiStefano to consider the following hypothetical: an individual of the same age, education and work experience as Plaintiff, with an RFC to lift and/or carry up to twenty pounds occasionally, ten pounds frequently, to stand and/or walk for a total of six hours and sit for a total of six hours in an eight hour day. (R. 53).  This individual could occasionally climb ramps and stairs, but no ladders, ropes or scaffolds. (R. 53).  The ALJ included the limitation of avoiding concentrated exposure to odors, dusts, fumes, gasses, poor ventilation, and other respiratory irritants. (R. 53). The ALJ clarified that this would take into account non-exertional limitations but would allow for the performance of simple, routine and repetitive tasks that can be explained, involve making simple decisions, only occasional changes in routine and only occasional and superficial contact with others. (R. 53).  With that hypothetical person in mind, Ms. DiStefano named three jobs in the local, regional, or national economy that such a person could perform: assembler, mail clerk, and office helper. (R. 54).  ALJ Miller then asked what the effect would be if the person would

be off task twenty percent of the time, and Ms. DiStefano stated that this additional limitation would make it such that there were no jobs for this individual. (R. 55).

Plaintiff's representative additionally inquired as to contact with others involved in the office helper and mail clerk positions, and Ms. DiStefano reiterated that any contact would be superficial. (R. 55-56). Plaintiff's representative also asked what the effect would be if the person were absent on average more than four days per month, and Ms. DiStefano confirmed that this person would not be able to maintain employment in any of these jobs. (R. 56).

**E. ALJ Miller's April 12, 2013 Decision**

ALJ Miller applied the five-step approach in his April 12, 2013 decision. (R. 11-21). At the first step, ALJ Miller found that Plaintiff had not engaged in "substantial gainful activity since September 7, 2011, the application date." (R. 13). The ALJ noted that Plaintiff had been working on a temporary part-time basis since May 2011, but that his earnings did not meet the requirement for substantial gainful activity. (R. 13). At the second step, ALJ Miller determined that Plaintiff had the following severe impairments: affective disorder, mood disorder, anxiety disorder, and PTSD. (R. 13). He noted that Plaintiff had alleged disability due to asthma, hypothyroidism, hypertension, remote hernia repair, and attention deficit disorder. (R. 13-14). He found that Plaintiff's asthma was non-severe,[3] that his hypothyroidism was stable with medication,[4] that his hypertension was stable with medication, that the record did not indicate that the hernia repair resulted in a functional limitation, and that the record did not support a diagnosis of attention deficit disorder. (R. 14). At the third step, ALJ Miller held that Plaintiff did not have a medically determinable impairment or a combination of impairments that were

---

[3] Nonetheless, the ALJ afforded Plaintiff limitations for pulmonary irritants in his RFC determination.

[4] Plaintiff was also afforded limitations for light work in the RFC determination.

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14). He noted his consideration of the "paragraph B" criteria and his findings that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning, mild difficulties with regard to concentration, persistence or pace, and no episodes of decompensation of extended duration. (R. 15). ALJ Miller also found that the evidence failed to establish the presence of "paragraph C" criteria. (R. 15).

ALJ Miller then concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), with the further limitation that he could occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, should avoid concentrated exposure to odors, dust, fumes, gases and poor ventilation and other respiratory irritants. (R. 16). The ALJ's RFC finding also took into account Plaintiff's mental limitations, which he found allowed for the performance of simple, routine and repetitive tasks that can be explained, involve making simple decisions, only occasional changes in routine, only occasional and superficial contact with others, minimal social interaction, and entry level unskilled work. (R. 16).

In determining Plaintiff's RFC, ALJ Miller held that Plaintiff's allegations as to the intensity, persistence and limiting effects of his symptoms were not totally credible. (R. 17). He noted the inaccuracies in Plaintiff's hearing testimony, during which he said that he had last worked in 2007 although he had worked in 2011, and he said that he had not used drugs since being released from jail despite testing positive for cocaine during the relevant period. (R. 16).

The ALJ specifically noted his "careful consideration of the evidence." (R. 17). He found that the record showed ongoing polysubstance abuse, including testing positive for cocaine on October 24, 2011, and for benzos and cocaine on June 30, 2012. (R. 17). The ALJ noted that the RFC represented Plaintiff's maximum abilities while not under the influence of any such

substances. (R. 17).  The ALJ reviewed the records from the Daytop Outpatient Treatment program, which Plaintiff successfully completed in August 2011. (R. 17).  The program's treatment notes showed relatively mild symptoms, with Plaintiff described as somewhat anxious but otherwise unremarkable, and that Plaintiff remained active. (R. 17).  He reported good response to Remeron and that he was planning to travel and attempting to get supervised visits with his daughters. (R. 17).  The ALJ noted that Dr. Dmitri Bougakov's psychiatric consultative examination resulted in a largely normal mental status evaluation, other than dysthymic mood and mildly impaired concentration and memory. (R. 17-18).  He was diagnosed with depressive disorder with some psychotic features and an unspecified learning disorder with low average to borderline intellectual functioning. (R. 18).  The ALJ noted that although Plaintiff denied a drug history, he tested positive for cocaine three days after the examination. (R. 18).  The ALJ also noted the treatment records from Lincoln Medical Center, which included Plaintiff's report that he was studying refrigeration. (R. 18).  He was diagnosed with a mood disorder and was referred to Urban Horizon clinic for therapy, where he was seen for an initial assessment but declined therapy and only sought medication. (R. 18).  On June 30, 2012 Plaintiff was brought to Lincoln Medical Center due to an altered state that appeared to be due to drug intoxication. (R. 18).

Regarding opinion evidence, the ALJ said that he gave significant but not controlling weight to consultative examiner Dr. Manyam's assessment that Plaintiff had no limitations to physical activities of standing a long time, sitting a long time, walking a long time, bending, carrying and lifting weights, climbing stairs, pushing and pulling. (R. 18).  He noted that these findings were largely consistent with the evidence of record, but that due to Plaintiff's complaints of asthma, hypothyroidism and hypertension, as well as his remote treatment for hernia repair, the RFC was limited to light exertional work with additional limitations

nonetheless. (R. 18).  Next ALJ Miller gave little overall weight to Dr. Bougakov's opinion that

Plaintiff could follow and understand simple directions and instructions, could perform simple

tasks, maintain attention and concentration, maintain a regular schedule, was limited in his

ability to learn new tasks and perform complex tasks, could make appropriate decisions, and had

mild limitations in his ability to deal with others and stress. (R. 19).  He noted that Dr. Bougakov

had to rely on Plaintiff's subjective allegations and that Plaintiff made a number of inconsistent

statements at the examination, including those relating to his drug use. (R. 19).  The ALJ

similarly gave limited weight to psychologist and state agency evaluator E. Kamin's

determination that Plaintiff had, at most, moderate limitations, including in accepting instructions

and responding appropriately to criticism from supervisors. (R. 19).  The ALJ noted that

although this conclusion was largely consistent with his RFC conclusion, the opinion was

entitled to only limited weight because it did not take into account new evidence that showed that

Plaintiff tested positive for drug use and had ongoing work activity. (R. 19).

    Regarding the opinions of Plaintiff's treating medical sources, the ALJ gave limited

weight to the opinion of Dr. Jorge Kirschtein, who opined that Plaintiff was temporarily

unemployable for ninety days. (R. 19).  ALJ Miller noted that Plaintiff had seen Dr. Kirschtein

for an intake evaluation, but the record did not support any established treatment history beyond

that, and Dr. Kirschtein's opinion was not well supported, and either way did not indicate that

Plaintiff was disabled for a continuous twelve-month period. (R. 19).  Regarding the Medical

Source Statement of Thomas McCarry, LMHC, ALJ Miller assigned the opinion limited weight.

Mr. McCarry had found that Plaintiff was unable to meet competitive standards in a range of

work activities and that he would be absent for more than four days per month. (R. 19).  ALJ

Miller found that this was inconsistent with the conservative care prescribed as Plaintiff only

received medication management and was seen relatively infrequently. (R. 19). Additionally, the record did not show established treatment history and Mr. McCarry did not discuss Plaintiff's work activities during the period or the impact of his ongoing substance abuse. (R. 19).

ALJ Miller concluding that Plaintiff's mental health problems appeared to be relatively mild, that he had "busy activities," including managing his own money, living alone and traveling to Puerto Rico. (R. 19). He worked through the relevant period, and appeared to have attended classes in refrigeration. (R. 19-20). Additionally, his ongoing polysubstance abuse indicated to ALJ Miller that Plaintiff was more active that he admitted. (R. 20).

At the fourth step, ALJ Miller determined that Plaintiff was not capable of performing his past relevant work. (R. 20). ALJ Miller noted that Plaintiff was a younger individual, that he had at least a high school education and was able to communicate in English. (R. 20). At the fifth step, ALJ Miller noted that Plaintiff's additional limitations impeded his ability to perform all or substantially all of the requirements of light work, and he, therefore, consulted the vocational expert's testimony to determine whether jobs existed in the national economy that Plaintiff could perform. (R. 21). Based on the vocational expert's testimony that an individual with Plaintiff's age, education, work experience, and RFC as stated by ALJ Miller in the hypotheticals at the hearing would be able to perform jobs such as assembler, mail clerk and office helper, ALJ Miller concluded that Plaintiff was not disabled. (R. 21).

## II. DISCUSSION

The Commissioner argues that the ALJ's decision was legally correct and supported by substantial evidence. (Docket No. 20). More specifically, the Commissioner asserts that there is substantial evidence in the record that supports the ALJ's conclusions that Plaintiff was able to perform a wide range of light work, that Plaintiff was able to perform substantial gainful activity,

that Plaintiff was not a credible witness, and that the evidence further submitted to the Appeals Council did not warrant further consideration. (Docket No. 20).

Plaintiff's complaint summarily argues that ALJ Miller's decision "was erroneous, not supported by substantial evidence in the record, and/or contrary to law." (Docket No. 2 at ¶ 9). As noted above, Plaintiff did not file a motion for judgment on the pleadings, or an opposition to the Commissioner's motion.  The Commissioner has filed certificates of service, indicating that Plaintiff has been served by mail with all motion papers, and the Court has mailed copies of all orders with deadlines for filings to Plaintiff at his home address.  None of the Court's mailings have been returned as undeliverable.  Additionally, Plaintiff has not failed all together to respond, but in place of a motion or opposition to the Commissioner's motion, has mailed the Court three letters from mental health service providers, indicating that Plaintiff sought mental health services on April 7, 2015, April 14, 2015, and on May 4, 2015. (Docket No. 24).  The return address on these mailings is the same as the address on file for Plaintiff at the Clerk's Office.  Plaintiff has clearly been made aware of the deadlines for responding to the Commissioner's motion or for filing his own motion, and chose instead to supply the Court with these medical appointment records.

A.  Legal Standards

A claimant is disabled and entitled to disability benefits if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "'and bears the burden of proving his or her case at steps one through four.'" *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (citation omitted).

**B. Standard of Review**

When reviewing an appeal from a denial of Social Security benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g). The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quotation marks and citations omitted). If the findings of the Commissioner are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971).  The substantial evidence standard "is still a very deferential standard of review—even more so than the 'clearly erroneous' standard.  The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (emphasis in the original) (quotation marks and citations omitted).  "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149 (citation omitted).  Even if there is evidence on the other side, the Court defers "to the Commissioner's resolution of conflicting evidence." *Cage*, 692 F.3d at 122 (citation omitted).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.  Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quotation marks and citation omitted).

## C.  The ALJ's Conclusions Are Supported by Substantial Evidence

ALJ Miller applied the five-step analysis described above and determined that Plaintiff had not engaged in substantial gainful activity since the application date. (R. 13).  This conclusion benefits Plaintiff, and is not disputed by the Commissioner.  Next, the ALJ determined that Plaintiff had the following severe impairments: affective disorder, mood disorder, anxiety disorder, and PTSD. (R. 13).  The ALJ noted that Plaintiff alleged disability due to asthma, hypothyroidism, hypertension, remote hernia repair, and attention deficit disorder, but ALJ Miller found that these impairments were either not supported by the record or not severe. (R. 13-14).  Substantial evidence in the record supports these conclusions at step two.  "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight

abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999)[5] (quoting *Bowen v. Yuckert*, 482 U.S. 137, 154 n.12 (1987)).  Treatment records from Lincoln Medical and Mental Health Center from 2011 and 2012 showed successful treatment for hypothyroidism and hypertension, both of which were well controlled by medication and had no resulting symptoms. (R. 229, 236, 245, 465-66, 580, 584, 588).  At the evaluation with Dr. Manyam, Plaintiff reported his 2007 hernia surgery and stated that he had a history of asthma, for which he had not received treatment. (R. 377).  However, Dr. Manyam found that Plaintiff had no limitations for physical activities, (R. 379), and Plaintiff reported that his hobby was working out and that he enjoyed his part-time work as a porter, (R. 295, 313).  Other than the records from the hernia surgery itself, Plaintiff never sought any medical treatment for symptoms relating to that surgery.  Finally, only Dr. Kirschtein's report includes attention deficit disorder to be ruled out, and Plaintiff's other records show that he did not have a gross impairment of his cognitive functioning. (R. 508).  Substantial evidence supports the ALJ's determination that these impairments had no more than a minimal effect on Plaintiff's ability to work.

At the third step, the ALJ determined that Plaintiff did not have a medically determinable impairment or combination of impairments that were listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14).  ALJ Miller's determinations that Plaintiff's asthma did not meet listing 3.00 for respiratory system impairments because there was no indication of loss of pulmonary function or gas exchange abnormalities is supported by substantial evidence.  The record does not indicate any symptoms from asthma since the date of application.  Similarly, ALJ Miller's

---

[5] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), and Local Rule 7.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and any others cited herein, only available by electronic database, accompany this Report and Recommendation and shall be simultaneously delivered to *pro se* Plaintiff.

determination that Plaintiff's hypertension did not meeting the criteria under Listing 4.00 was not

legally erroneous. Listing 4.00 notes that "[b]ecause hypertension (high blood pressure)

generally causes disability through its effects on other body systems, [the Commissioner] will

evaluate it by reference to the specific body system(s) affected (heart, brain, kidneys, or eyes)[.]"

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00(H)(1).  Substantial evidence in the record shows that

Plaintiff's hypertension was controlled by medication and did not have adverse effects on

Plaintiff's other body systems. (R. 229, 588).

Turning to Plaintiff's alleged mental impairments, ALJ determined that they did not meet

or medically equal the criteria of listings 12.04 (affective disorders) or 12.06 (anxiety related

disorders).  This determination is also supported by substantial evidence.  As each listing

requires a consideration of the "paragraph B" criteria, which assess Plaintiff's impairment-

related functional limitations, the ALJ correctly considered these criteria and determined based

on the medical evidence in the record that Plaintiff did not have two of the following: marked

restriction of activities of daily living; marked difficulties in maintaining social functioning;

marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of

decompensation, each of extended duration.  (R. 14-15).

Substantial evidence supports ALJ Miller's conclusion that Plaintiff had mild restrictions

in activities of daily living, moderate difficulties in social functioning, mild difficulties with

regard to concentration, persistence or pace, and no episodes of decompensation of extended

duration.  Plaintiff reported activities of daily living such as working out, (R. 295), talking with

friends over the phone, (R. 40-42), travel, (R. 316), cooking and cleaning, (R. 377), taking care

of himself, managing his own money and using public transportation, (R. 382).[6]  Additionally,

Plaintiff reported difficulties with being around people, but substantial evidence supports the

ALJ's determination that he had only moderate limitations in social functioning.  He attended

group therapy sessions (R. 319, 322, 324, 327, 330, 333, 335-36, 340, 342).  He reported a

relationship with his stepfather, (R. 382), and hospital records indicated that he had a girlfriend,

(R. 553).  As noted above, he was able to take public transportation, (R. 382), was enrolled in

classes in refrigeration, (R. 510), and claimed to be enjoying his part-time work as a porter at

Hunter College, (R. 313).  Mr. McCarry's Medical Source Statement dated July 19, 2012 further

supports the ALJ's determination that Plaintiff had only moderate limitations in social

functioning. (R. 635).  Similarly, ALJ Miller's conclusion that Plaintiff had mild limitations in

maintaining concentration, persistence or pace is supported by Plaintiff's reported activities of

daily living, treatment records from April 2012 indicating no gross impairments in cognitive

functioning, (R. 508), and Dr. Bougakov's conclusion that Plaintiff could maintain attention and

concentration, (R. 382).  Finally, the record supports the ALJ's determination that Plaintiff had

no episodes of decompensation of extended duration.  Therefore, ALJ Miller's determination that

Plaintiff did not meet the "paragraph B" criteria was not in error.[7]

---

[6] Some of these records predate Plaintiff's application date. "'The ALJ may consider all evidence of record,
including medical records and opinions dated prior to the alleged onset date, when there is no evidence of
deterioration or progression of symptoms.'" *Green v. Barnhart,* No. 07-CV-0023, 2009 WL 68828, at *9 (W.D.N.Y.
Jan. 6, 2009) (quoting *Pirtle v. Astrue,* 479 F.3d 931, 934 (8th Cir. 2007)).

[7] ALJ Miller also found that there was no evidence of "paragraph C" criteria in the record.  Paragraph C of listing
12.04 requires: (1) Repeated episodes of decompensation, each of extended duration; or (2) A residual disease
process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in
the environment would be predicted to cause the individual to decompensate; or (3) Current history of 1 or more
years' inability to function outside a highly supportive living arrangement, with an indication of continued need for
such an arrangement.  Paragraph C of listing 12.06 requires that the impairment result "in complete inability to
function independently outside the area of one's home."  Substantial evidence supports the ALJ's determinations that
these criteria were not met.

Having determined that Plaintiff's impairments did not meet or medically equal any of the listed impairments, ALJ Miller next assessed Plaintiff's RFC.  Based on his review of the medical evidence, Plaintiff's testimony, and the opinion evidence in the record, ALJ Miller determined that Plaintiff could perform light work, with additional limitations for climbing and exposure to respiratory irritants.  Substantial evidence supports this determination.  As discussed above, the record supports the conclusion that Plaintiff's physical limitations were minimal, but because of Plaintiff's complaints of asthma, hypothyroidism and his remote treatment for hernia repair, the ALJ limited his RFC to light work and afforded him additional limitations for climbing and exposure to respiratory irritants. By incorporating these additional limitations into his RFC determination, the ALJ was crediting Plaintiff's testimony regarding the effect of his conditions, and the Commissioner does not contest these determinations.

Regarding Plaintiff's mental limitations, ALJ Miller found that Plaintiff's RFC allowed for the performance of simple, routine and repetitive tasks that could be explained, and involved making simple decisions, only occasional changes in routine, only occasional and superficial contact with others, minimal social interaction, and entry level unskilled work. (R. 16). Substantial evidence supports this determination.  Treatment records from April 23, 2012 assessed Plaintiff with no gross impairments in cognitive functioning and an euthymic mood. (R. 508).  On instances in which he presented with an altered mental state, he tested positive for polysubstance use. (R. 484).  He continued to work part-time, and reportedly enjoyed his work as a porter at Hunter College. (R. 313).[8]  This evidence supports the ALJ's RFC determination regarding Plaintiff's mental limitations.

_____

[8] Dr. Bougakov also concluded that Plaintiff could follow and understand simple directions and instructions, could perform simple tasks, maintain attention and concentration, maintain a regular schedule, and make appropriate decisions. (R. 382).  The ALJ's determination is also consistent with Dr. Bougakov's conclusion that Plaintiff had

Having determined Plaintiff's RFC, the ALJ then concluded that Plaintiff could not perform his past relevant work, which required a higher exertional level than light work. (R. 20). He then consulted with a vocational expert to determine whether jobs existed in the national economy that Plaintiff could perform.  The vocational expert's testimony that an individual with Plaintiff's age, education, work experience, and RFC, which is supported by substantial evidence, would be able to perform jobs such as assembler, mail clerk, and office helper satisfies the Commissioner's burden of showing the existence of alternative substantial gainful employment for Plaintiff.[9] *See Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983).

## D.  The Treating Physician Rule

In coming to his RFC determination, ALJ Miller gave limited weight to the opinions of two treating medical sources: Dr. Kirschtein and Mr. McCarry. (R. 19).  This was not in error.  In determining an applicant's RFC, the ALJ must apply the treating physician rule, which requires the ALJ to afford controlling weight to the applicant's treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c)(2).

First, Mr. McCarry is a Licensed Mental Health Counselor and is, therefore, not an "acceptable medical source" under the regulations, but rather, like a social worker, is treated as an "other source."  *See Mitchell v. Colvin*, No. 09-CV-5429(ENV), 2013 WL 5676289, at *8

---

mild limitations in his ability to deal with others.  It should be noted that the ALJ gave Dr. Bougakov's opinion minimal weight because he relied on Plaintiff's subjective complaints, and Plaintiff made inconsistent statements at the examination regarding his drug use. (R. 19).  Even if the ALJ only placed minimal weight on Dr. Bougakov's report, it is nonetheless consistent with ALJ Miller's conclusion.

[9] Although Ms. DiStefano testified that there would be no jobs available for a person who was off task twenty percent of the time, this limitation was not part of ALJ Miller's final RFC determination and therefore this testimony does not affect the Court's analysis.

(E.D.N.Y. Oct. 17, 2013) (citing 20 C.F.R. § 416.913(d)).  Therefore Mr. McCarry's assessment

"is ineligible to receive controlling weight[.]" *Bliss v. Comm'r of Soc. Sec.*, 406 F. App'x 541,

541 (2d Cir. 2011); *see also Cordero v. Astrue*, No. 11 Civ. 5020(PAE)(HBP), 2013 WL

3879727, at *3 (S.D.N.Y. July 29, 2013) ("an ALJ is not required to give controlling weight to a

social worker's opinion; although he is not entitled to disregard it altogether, he may use his

discretion to determine the appropriate weight").  ALJ Miller considered Mr. McCarry's

assessment and determined that it was entitled to limited weight because Mr. McCarry's

conclusions were inconsistent with the conservative care that Plaintiff had received, the record

did not show an established treatment history, and Mr. McCarry did not discuss Plaintiff's work

activities or the impact of Plaintiff's ongoing substance abuse. (R. 19).  This was a permissible

use of the ALJ's discretion and did not violate the treating physician's rule.

      Next, the ALJ gave limited weight to the opinion of Dr. Jorge Kirschtein, who opined

that Plaintiff was temporarily unemployable for ninety days. If there is substantial evidence in

the record that contradicts or questions the credibility of a treating physician's assessment, the

ALJ may give that treating physician's opinion less deference. *Halloran v. Barnhart*, 362 F.3d

28, 32 (2d Cir. 2004) (refusing to give controlling weight to treating physicians' opinions, as

they were not supported by substantial evidence in the record); *Veino v. Barnhart*, 312 F.3d 578,

588 (2d Cir. 2002) (same); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (same).  To

discount the opinion of a treating physician, the ALJ must consider various factors and provide a

"good reason." 20 C.F.R. § 416.927(c)(2)-(6).  These factors include:  (1) the length of the

treatment relationship and the frequency of examination; (2) the nature and extent of the

treatment relationship; (3) the supportability of the opinion; (4) the consistency with the record

as a whole; (5) the specialization of the treating physician; and (6) other factors that are brought

to the attention of the Court. *See Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).  The Second Circuit has made clear that the ALJ need not "slavish[ly] recit[e] . . . each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Molina v. Colvin*, No. 13 Civ. 4701(GBD)(GWG), 2014 WL 2573638, at *11 (S.D.N.Y. May 14, 2014) (collecting cases).

Here, ALJ Miller chose to give less weight to Dr. Kirschtein's opinion because the record indicated that he had only seen Plaintiff for an initial intake and his opinion was not well supported by the record.  These are adequate reasons for discounting this treating source's opinion.

### E.  The ALJ's Assessment of Plaintiff's Credibility

Next, the Commissioner argues that the ALJ properly determined that Plaintiff was not credible.  It is within the ALJ's discretion to make a credibility determination with the information before him. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (the ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.") (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979)).  ALJ Miller did a detailed analysis of Plaintiff's medical history and noted the instances in which Plaintiff denied drug use, and yet had positive toxicology reports for cocaine and benzos.  He also reviewed Plaintiff's hearing testimony as to his work history, which was inconsistent with other reports in the record.  Following this review, ALJ Miller concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible.  This determination was within the ALJ's discretion, was not a legal error, and is supported by substantial evidence.

**F.  New Evidence Submitted**

In addition to the medical records before ALJ Miller, Plaintiff filed two medical records before the Appeals Council, which were added to the administrative record at that stage. (R. 644-50).  When reviewing an ALJ's decision on an application for benefits, the Appeals Council considers additional evidence submitted "only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 416.1470(b).  If the new evidence relates to a period before the ALJ's decision, the Appeals Council "shall evaluate the entire record including the new and material evidence submitted ... [and] then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Perez v. Chater*, 77 F.3d at 44 (citing 20 C.F.R. §§ 404.970(b), 416.1470(b)).  When the Appeals Council denies review of the ALJ's decision, the new evidence submitted to the Appeals Council becomes part of the administrative record for judicial review. *Perez v. Chater*, 77 F.3d at 45.

Here, the evidence submitted before the Appeals Council was a treatment record from Mr. McCarry dated November 1, 2013, and a medical source statement from Dr. Contreras, who began treating Plaintiff in June 2013 and issued her medical source statement on November 13, 2013. (R. 644-50).  The Appeals Council correctly found that these records did not relate to the period prior to the ALJ's decision on April 12, 2013, and denied review of the ALJ's decision. (R. 2).  After reviewing these records, I find that they do not provide insight into Plaintiff's impairments during the relevant period and, therefore, do not compel a different outcome.

Finally, Plaintiff mailed copies of three medical appointment confirmation documents to the Court in support of his appeal. (Docket No. 24).  The Court "may order the Secretary to consider additional evidence, 'but only upon a showing that there is new evidence which is

material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988) (citing 42 U.S.C. § 405(g)). The Second Circuit has indicated that Plaintiff bears the burden of establishing that "the proffered evidence is (1) new and not merely cumulative of what is already in the record . . . , and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative . . . . Finally, [Plaintiff] must show (3) good cause for her failure to present the evidence earlier." *Tirado*, 842 F.2d at 597. Additionally, the prong of materiality requires "a reasonable possibility that the new evidence would have influenced the Secretary to decide [Plaintiff's] application differently." *Id.*

Here, it cannot be said that Plaintiff has met the requisite showing for the Court to order the Commissioner to consider this new evidence, as Plaintiff has made no argument. Nonetheless, the Court has considered the documents supplied by Plaintiff and finds that they are not material. The records provided indicated that Plaintiff sought information about mental health services on April 7, 2015, April 14, 2015, and May 4, 2015. (Docket No. 24). The records contain no information about Plaintiff's symptoms, nor do they supply any new diagnosis of impairments that Plaintiff had at the time of the ALJ's decision. The Court finds that no reasonable possibility that this new evidence would have caused a different result before the administrative agency. Therefore, I conclude and respectfully recommend that the Court decline to order the Commissioner to consider this new evidence.

## III. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the Commissioner's motion for judgment on the pleadings should be granted and this case should be dismissed with prejudice.

## IV.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from receipt of this Report and

Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for

computing time).  If copies of this Report and Recommendation are served upon the parties by

mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written

objections. *See* Fed. R. Civ. P. 6(d).  Objections and responses to objections, if any, shall be filed

with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable

Vincent L. Briccetti at the United States District Court, Southern District of New York, 300

Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at

said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Vincent

L. Briccetti and not to the undersigned.  Failure to file timely objections to this Report and

Recommendation will preclude later appellate review of any order of judgment that

will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v.*

*Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   July 21, 2016
        White Plains, New York

                                       **RESPECTFULLY SUBMITTED,**

                                         JUDITH C. McCARTHY
                                         United States Magistrate Judge

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by    Dibble v. Colvin,    N.D.N.Y.,    July 1, 2016

512 Fed.Appx. 67
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

William P. ATWATER, Plaintiff–Appellant,

v.

Michael J. ASTRUE, Commissioner of the Social
Security Administration, Defendant–Appellee.

No. 12–902–cv.
|
Feb. 21, 2013.

**Synopsis**
**Background:** Claimant brought action seeking judicial
review of Commissioner of Social Security's denial of his
application for disability insurance benefits. The United
States District Court for the Western District of New
York, Skretny, C.J., 2012 WL 28265, affirmed, and
claimant appealed.

**Holdings:** The Court of Appeals held that:

[1] substantial evidence supported finding that claimant
had acquired transferable skills from his employment with
military;

[2] substantial evidence supported ALJ's failure to give
controlling weight to opinion of claimant's treating
physician; and

[3] Commissioner did not improperly disregard
Department of Veterans Affairs' (VA) decision that
claimant was entitled to individual unemployability
benefits.

Affirmed.

**\*68** Appeal from the United States District Court for the
Western District of New York (Skretny, C.J.).

ON CONSIDERATION WHEREOF, IT IS HEREBY
ORDERED, ADJUDGED, and DECREED that the
judgment of the district court be and hereby is
AFFIRMED.

**Attorneys and Law Firms**

William C. Bernhardi, Bernhardi & Lukasik, PLLC, West
Seneca, N.Y., for Plaintiff–Appellant.

David L. Brown, Special Assistant United States
Attorney, and Stephen P. Conte, Regional Chief Counsel,
Social Security Administration, for William J. Hochul, Jr.,
United States Attorney for the Western District of New
York, Buffalo, N.Y., for Defendant–Appellee.

**\*69** Present: JOHN M. WALKER, JR., ROBERT A.
KATZMANN, Circuit Judges, LORETTA A. PRESKA,
District Judge. [*]

SUMMARY ORDER

**\*\*1** Plaintiff–Appellant William P. Atwater appeals
from the final judgment of the United States District
Court for the Western District of New York (Skretny,
*C.J.*), which affirmed the decision of the Commissioner
of the Social Security Administration denying Atwater
disability benefits under the Social Security Act. We
assume the parties' familiarity with the underlying facts,
the procedural history, and the issues presented for review.

Atwater principally argues that the Commissioner erred
by: (1) finding that Atwater had acquired transferable
skills from his previous employment in the military, (2)
giving insufficient weight to the opinion of Atwater's
treating physician, (3) failing to consider properly the
decision by the Department of Veterans Affairs (the
"VA") that Atwater was disabled, and (4) refusing
to find fully credible Atwater's description of his
pain and limitations. On appeal, we first "review[ ]
the Commissioner's decision to determine whether the
Commissioner applied the correct legal standard" and
then "examine[ ] the record to determine if the
Commissioner's conclusions are supported by substantial
evidence." *Tejada v. Apfel,* 167 F.3d 770, 773 (2d
Cir.1999). Substantial evidence is more than a mere
scintilla. It is "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." *Id.* at
773–74.

**[1]**   We hold that the Commissioner did not err in finding that Atwater had acquired transferable skills from his employment with the military. A vocational expert testified that Atwater's past employment involved clerical duties, light typing, filing, answering the phone, providing information to callers, and directing people to assistance. First, Atwater contends that such abilities are not "skills." However, Social Security Ruling 82–41 states that "clerical skills" such as "typing, filing, [and] tabulating and posting data in record books ... may be readily transferable to such semiskilled sedentary occupations as typist, clerk-typist and insurance auditing control clerk." *SSR–82–41(2)(d), 1982 WL 31389, at *3 (S.S.A. 1982).* At the least, Atwater's typing, filing, and clerical abilities constitute "skills" under the regulations. Second, Atwater asserts that any knowledge or expertise acquired in the vocational setting of the military is not transferable. But he has not offered any basis in law or fact to suggest that the clerical skills he developed in the military are among those that are "so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining, agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings." *20 C.F.R. § 404.1568(d)(3).* Finally, Atwater argues that vocational experts Manzi and Steinbrenner gave conflicting testimony regarding the transferability of Atwater's skills and that the administrative law judge ("ALJ") failed to resolve that conflict. Atwater, however, fails to identify the conflict. Although Steinbrenner testified that many military jobs do not have an exact counterpart in the Dictionary of Occupational Titles, he did not state that employees cannot acquire any transferable skills through the **\*70** performance of military jobs or that Atwater in particular acquired no transferable skills through his employment with the military.

**\*\*2**   **[2]**   We hold that the Commissioner did not err in evaluating the assessment of Atwater's treating physician, Dr. Srikrishnan. First, Atwater contends that the ALJ should have given greater weight to the physical therapist's findings as adopted by Dr. Srikrishnan because the evaluation conducted by the physical therapist was based on objective medical testing. However, the physical therapist's progress notes only show that Atwater was observed lifting ten pounds; the rest of the physical therapist's findings are of uncertain origin, and it appears that some if not all of them were obtained from Atwater's

own description of his abilities and activities. The ALJ provided Dr. Srikrishnan with an opportunity to clarify the basis of these findings, and Dr. Srikrishnan failed to do so. Second, Atwater argues that Dr. Srikrishnan's functional capacity evaluation was consistent with the record. For substantially the reasons articulated by the district court, we hold that there was substantial evidence from which to find that Dr. Srikrishnan's residual capacity evaluation of Atwater was inconsistent with the record as a whole. Finally, Atwater challenges the ALJ's failure to review explicitly each factor provided in *20 C.F.R. § 404.1527(c).* We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear. *See Halloran v. Barnhart, 362 F.3d 28, 31–32 (2d Cir.2004)* (per curiam) (affirming ALJ opinion which did "not expressly acknowledge the treating physician rule," but where "the substance of the treating physician rule was not traversed.").

**[3]**   We also hold that the Commissioner did not improperly disregard the VA's decision that Atwater was entitled to individual unemployability benefits because he was unable to engage in substantially gainful occupation as a result of service-connected disabilities. A determination made by another agency regarding a claimant's disability is not binding on the Social Security Administration. *20 C.F.R. § 404.1504.* Nonetheless, "it is entitled to some weight and should be considered." *Hankerson v. Harris, 636 F.2d 893, 897 (2d Cir.1980).* Here, it is undisputed that the ALJ considered the VA's decision. Atwater contends that the ALJ entertained an "erroneous notion of how th[e VA's] determination came about." Appellant's Br. 55. However, the ALJ correctly described the VA's decision as based on a letter from Atwater's former employer. The VA listed the letter first under the heading "*REASONS FOR DECISION* " in its decision to grant Atwater benefits.

Finally, we hold that the ALJ did not err in finding that Atwater's testimony regarding his symptoms was not fully credible. For substantially the reasons articulated by the district court, we hold that the ALJ's credibility determination was supported by substantial evidence.

We have considered Atwater's remaining arguments and find them to be without merit. For the reasons stated herein, the judgment of the district court is **AFFIRMED.**

**All Citations**

512 Fed.Appx. 67, 2013 WL 628072

Footnotes

\*      The Honorable Loretta A. Preska, of the United States District Court for the Southern District of New York, sitting by
        designation.

---

**End of Document**                                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

406 Fed.Appx. 541
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Jeanette M. BLISS, Plaintiff–Appellant,

v.

COMMISSIONER OF SOCIAL
SECURITY, Defendant–Appellee.

No. 10–1558.
|
Jan. 19, 2011.

Appeal from a judgment of the United States District
Court for the Northern District of New York (Hurd, J.).
**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED AND DECREED** that the
judgment of the District Court be **AFFIRMED.**

**Attorneys and Law Firms**

Peter W. Antonowicz, Rome, NY, for Appellant.

Joanna Jackson, Special Assistant United States Attorney
(Kristina Cohn, Special Assistant United States Attorney,
Stephen P. Conte, Regional Chief Counsel, Social Security
Administration, of counsel), for Richard S. Hartunian,
United States Attorney for the Northern District of New
York, Albany, NY, for Appellee.

PRESENT: DENNIS JACOBS, Chief Judge, RICHARD
C. WESLEY, DENNY CHIN, Circuit Judges.

*SUMMARY ORDER*

**\*\*1** Plaintiff–Appellant Jeanette Bliss appeals from the
judgment on the pleadings entered by the United States
District Court for the Northern District of New York
(Hurd, J.), affirming the denial of her claim for Social
Security disability benefits by Defendant–Appellee, the
Commissioner of Social Security. We assume the parties'
familiarity with the underlying facts, the procedural
history, and the issues presented for review.

**[1]** Bliss argues that the decision of the Administrative Law
Judge ("ALJ") was not supported by substantial evidence,

and that the assessments by her treating psychiatrist and
social worker should have been controlling.

At the threshold, the assessment by the social worker
is ineligible to receive controlling weight because social
workers do not qualify as "acceptable medical source[s]."
*See* 20 C.F.R. §§ 404.1513(a), 404.1527(a)(2).

"While the opinions of a treating physician deserve special
respect, they need not be given controlling weight where
they are contradicted by other substantial evidence **\*542**
in the record." *Veino v. Barnhart,* 312 F.3d 578, 588 (2d
Cir.2002) (internal citations omitted). The assessment by
the treating psychiatrist was contradicted by: [a] his own
treatment notes, which suggested only mild-to-moderate
psychiatric limitations, and reflected improvement by
Bliss during the course of her treatment; [b] treatment
notes from Bliss's primary physician, an examining
orthopedist, and an examining arthritis specialist; and
[c] the comprehensive review of her medical records
conducted by the non-treating psychologist. The ALJ's
discussion of all these medical opinions shows careful
consideration of the requisite factors for assessing a
treating physician's opinion. *See Halloran v. Barnhart,*
362 F.3d 28, 32 (2d Cir.2004) (per curiam); 20 C.F.R. §
404.1527(d)(2).

The opinions that are inconsistent with the assessment by
Bliss's psychiatrist are sufficient for "a reasonable mind
[to] accept as adequate to support [the ALJ's] conclusion,"
*Halloran,* 362 F.3d at 31; substantial evidence therefore
supports the ALJ's finding.

**[2]** The treatment notes of the orthopedist suggested
a psychological assessment. Bliss argues that it was
incumbent upon the ALJ to commission such an
assessment. Although the ALJ has a "duty to scrupulously
and conscientiously probe into, inquire of, and explore for
all the relevant facts," *Hankerson v. Harris,* 636 F.2d 893,
895 (2d Cir.1980) (internal ellipsis omitted), an additional
psychological examination would have been cumulative
in view of the assessments by Bliss's psychiatrist, social
worker, and a non-treating psychologist. Moreover, the
orthopedist's report pre-dates any of these mental health
examinations.

**[3]** Bliss argues that the ALJ should have alerted the
treating psychiatrist (or her counsel) of the perceived
inconsistencies between the psychiatrist's report and

treatment notes. However, the ALJ need not involve medical sources or claimant's counsel in his deliberative process or assessment of the evidence. *See Veino,* 312 F.3d at 588 ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

**2  [4]** Bliss claims that the ALJ improperly discounted her testimony about her chronic, disabling pain as "not entirely credible." However, "[i]t is the function of the Secretary ... to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983). The ALJ's appraisal of her credibility was sufficiently informed; it was made with the benefit of the entire record, including her extensive testimony during the hearing and treatment notes from multiple physicians (which frequently recorded

her self-reported symptoms, mood, and physical and mental limitations). Bliss underscores that her doctors never questioned the existence or extent of her symptoms, but the lack of such accusations is unsurprising: A doctor's primary endeavor is to provide medical expertise rather than to assess credibility.

We have considered Bliss's remaining arguments on this appeal and have found them to be without merit. For the foregoing reasons, the judgment of the District Court is hereby **AFFIRMED.**

**All Citations**

406 Fed.Appx. 541, 2011 WL 227583

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3879727
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ivette Z. CORDERO, Plaintiff,
v.
Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

No. 11 Civ. 5020(PAE)(HBP).
|
July 29, 2013.

*OPINION & ORDER*

PAUL A. ENGELMAYER, District Judge.

**\*1** Plaintiff Ivette Cordero brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security denying her application for disability benefits under Title II of the Social Security Act. Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Before the Court is the January 2, 2013 Report and Recommendation of Magistrate Judge Henry B. Pitman, recommending that the Court grant the Commissioner's motion and deny Cordero's motion (the "Report"). For the reasons that follow, the Court adopts the Report in full.

## I. Background

On May 23, 2008, Cordero filed an application for disability benefits, alleging that she had been disabled since February 12, 2003. After the Social Security Administration initially denied Cordero's application for benefits, she timely requested and was granted a hearing before an Administrative Law Judge ("ALJ"). On June 30, 2010, the ALJ conducted a hearing, which included testimony from both Cordero and a vocational expert. On September 9, 2010, the ALJ issued a decision finding that Cordero was not disabled and thus was not entitled to benefits. The Appeals Council denied Cordero's request for review, and on July 11, 2011, Cordero commenced this action. Dkt. 2.

On August 16, 2011, Honorable Barbara S. Jones, to whom the case was then assigned, referred the case to Judge Pitman. Dkt. 3. On June 7, 2012, the Commissioner moved for judgment on the pleadings. Dkt. 10. On June 22, 2012, Cordero cross-moved for judgment on the pleadings. Dkt. 12 ("Cordero Br."). On January 2, 2013, Judge Pitman issued the Report. Dkt. 15. On January 23, 2013, Cordero filed objections to the Report. Dkt. 17 ("Cordero Obj."). On February 12, 2013, the Commissioner filed a response to Cordero's objections. Dkt. 18. On May 29, 2013, the case was reassigned to this Court.

## II. The Report

Judge Pitman's 63–page Report sets forth Cordero's personal and medical background in exhaustive detail. *See* Report 3–28. To summarize, Cordero worked as a nurse's aide for 23 years and a mail carrier for nine years before ceasing work in 2003. Beginning in 2001, Cordero made frequent visits to physicians regarding various health issues, including lower back pain, carpal tunnel syndrome, heart palpitations, diabetes, and depression. In October 2003, she ceased her employment with the United States Postal Service due to "heart fibrillations." She continued to be treated by various physicians from the time of her application for benefits in 2008, and up to the time of her 2010 hearing before the ALJ. Cordero does not object to the Report's recitation of the facts, and the Court adopts that recitation in full.

The Report also sets forth the proceedings before the ALJ in great detail. *See* Report 28–34. Cordero testified about her work history and her physical and psychological symptoms. *See id.* at 28–31. The ALJ also heard from Salvatore Garozzo, a vocational expert who testified as to Cordero's ability to perform different occupations, ultimately opining that Cordero could perform three suitable jobs existing in the economy in sufficient numbers: housekeeper, assembly worker, and electronics assembly worker. *Id.* at 31–33.

**\*2** The Report then recounted the ALJ's decision. After finding that Cordero met the disability insured status requirement through December 31, 2008 (her last insured date), the ALJ conducted the five-step analysis required in evaluating disability claims. Report 41–47; *see Balsamo v. Chater,* 142 F.3d 75, 79–80 (2d Cir.1998) (setting forth five-step analysis). Relevant here, the ALJ found at step four of the analysis—which involves an

inquiry into the claimant's residual functional capacity, *i.e.,* "the most [the claimant] can still do despite [her] limitations," *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1)—that Cordero had the residual functional capacity to perform "light work ... that did not entail greater than occasional interaction with members of the public." Report 42 (quoting Transcript of ALJ Decision ("Tr.") at 29). The ALJ determined that Cordero could lift and carry 20 pounds occasionally and 10 pounds frequently, and could stand or walk for a total of six hours during an eight-hour work day. *Id.* The ALJ also considered Cordero's mental conditions, concluding that although the evidence showed "intermittent manifestations of a depressive disorder, an anxiety disorder, and alcohol abuse," these conditions "resulted in no limitations of [Cordero's] activities of daily living; a moderate restriction in terms of social functioning; and a mild limitation for maintaining concentration, persistence and pace." *Id.* (quoting Tr. 29). Thus, "[t]he evidence simply [did] not corroborate allegations of mental compromise that would have been preclusive of any work-related activity." *Id.* (quoting Tr. 30).

At step five—which, if the claimant cannot perform her past work, involves inquiring into what other work the claimant can perform, *see Balsamo,* 142 F.3d at 80—the ALJ found that based on Cordero's age, education, work experience, and residual functional capacity, Cordero could perform at least three jobs that existed in significant numbers in the national economy. Report 46. Thus, the ALJ concluded, Cordero was not disabled under the Social Security Act.

After summarizing Cordero's arguments, *see* Report 47–49, the Report analyzed the ALJ's decision. The Report found that the ALJ had applied the correct legal standards, and that the ALJ's decision was supported by substantial evidence. *Id.* at 49–61.

## III. Discussion

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Burgess v. Astrue,* 537 F.3d 117, 127 (2d Cir.2008); *see* 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess,* 537 F.3d at 127 (citation omitted).

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C). Where a party timely objects to a report and recommendation, the district court reviews those portions of the report to which the party objected *de novo. Id.* To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *Carlson v. Dep't of Justice,* No. 10 Civ. 5149(PAE)(KNF), 2012 WL 928124, at *1 (S.D.N.Y. Mar. 19, 2012) (citation omitted); *see also Wilds v. United Parcel Serv.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003). "[I]t is well-settled that when the objections simply reiterate previous arguments or make only conclusory statements, the Court should review the report for clear error." *Dickerson v. Conway,* No. 08 Civ. 8024(PAE)(FM), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *accord Kirk v. Burge,* 646 F.Supp.2d 534, 538 (S.D.N.Y.2009) (collecting cases). That is, "[r]eviewing courts should review a report and recommendation for clear error where objections are merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition." *Ortiz v. Barkley,* 558 F.Supp.2d 444, 451 (S.D.N.Y.2008).

**\*3** Cordero's objections, which were submitted by counsel, are perfunctory. In a brief document that lacks citation to a single legal authority, Cordero rehashes her previous arguments in vague and conclusory terms. Accordingly, the Court reviews the Report for clear error. It finds none: Judge Pitman's Report is detailed, balanced, and persuasive.

To the extent any specific objections can be discerned from Cordero's submission that would trigger *de novo* review, they are exceedingly unpersuasive. First, Cordero appears to argue that the ALJ erred in his determination that Cordero could perform certain jobs, by not giving sufficient weight to testimony about Cordero's mental health problems that would limit her ability to function on a daily basis. *See* Cordero Obj. 1–4. But this is precisely what she argued previously. *See* Cordero Br. 16. And, in any event, as the Report explains, *see* Report 52–55, the ALJ made his findings as to Cordero's medical condition based primarily on his consideration of the testimony of Dr. Heprin and Dr. Guidici. It was not error to decline to give "significant probative weight," *see* Tr.

29, to the opinion of social worker Marie Brown: An ALJ is not required to give controlling weight to a social worker's opinion; although he is not entitled to disregard it altogether, he may use his discretion to determine the appropriate weight. *Genovese v. Astrue,* No. 11–CV–02054 (KAM), 2012 WL 4960355, at *15 (E.D.N.Y. Oct. 17, 2012). Nor was it error not to grant "significant probative weight" to Dr. Gapay's assessment of Cordero's inability to work, as it was vague and embraced the ultimate issue to be decided by the ALJ. *See* 20 C.F.R. § 404.1527(d)(1). Cordero argues that if Dr. Gapay's testimony "was too vague for the ALJ, he should have contacted the doctor for a clarification." Cordero Obj. 5. That is incorrect. *See Micheli v. Astrue,* 501 F. App'x 26, 29 (2d Cir.2012) (summary order) ("Micheli argues that to the extent Dr. Tracy's opinion was unsupported or internally inconsistent, the ALJ was required to re-contact Dr. Tracy for clarification. This argument is without merit. The mere fact that medical evidence is conflicting or internally inconsistent does not mean that an ALJ is required to re-contact a treating physician.").

Second, Cordero appears to object to the Report's observation, *see* Report 51, that the ALJ's determination that Cordero could perform light work was consistent with a prior residual functional capacity assessment made by disability examiner Crumb, whom, Cordero notes, is "not a doctor and never even saw the plaintiff." Cordero Obj. 2. Cordero does not explain why the Report's passing reference to the consistency between these two determinations undermines the ALJ's determination. And, in any event, there is no indication that the Report relied on this observation in finding the ALJ's determination to be supported by substantial evidence.

**\*4** Finally, Cordero objects to the ALJ's failure to account for Cordero's work history in assessing her credibility. Cordero Obj. 5–6. But this, too, was previously argued by Cordero, *see* Cordero Br. 8 ("Plaintiffs who have good work histories should be given credence when they describe why they cannot work."), to no avail. As the Report noted, *see* Report 58, "work history is just one of many factors that the ALJ is instructed to consider in weighing the credibility of claimant testimony." *Schaal v. Apfel,* 134 F.3d 496, 502 (2d Cir.1998); *see Wavercak v. Astrue,* 420 F. App'x 91, 94 (2d Cir.2011) (summary order) ("That Wavercak's good work history was not specifically referenced in the ALJ's decision does not undermine

the credibility assessment, given the substantial evidence supporting the ALJ's determination.").

Accordingly, even upon *de novo* review of Cordero's conclusory objections, the Court fully adopts the Report. The ALJ's determination that Cordero was not disabled under the Social Security Act is supported by substantial evidence.

## CONCLUSION

For the reasons stated herein, the Court adopts the Report in full. The Commissioner's motion is granted; Cordero's motion is denied. The Clerk of Court is directed to terminate the motions pending at docket numbers 10 and 12, and to close this case.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

PITMAN, United States Magistrate Judge.

TO THE HONORABLE BARBARA S. JONES, United States District Judge,

### I. *Introduction*
Plaintiff, Ivette Cordero, brings this action pursuant to section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Act.

Both Cordero and the Commissioner have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docket Items 10 and 12). For the reasons set forth below, I respectfully recommend that the Commissioner's motion be granted and that Cordero's motion be denied.

### II. *Background*

#### A. *Procedural Background*
Plaintiff filed an application for disability benefits on May 23, 2008, alleging she had been disabled since February

12, 2003 (Tr. [1] 178–84, 192–94, 195–202). Plaintiff alleged she was disabled due to lower back pain, carpal tunnel syndrome, heart palpitations, diabetes and depression (Tr. 94). The Social Security Administration denied plaintiff's application for benefits on August 15, 2008, finding that she was not disabled (Tr. 91–99).

Plaintiff timely requested (Tr. 100) and was granted a hearing before an Administrative Law Judge ("ALJ") (Tr. 101–02). The ALJ, Brian W. Lemoine, conducted a hearing on June 30, 2010 at which both plaintiff and a vocational expert ("VE") testified (Tr. 38–83). In a decision dated September 9, 2010, the ALJ found that plaintiff was not disabled and was not, therefore, entitled to benefits (Tr. 20–37). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on May 20, 2011 (Tr. 1–4).

 **\*5** Plaintiff commenced this action challenging the Commissioner's decision on July 11, 2011 (Docket Item 2). Defendant argues that the Commissioner's decision was supported by substantial evidence and should be upheld (Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, dated May 9, 2012 (Docket Item 13) ("Def.'s Mem."), at 2; Reply Memorandum of Law in Support of the Defendant's Motion for Judgment on the Pleadings, dated June 22, 2012 (Docket Item 13) ("Def.'s Reply Mem."), at 2). Though she provides few specifics, plaintiff argues that she did not have a full and fair hearing, and that the Commissioner's decision was not supported by substantial evidence and was contrary to the law (Plaintiff's Memorandum of Law in Support of His [*sic* ] Cross Motion for Judgment on the Pleadings, dated June 6, 2012 (Docket Item 11) ("Pl.'s Mem."), at 1–2).

## B. *Plaintiff's Social Background*
Plaintiff was born on August 10, 1954 in Puerto Rico (Tr. 43–44, 192). When she was nine years old, she moved to the mainland United States and attended school through the eighth grade (Tr. 44). When plaintiff was 21, she obtained a General Equivalency Diploma ("GED") and attended college for several months (Tr. 44). Prior to ceasing work in 2003, plaintiff had worked as a nurse's aide for 23 years and as a mail carrier for nine years (Tr. 45–46). At the time plaintiff applied for disability benefits in 2008, she lived with her husband and minor son (Tr. 55).

## C. *Plaintiff's Medical Background*

### 1. *Evidence Prior to Plaintiff's Last Insured Date*
On July 5, 2001, plaintiff met with Dr. Janeth Montoya at Middletown Medical, P.C. ("Middletown Medical"), complaining that she had been suffering from low back pain for two days (Tr. 320) An x-ray taken of plaintiff's lumbar spine was "negative," and Dr. Montoya diagnosed plaintiff as suffering from a "lumbar strain" (Tr. 320).

Plaintiff returned to Middletown Medical on July 6, 2001, and met with Dr. Alexander Gapay, complaining of heart palpitations, depression, and difficulty sleeping, among other things (Tr. 321). Dr. Gapay noted that plaintiff "recently started working at the post office and she seems quite anxious with her work and feels like she is overwhelmed" (Tr. 321).

On August 21, 2001, Dr. Gapay noted at a follow-up appointment that plaintiff's "back pain ha[d] improved" and that "her anxiety and depression [were] quite better at this time with the medications" (Tr. 323).

On February 13, 2003, plaintiff saw Dr. Carol P. Taylor at Middletown Medical, complaining of pain and bruising in her left hip due to a fall on ice she had suffered the previous day (Tr. 341). Plaintiff's past medical history showed "[a]rthritis of the lower back" (Tr. 341). No "depression, sadness, crying, difficulty sleeping or loneliness" were reported, nor was plaintiff experiencing any "chest pain, palpitations, syncope [2] or chest pressure" (Tr. 341–42). Dr. Taylor noted "very minimal bruising over the lateral aspect of the left hip," and "full range of motion of flexion and extension at the hip" (Tr. 343). An x-ray of plaintiff's lumbosacral spine showed no fractures or disc herniations (Tr. 343). Dr. Taylor diagnosed "status post fall rule out left hip contusion," and prescribed Celebrex and Robaxin (Tr. 343). At a follow-up appointment on February 18, 2003, Dr. Taylor noted that plaintiff's pain was "improving" and continued her on Celebrex and Robaxin (Tr. 344).

 **\*6** Plaintiff again visited Middletown Medical on February 27, 2003, complaining of chest tightness, and met with Amanda Lahar, a physician's assistant (Tr. 345). According to plaintiff, she had been hospitalized in the Horton Medical Center from February 20

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   4

through February 26 for atrial fibrillation [3] and syncope, and had undergone a cardioversion [4] procedure (Tr. 345). An electrocardiogram ("EKG") was normal, and no psychiatric symptoms were reported (Tr. 346–47). Plaintiff was diagnosed with chest pain, status cardioversion for atrial fibrillation, and shoulder pain "probably muskuloskeletal" from the electric shocks used in the cardioversion procedure (Tr. 347). Plaintiff's dosage of Celebrex was increased, she was advised to make a follow-up appointment with her cardiologist and her primary care physician, and she was scheduled for a nuclear stress test (Tr 347–48).

On March 3, 2003, plaintiff saw Dr. Gapay, complaining of "[p]ersistent and recurrent pain in the chest" (Tr. 349). An EKG showed "no significant change, except for brady[cardia] [5] " (Tr. 349). Plaintiff was again diagnosed with atrial fibrillation and syncope (Tr. 350). Dr. Gapay started plaintiff on Nexium, and recommended that plaintiff follow up with her cardiologist, Dr. Bonnie Seecharran (Tr. 349).

Plaintiff met with Dr. Seecharran on March 4, 2003 (Tr. 351). Plaintiff complained of "chest discomfort, which is graded 8/10 in severity radiating to the left arm also associated with numbness of the feet and difficulty breathing" (Tr. 351). Dr. Seecharran reported than an EKG "showed sinus bradycardia [6] at 48 beats per minute, [and] normal PR, QRS, and QT interval[s] [7] " (Tr. 352). She diagnosed plaintiff with paroxysmal [8] atrial fibrillation (Tr. 352). She recommended that plaintiff have her international normalized ratio ("INR") [9] measured, start taking Prevacid, undergo stress testing, and see a rheumatologist (Tr. 352).

On March 10, 2003, plaintiff met with Dr. Gerald Leff, a rheumatologist at Middletown Medical (Tr. 353). Dr. Leff reported that plaintiff had "limited internal rotation of both shoulders," "some pain on external rotation of the right hip," a left hip that "was within normal limits," and "some grinding crepitus [10] bilaterally" in her knees (Tr. 354). Plaintiff was diagnosed with bilateral bursitis versus tendinitis [11] of the shoulder, which was more pronounced in her left shoulder, (2) osteoarthritis and (3) a recent history of paroxysmal atrial fibrillation (Tr. 355). Dr. Leff referred plaintiff for physical therapy and continued her on her medications (Tr. 355).

On March 14, 2003, plaintiff saw Dr. Gapay for a cardiac follow-up (Tr. 356). Dr. Gapay noted "coldness in both hands, question of possible Raynaud's," and continued plaintiff on her medications in anticipation of the results of her stress test, which was conducted that same day by Dr. Seecharran (Tr. 356). Later that day, plaintiff complained to Dr. Gapay of pain in her left hip and left shoulder (Tr. 358). She reported that the pain in her hip worsened with walking, and was aggravated by the stress test (Tr. 358). Dr. Gapay noted "pain tenderness [ ] in the left shoulder with flexion and extension" as well as "pain tenderness" in plaintiff's hips (Tr. 358). He diagnosed plaintiff with "probably a trochanteric [12] bursitis" and recommended physical therapy and that plaintiff avoid Tylenol (Tr. 358–59). Dr. Gapay also stated that plaintiff was unable to resume work at that time because of her condition but that he would reassess her in two weeks" (Tr. 359).

**\*7** On March 20, 2003, plaintiff had a follow-up appointment with Dr. Seecharran (Tr. 360). The results of the March 14, 2003 stress test showed that plaintiff had exercised for 8 minutes and achieved a peak heart rate of 149 beats per minute (Tr. 360). Dr. Seecharan reported that the "SPECT [13] scan was normal with an ejection fraction of 68% on the gated SPECT" (Tr. 360). Under "Plan of Care," Dr. Seecharan wrote:

> [Plaintiff] still remains in sinus rhythm today and I see that her INR was 1.78 and therefore her primary care physician increased the Coumadin to 8 mg. She obviously needs to have this repeated INR in 4–5 days. She is going on a cruise to Bahamas and she will seek out facility where this can be checked.
> (Tr. 360).

On April 7, 2003, plaintiff had a follow-up appointment with Dr. Leff (Tr. 361). Plaintiff complained of "[m]ultiple joint pains[,] particularly the shoulders" (Tr. 361). Dr. Leff noted "decreased full abduction [14] of the shoulders bilaterally" (Tr. 361). He diagnosed plaintiff with (1) bilateral tendinitis with osteoarthritis of the shoulders and the acromioclavicular [15] joints, (2) osteoarthritis, and (3) recent history of paroxysmal atrial fibrillation (Tr. 361–62). Dr. Leff administered an injection of "60 mg Depo–Medrol into the right shoulder with half cc of Lidocaine" and advised plaintiff to follow up in one week (Tr. 362). One week later, on April 14, 2003, Dr. Leff reported

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

that plaintiff had "done remarkably well and almost the entire pain ha[d] gone away" (Tr. 363). He further noted "excellent range of motion in the right shoulder," and that "[t]endonitis of the shoulder[] had been resolved with intraarticular injections to the right shoulder" (Tr. 363).

On April 15, 2003, at a follow-up with Dr. Gapay regarding her hip pains, plaintiff reported "to be feeling much better" and that she wanted to try to go back to work with the Postal Service (Tr. 365). Dr. Gapay diagnosed (1) a history of a left hip contusion, (2) left shoulder tendinitis "probably from cardioversion," and (3) paroxysmal atrial fibrillation (Tr. 365). He recommended that plaintiff "return to regular duty April 21, 2003" (Tr. 365).

Plaintiff met with Dr. Seecharran on July 10, 2003 for a cardiology follow-up (Tr. 367). Dr. Seecharran noted that plaintiff reported that "about once a month, she has very brief episodes of palpitations lasting a couple of seconds" (Tr. 367). She recommended an event monitor recorder and an increase of plaintiff's dosage of Cartia XL (Tr. 367).

Plaintiff again met with Dr. Seecharran on July 22, 2003, complaining of fatigue, "decreasing exercise tolerance," and "discomfort in the right chest" (Tr. 369). An EKG "revealed atrial fibrillation with a controlled ventricular rate response and QT interval of 400 milliseconds" (Tr. 369). Dr. Seecharran proposed the following plan of care: (1) admission to the progressive care unit, (2) telemetry, (3) intravenous Heparin therapy, [16] (4) Sotalol therapy, [17] and (5) cardioversion (Tr. 369).

 *8  On July 31, 2003, plaintiff met with Dr. Gapay, complaining of fatigue (Tr. 371). Dr. Gapay made the following observations:

> She has no anginal symptoms but she has fatigue and weakness. She has noted problem with memory, recent memory and also cognitive problems and difficulty of spelling certain words, which she knew very well in the past. This seems to have started since initial problem back in February but she noted this more when she was helping her son do ... homework.

(Tr. 371). Plaintiff was diagnosed with (1) status post cardioversion, atrial fibrillation, (2) blurriness of vision with memory loss, (3) cognitive dysfunction, (4) hypomagnesemia [18] and (5) depression (Tr. 372–73). Dr. Gapay also recommended that plaintiff seek treatment from a neurologist (Tr. 373).

On August 4, 2003, plaintiff met with Dr. Seecharran for a cardiology follow-up (Tr. 374). Plaintiff reported feeling fatigued, but that there were "no episodes of palpitation, sycope, and pre-syncope" (Tr. 374). Dr. Seecharran noted that "an EKG today revealed a sinus rhythm of 44 beats per minute, normal PR, QRS, QT intervals at 455 milliseconds" (Tr. 374). She diagnosed plaintiff with paroxysmal atrial fibrillation and recommended that she obtain measurements of prothrombin time [19] and magnesium, and also undergo a basic metabolic panel test (Tr. 374). Dr. Seecharran also recommended ceasing Cartia (Tr. 374).

On August 7, 2003, plaintiff again visited Dr. Seecharran, complaining of "feeling tired," but "den[ying] any chest pain, shortness of breath, or decreased exercise tolerance" (Tr. 376). Dr. Seecharran noted that plaintiff had gone "to see another cardiologist in Manhattan who recommended not pursuing non-pharmacological modalities for treatment of her atrial fibrillation" (Tr. 376). The other cardiologist also "recommended stopping the Sotalol therapy and commenced [plaintiff] on digoxin therapy [20]" (Tr. 376). In her plan of care, Dr. Seecharran recommended "possibly restarting the Sotalol therapy," and that plaintiff have her INR checked (Tr. 376).

On August 14, 2003, plaintiff had another general follow-up examination with Dr. Gapay (Tr. 377). Dr. Gapay stated the following with respect to plaintiff's "history":

> [Plaintiff] has been unable to return to work because she has been unable to perform the duties, which is mail woman post office worker. She gave me a list of things which she does. She delivers mail, sometimes requires walking of up to 14 miles a day and she carries about 16 pounds. She does quite a bit of work reaching over the shoulder twisting, turning,

Cordero v. Astrue, Not Reported in F.Supp.2d (2013)
2013 WL 3879727
Case 7:14-cv-09733-VB   Document 25   Filed 07/21/16   Page 40 of 88

bending, stooping and she does use when separating and sorting individual mail. She does get about 1000–2000 mail a day and she works about six days a week. She claims the extreme heat and extreme cold may have been triggering and have triggered the attacks. She has no chest pain or respiratory distress at this time, but she is feeling weak.

**\*9** (Tr. 377). Dr. Gapay further noted that plaintiff had "[s]ome pain and tenderness in the right shoulder with pain on flexion, extension, and [a]bduction" (Tr. 378). Dr. Gapay diagnosed plaintiff with paroxysmal atrial fibrillation, recent cardioversion, and shoulder impingement (Tr. 378). Dr. Gapay observed that plaintiff had "been unable to return to work because surprisingly she has not get into atrial fibrillation again [*sic* ]. We are awaiting from the cardiologist for an opinion in this area" (Tr. 378).

On October 20, 2003, plaintiff met with Dr. Sami F. Yasin, a doctor of internal medicine and infectious diseases (Tr. 317). Dr. Yasin stated that plaintiff had been "experiencing aches and pains as well as fatigue" for about one year (Tr. 317). Plaintiff reported to Dr. Yasin that "[c]urrently, she [was] working full-time" (Tr. 317). Dr. Yasin noted "chronic back pain" and that plaintiff "has a difficult time remembering common dates" (Tr. 317). A cardiac examination conducted by Dr. Yasin "disclosed no murmurs, rubs or gallops" and a "limited" neurological examination "was within normal limits" (Tr. 318).

A Holter Monitor [21] Report dated November 2, 2005, and signed by Dr. Seecharran, noted the following findings based on 23 hours and 32 minutes of observation:

1. The underlying rhythm was normal sinus.

2. Minimum heart rate 43 beats per minute at 5:28 am. Maximum heart rate 122 beats per minute at 1:16 pm.

3. Occasional [premature ventricular contractions] were seen.

4. Frequent supraventricular ectopic [22] activities was seen with brief atrial runs and brief episodes of paroxysmal atrial fibrillation, episode at 1:16 pm lasting for 19 beats at 119 beats per minute.

5. No pauses exceeding 2.0 seconds.

6. The patient's event at 4:47 pm corresponded to sinus rhythm at 68 beats per minute. The patient's event at 1:17 pm corresponded to an atrial run.

(Tr. 250). Dr. Seecharran also performed an echocardiogram on plaintiff the next day, on November 3, 2005, after she complained of chest pain (Tr. 251). The test showed "[n]ormal left ventricular size and function" as well as "[t]rivial-to-mild mitral regurgitation" (Tr. 251).
On August 6, 2007, plaintiff went to the emergency room at Orange Regional Medical Center, complaining of epigastric pain and palpitations (Tr. 392). Plaintiff was admitted to the telemetry unit (Tr. 392). Several tests were conducted, including serial cardiac enzymes test, an EKG, and a stress test (Tr. 392). Plaintiff was discharged from the hospital on August 7, 2007, and advised follow up with her primary care physician and cardiologist and additionally to consult a gastroenterologist (Tr. 392).

A note from Middletown Medical, dated March 3, 2008, reads, in pertinent part, as follows:

Please be advised that the above named patient was seen in our office today at Middletown Medical P.C. My patient is currently not able to work. The above named patient cannot stand or sit for long periods of time. [Plaintiff has] been diagnosed with a series of medical problems. This patient has Pinched nerves in her back as well as Atrial Fibrillation, Depression [and] Hypertension.

**\*10** (Tr. 443). The note is signed, but the signature is illegible (Tr. 443).

On July 16, 2008, plaintiff met with Dr. Leslie Helprin, a psychologist at Industrial Medicine Associates, P.C., for a consultative psychiatric evaluation (Tr. 401–05). Dr. Helprin noted that plaintiff had driven herself to the

appointment, a distance of "about 30 miles" (Tr. 401). Regarding plaintiff's current functioning, Dr. Helprin wrote that plaintiff "reports dysphoric [ 23 ] moods and crying spells and that she is sensitive to everything .... She states that she is bothered by noise and reports screaming which she said her spouse states is daily .... Cognitively, she reports short-term memory difficulties and trouble completing tasks" (Tr. 402). Plaintiff also stated that she would drink "three to four drinks about once weekly 'to get [herself] in the mood to clean' " (Tr. 402). Dr. Helprin noted that during the evaluation, plaintiff was cooperative, appropriately dressed, and spoke fluently and coherently (Tr. 402–03). Plaintiff's affect was "dysphoric and anxious," and her mood was "anxious and dysthymic [24] with crying" (Tr. 403). Plaintiff told Dr. Helprin that she was "able to dress, bathe, and groom herself, cook and prepare foods, clean and launder," and also that she was able to drive, albeit with "difficulties sitting and standing long and lifting" (Tr. 403). Dr. Helprin noted that plaintiff did not use public transportation because she would get anxious in crowds, and that plaintiff reported that she had one friend with whom she socialized (Tr. 403). (Tr. 403). Among her hobbies and interests, plaintiff indicated "watching TV, listening to music, and walking" (Tr. 404). It was also noted that plaintiff had recently traveled to Texas by herself to visit family (Tr. 404). Dr. Helprin made the following conclusions about plaintiff's vocational capabilities:

She is able to follow and understand simple directions and instructions and perform simple rote tasks and some complex tasks independently, maintain attention and concentration for simple tasks, maintain a regular schedule, make appropriate simple decisions, relate adequately with others, but would have difficulty dealing appropriately with stress of an independent job in a [ ] competitive workplace due to her significant depression.

(Tr. 404). Dr. Helprin diagnosed plaintiff as follows: Axis I—"Major depressive disorder, moderate, chronic. Panic disorder with agoraphobia. Alcohol abuse."; Axis II—"Rule out borderline intellectual functioning"; Axis III—"Atrial fibrillation. Arthritis. Pinched nerves. Hypertension. Diabetes," and recommended that she continue psychiatric treatment and enter an alcohol treatment program (Tr. 404).

Also on July 16, 2008, Dr. Stephen Rocker conducted a consultative internal medicine examination of plaintiff (Tr. 406–10). Plaintiff reported that she was "independent in cooking, cleaning, laundry, and shopping" (Tr. 407). Her blood pressure was 140/98 (Tr. 407). Regarding plaintiff's general appearance, gait, and station, Dr. Rocker observed:

**\*11** The claimant is an overweight female in no distress. Gait normal. Can walk on heels and toes without difficulty. Squat subjectively 50% of full. Stance normal. Uses no assistive devices. Needs no help changing for exam or getting on and off exam table. Able to rise from chair without difficulty.

(Tr. 407–08). Under the subheading "musculoskeletal," Dr. Rocker made the following findings:

Cervical spine shows full flexion, extension, lateral flexion, bilaterally, and full rotary movement bilaterally. No scoliosis, [ 25 ] kyphosis, [ [26] or abnormality in thoracic spine. Lumbar spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. [Straight leg raise] in a sitting and lying position elicits posterior thigh pain bilaterally at 30 degrees. Full [range of motion] of shoulders, elbows, forearms, and wrists bilaterally. Full [range of motion] of hips, knees, and ankles bilaterally. Strength 5/5 in upper and lower extremities. No evident subluxations, [ 27 ] contractures, [ 28 ] ankylosis, [ 29 ] or thickening. Joints stable and nontender. No redness, heat, swelling, or effusion.

(Tr. 408). Dr. Rocker diagnosed plaintiff as follows: "1. Low back pain; arthralgia [30] wrists and elbows. 2. Hypertension. 3. History of diabetes mellitus (type 2). 4. History of cardiac arrhythmia (atrial fibrillation) well controlled currently. 5. Moderate obesity. 6. Depression,

as per history" (Tr. 409). Additionally, Dr. Rocker remarked: "No limitation for hearing speaking, sitting, or handling. As per symptoms, mild limitation for standing, walking, lifting, and carrying" (Tr. 409).

On July 31, 2008, T. Harding, a state psychologist, completed a Psychiatric Review Technique form, indicating that plaintiff suffered from "major depression," had reported "borderline intellectual functioning," a "panic [disorder] with agoraphobia," and a history of "alcohol abuse" (Tr. 412–20). Regarding plaintiff's functional limitations, the following degrees of limitation were noted: "1. Restriction on Activities of Daily Living"—Mild; "2. Difficulties in Maintaining Social Functioning"—Mild; "3. Difficulties in Maintaining Concentration, Persistence, or Pace"—Moderate; "4. Repeated Episodes of Deterioration. Each of extended duration"—Never (Tr. 422). Dr. Harding also completed a Mental Residual Functional Capacity Assessment form, in which he concluded that "[b]ased on the information in the file, the [plaintiff] has a combination of impairments which do not meet or equal the Listings" (Tr. 428).

On August 12, 2008, plaintiff met with Dr. Stanley C. Giudici, a psychiatrist (Tr. 585). Plaintiff had initially met with Dr. Giudici on July 15, 2008, although there seems to be no separate documentation memorializing this visit (Tr. 585). After a decrease in her dosage of Zoloft and an increase in her dosage of Cymbalta, plaintiff reported "less tearfulness" and that "others have noticed improvement in her" (Tr. 585). However, plaintiff still described her mood in the two weeks prior to the August 12 appointment as "horrible" (Tr. 585). Dr. Giudici listed plaintiff's major sources of stress as "can't find work, finances, pain" (Tr. 585). He further described plaintiff as "pleasant and cooperative," but with speech of "normal volume and tone mixed with sobs" and a tearful affect (Tr. 587). Dr. Giudici diagnosed plaintiff as follows: Axis I—"Major Depressive Disorder, Single Episode, Severe; Generalized Anxiety Disorder; Alcohol Dependence."; Axis II—"Defer."; Axis III—and "Lumbar Disc Disease" (Tr. 587). Dr. Giudici continued plaintiff on Cymbalta at the then-present dosage and scheduled a follow-up six weeks later (Tr. 588).

**\*12** On August 14, 2008, M. Crumb, a disability examiner, completed a Physical Residual Functional Capacity Assessment form (Tr. 430–35). Crumb determined that plaintiff could occasionally lift/carry 20

pounds, could frequently lift/carry 10 pounds, could stand/walk for about 6 hours in an 8–hour workday, and could sit for about 6 hours in an 8–hour work day (Tr. 431). Based on these findings, Crumb concluded that plaintiff was "able to perform light work" (Tr. 434).

On September 23, 2008, plaintiff again saw Dr. Giudici (Tr. 589). Plaintiff reported that she was "doing well with Cymbalta" and that she had noticed "a greater than 50% improvement in mood" since starting the drug (Tr. 589). Dr. Giudici stated that plaintiff's depression was in remission (Tr. 592).

On November 18, 2008, plaintiff went to the emergency room at Orange Regional Medical Center, complaining of heart palpitations, and was admitted for telemetry monitoring (Tr. 461). After a cardiology consultation, plaintiff was diagnosed with "[p]alpitations most likely paroxysmal atrial fibrillation," hypertension, and hyperkalemia [31] (Tr. 464). An echocardiogram revealed a "normal left ventricular size and contractility pattern," "mild tricuspid regurgitation without significant pulmonary hypertension," and "trivial mitral and pulmonary insufficiencies" (Tr. 488). Plaintiff was discharged on November 20, 2008 (Tr. 472). A cardiac catheterization of plaintiff conducted on November 26, 2008 was normal (Tr. 613).

2. *Medical Evidence After Plaintiff's Last Insured Date*
On January 13, 2009, plaintiff again saw Dr. Giudici (Tr. 593). Plaintiff reported being "easily frustrated with fighting on near [*sic* ] 'screaming' on near daily basis" (Tr. 593). However, Dr. Guidici again noted that plaintiff's depression was in remission, and had been since September 23, 2008 (Tr. 596).

On April 30, 2009, plaintiff went to Middletown Medical, complaining of left lateral knee pain (Tr. 607). A left knee x-ray showed "mild osteoarthritic changes" (Tr. 609). An MRI revealed a "complex tear of the posterior horn of [plaintiff's] lateral meniscus, [32] " a tear of the "posterior horn of [plaintiff's] medial meniscus with probable extension to the inferior articular surface," and osteonecrosis [33] in plaintiff's lateral tibial plateau, and to a lesser extent, in plaintiff's medial tibial plateau (Tr. 612). Upon conducting a pre-operative evaluation on June 2, 2009 for knee surgery, Dr. Gapay determined that plaintiff was "low risk" (Tr. 616).

February 24, 2010, plaintiff saw Dr. Gapay complaining of "throat discomfort and multiple medical problems, [including] chronic low back pain" (Tr. 638). Addressing plaintiff's medical history, Dr. Gapay stated that plaintiff's "[c]hart was reviewed and the patient has not been able to work since 2003 because of multiple medical problems, including low back pain, [and] paroxysmal atrial fibrillation" (Tr. 638). After examining plaintiff, Dr. Gapay noted "pain and tenderness in the lumbosacral spine," and that plaintiff was "able to flex at the hip about almost 50% [less] than normal and she is able to heeltoe walk, but accompanied by pain" (Tr. 640). Plaintiff was diagnosed with (1) hypertension, (2) paroxymal atrial fibrillation, which was "pretty well controlled ... with medications," (3) chronic lower back pain with radiculopathy of lower extremities, (4) a history of [gastroesophageal reflux disease] symptoms, (5) "nocturia [34] probably overactive bladder," (6) disrupted sleep, "rule out sleep disorder," and (7) coronary and peripheral artery disease (Tr. 640). Dr. Gapay continued plaintiff on her then-current medications and referred her to physical therapy (Tr. 640). He made the following additional observation: "The patient has not been able to work since 2003. She is a poor candidate as far as returning to work and her capacity is limited because she continue[s] to have pain" (Tr. 640).

*13 On March 1, 2010, plaintiff began to seek treatment from Marie Brown, a licensed mental health counselor (Tr. 580). In a Mental Impairment Questionnaire completed by Brown around June 26, 2010, Brown reported that plaintiff had a current global assessment of functioning ("GAF") [35] score of 58 (Tr. 576). Brown also checked boxes indicating that plaintiff had poor memory, appetite disturbance with weight change, sleep disturbance, emotional [lability], social withdrawal or isolation, decreased energy, feelings of guilt/worthlessness, difficulty thinking or concentrating, generalized persistent anxiety, and irritability (Tr. 576–77). According to Brown, plaintiff's back pain was "daily," and her anxiety and depression "overwhelming" (Tr. 579). Brown thus concluded that plaintiff had "[d]eficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner" of a constant degree (Tr. 579).

On June 1, 2010, plaintiff had a follow-up appointment with Dr. Gapay regarding "multiple medical problems

and results of blood work" (Tr. 644). Plaintiff reported "chronic back pain and fatigue as well as carpal tunnel syndrome" (Tr. 644). Regarding plaintiff's other symptoms, Dr. Gapay advised plaintiff to continue her medication and "to keep active as much as possible" (Tr. 646).

### 3. Plaintiff's Medications
When plaintiff applied for social security disability benefits on May 23, 2008, she reported that she was taking Tikosyn for her atrial fibrillation, Cymbalta for her depression and anxiety, Warfarin Sodium as a blood thinner, Simvastatin for her diabetes, Fentanyl for her lower back pain, and Extra Strength Tylenol PM and Aleve for her lower back pain and arthritis (Tr. 232).

### D. Proceedings Before the ALJ
Plaintiff's hearing was conducted on June 30, 2010 before ALJ Brian W. Lemoine (Tr. 38). Plaintiff first testified to the following facts.

Plaintiff stated that she was employed as mail carrier for nine years by the United States Postal Service ("USPS"), ending in October 2003 due to "heart fibrillations" (Tr. 45, 46, 186, 214, 234). As a mail carrier, plaintiff testified that she walked extensively, as much as 14 miles in a day, while carrying "a lot of baggage" (Tr. 45). The job, according to plaintiff, entailed "a lot of stress" (Tr. 45). Plaintiff stated that prior to being employed by USPS, she had worked at a hospital as a nurse's aide for 23 years (Tr. 45). This job, testified plaintiff, required her to bathe and dress patients and lift them into and out of their beds or wheelchairs (Tr. 46).

Regarding her disabilities, plaintiff testified that she had pinched nerves in her back, carpal tunnel syndrome, fatigue "all the time," a lack of patience, and was "constantly crying" (Tr. 47–48). When the ALJ asked plaintiff about why she had waited until May of 2008 to file her application when she had last worked in 2003, plaintiff responded that she was "in denial," and then claimed to have filed an application in 2003 but to have been denied benefits (Tr. 48–49).

*14 Plaintiff then testified about the psychological symptoms relating to her depression and anxiety (Tr. 50–51). She described her memory as "so short that it frustrates me," and that she could not "remember how

to spell easy words" (Tr. 50). Plaintiff offered further testimony about her memory problems, attributing them to her lack of sleep (Tr. 53–55). When asked how long her "energy level" had been low, plaintiff stated that "[e]verything started in 2003" (Tr. 55).

Plaintiff testified that she had one friend (Tr. 55). She testified that she lived with her husband, an accountant, and her then 16–year–old son (Tr. 55–56). Plaintiff stated that she had become less socially active since the onset of her disabilities, and that she now had a tendency to "snap" at people (Tr. 56–57). Asked about her ability to maintain attention, plaintiff offered the following response:

> [L]et's say that I'm supposed to—I put in my mind that I have to go to the supermarket, and if I don't find parking—stupid things. Don't find parking close, I get frustrated and go back home. And then, my husband will go. He used to do the grocery for a certain limit of time, because I—that, I couldn't do. Or wait in line. Lose my patience in the car. And I know it's wrong sometimes. I know it, but I just can't control it.

(Tr. 57).

Describing her physical symptoms, plaintiff stated that she sometimes could not "pick up a cup of coffee, because it'll drop" (Tr. 57). She claimed to feel pain in her back and legs, and numbness and weakness in her hands and fingers (Tr. 58). Upon questioning by the ALJ, plaintiff testified that her carpal tunnel syndrome began in approximately 2005 (Tr. 58). The ALJ, however, stated that he was unable to find anything in plaintiff's medical records to substantiate a diagnosis of carpal tunnel syndrome during that period (Tr. 59).

Regarding her back and leg pain, plaintiff testified that it worsened around 2005 (Tr. 59–60). She claimed that she could not walk for more than a city block or sit for more than 30 minutes (Tr. 50). If she drove for more than half an hour, she stated, she would "feel like an 80–year–old getting out of the car" (Tr. 61). Plaintiff testified that she could carry 10 pounds pain-free, "but not for long" (Tr. 61–62).

When asked how she spent a typical day around her date last insured, December 31, 2008, plaintiff first testified that she did "nothing," and that she had hired someone to help with the housecleaning, but then testified that she would watch TV, cook and do laundry (Tr. 63–64). Plaintiff also stated that she received a disability pension from the Postal Service of $1,047 per month after taxes, and that her only other source of support was her husband's income (Tr. 64–65). She said that she had attempted to seek other employment after her mail carrier job, and had obtained a job "answering phones" in 2004, but had quit after two days due to an "anxiety attack" (Tr. 65). Asked whether she had applied for any job since that time, she responded that she had not (Tr. 65).

**\*15** Salvatore Garozzo, a VE, also testified at plaintiff's hearing (Tr. 66–81). Garozzo began by discussing plaintiff's past relevant work and transferable skills (Tr. 68–69). The ALJ then posed the following hypothetical scenario on which Garozzo was to opine:

> Let's assume a person of the same age, education, and work history as [plaintiff]. Let's further assume that that person physically is capable of the full range of light exertional work; and in addition to that, they had a mental limitation limiting them to no more than occasional interaction with the general public.

(Tr. 69–70). First, the ALJ inquired as to whether such a person could perform any of the plaintiff's past jobs, to which Garozzo responded in the negative, because plaintiff's past jobs had an exertional level of "medium" (Tr. 70). When asked whether there were other jobs such an individual could perform, Garozzo identified three suitable jobs that existed in the economy in sufficient numbers: a housekeeper (Dictionary of Occupational Titles ("DOT") § 323.687–014), an assembly worker (DOT § 706.687–010), and an electronics assembly worker (DOT § 729.687–010) (Tr. 71–72). When asked to identify sedentary jobs as to which plaintiff's skills might transfer, Garozzo identified the job of mail sorter (DOT § 209 .687–022) (Tr. 72). Finally, when asked whether any jobs existed for such an individual who was "unable to consistently report to work on a full-time basis," Garozzo responded that all of the jobs would be precluded (Tr. 74).

Plaintiff's attorney then examined Garozzo, and asked him questions based upon a modified version of the hypothetical:

> ATTY: ... [I]f we use the first hypothetical, but the claimant has, due to cognitive limitations, anxiety, and depression, and impaired recent and remote memory where it would—her memory would be impacted, you know, for recent items and remote items on an occasional basis, you know, one-third of the day, say, would that impact her ability to do the, the—I lost my—
>
> ALJ: Okay, so, so, you're saying, in addition to the limits in the first hypothetical, that basically, she'd be mentally off task at least a third of the day?
>
> ATTY: Yes, that's, that's fair.

(Tr. 74–75). Garozzo stated that, with these modifications, the individual would be unable to perform the job of an electronics assembly worker, but would still be able to work as a housekeeper or assembly worker, because the "work would be more routine" (Tr. 75). When asked if the situation would be different if the person "was off task more than occasionally, Garozzo testified that none of the jobs would be able to be performed (Tr. 75). Plaintiff's attorney then asked about one final variation on the hypothetical:

> ATTY: ... [I]f we add to the first hypothetical, as the consultive examiner stated in his medical source statement on July 16, #08, that the claimant would have difficulty dealing appropriately with stress of an independent job, like if, if the claimant could not consistently work independently, would that preclude those jobs?
>
> **\*16** [VE]: Counselor, I would say that it probably wouldn't preclude those jobs, because those jobs are, are pretty routine in nature.

(Tr. 76–77). After plaintiff's attorney lodged an objection relating to purported inaccuracies in the figures Garozzo was using to determine the number of available positions in the economy, the hearing concluded (Tr. 81–83).

## III. *Analysis*

### A. *Applicable Legal Principles*

#### 1. *Standard of Review*

The Court may set aside the final decision of the Commissioner [36] only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); *Burgess v. Astrue,* 537 F.3d 117, 127–28 (2d Cir.2008); *Shaw v.. Chater,* 221 F.3d 126, 131 (2d Cir.2000); *Tejada v. Apfel,* 167 F.3d 770, 773–74 (2d Cir.1999); *Bubnis v. Apfel,* 150 F.3d 177, 181 (2d Cir.1998).

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. *Tejada v. Apfel, supra,* 167 F.3d at 773–74; *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987); *Ellington v. Astrue,* 641 F.Supp.2d 322, 327–28 (S.D.N.Y.2009) (Marrero, D.J.). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue, supra,* 641 F.Supp.2d at 328; *accord Johnson v. Bowen, supra,* 817 F.2d at 986. However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." *Johnson v. Bowen, supra,* 817 F.2d at 986.

"The Supreme Court has defined substantial evidence as 'more than a mere scintilla' and as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Quinones v. Chater,* 117 F.3d 29, 33 (2d Cir.1997), *quoting Richardson v. Perales,* 402 U.S. 389, 401 (1971). "Consequently, where [there is] substantial evidence ... this Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review." *Beres v. Chater,* 93 Civ. 5279(JG), 1996 WL 1088924 at \*5 (E.D.N.Y. May 22, 1996); *see also Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984). Thus, " '[t]o determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.' " *Terwilliger v. Comm'r of Soc. Sec.,* No. 3:06–CV–0149 (FJS/GHL), 2009 WL 2611267 at \*2 (N.D.N.Y. Aug. 24, 2009), *citing Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988).

#### 2. *Determination of Disability*

Cordero v. Astrue, Not Reported in F.Supp.2d (2013)
Case 7:14-cv-09733-VB Document 25 Filed 07/21/16 Page 46 of 88
2013 WL 3879727

A claimant is entitled to disability benefits if he or she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d) (1)(A), 1382c(a)(3) (A); *see also Barnhart v. Walton,* 535 U.S. 212, 217–22 (2002) (both impairment and inability to work must last twelve months). The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> **\*17** of such severity that [the claimant] is not only unable to do his previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c (a)(3)(B).

The Commissioner must consider both objective and subjective factors when assessing a disability claim, including: (1) objective medical facts and clinical findings; (2) diagnoses and medical opinions of examining physicians; (3) subjective evidence of pain and disability to which the claimant and family or others testify; and (4) the claimant's educational background, age and work experience. *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999); *Rivera v. Schweiker,* 717 F.2d 719, 723 (2d Cir.1983).

"In evaluating disability claims, the [Commissioner] is required to use a five-step sequence, promulgated in 20 C.F.R. §§ 404.1520, 416.920." *Bush v. Shalala,* 94 F.3d 40, 44 (2d Cir.1996).

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where ... the claimant is not so engaged, the Commissioner

next considers whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to do basic work activities .... Where the claimant does suffer a severe impairment, the third inquiry is whether, based solely on medical evidence, he has an impairment listed in Appendix 1 of the regulations or equal to an impairment listed there .... If a claimant has a listed impairment, the Commissioner considers him disabled. Where a claimant does not have a listed impairment, the fourth inquiry is whether, despite his severe impairment, the claimant has the residual functional capacity to perform his past work .... Finally, where the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Balsamo v. Chater,* 142 F.3d 75, 79–80 (2d Cir.1998); *see also Barnhart v. Thomas,* 540 U.S. 20, 24–25 (2003); *Butts v. Barnhart,* 388 F.3d 377, 383 (2d Cir.2004), *amended in part on other grounds on rehearing,* 416 F.3d 101 (2d Cir.2005); *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *Shaw v. Chater, supra,* 221 F.3d at 132; *Brown v. Apfel, supra,* 174 F.3d at 62; *Tejada v. Apfel, supra,* 167 F.3d at 774; *Rivera v. Schweiker, supra,* 717 F.2d at 722.

Step four requires that the ALJ make a determination as to the claimant's residual functional capacity. *See Sobolewski v. Apfel,* 985 F.Supp. 300, 308–09 (E.D.N.Y.1997). RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). To determine RFC, the ALJ makes a "function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch ...." *Sobolewski v. Apfel, supra,* 985 F.Supp. at 309. The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work, and may be categorized as sedentary, light, medium, heavy, or very heavy. 20 C.F.R. §§ 404.1567, 416.967; *see Rodriguez v. Apfel,* 96 Civ.

Cordero v. Astrue, Not Reported in F.Supp.2d (2013)
Case 7:14-cv-09733-VB Document 25 Filed 07/21/16 Page 47 of 88
2013 WL 3879727

8330(JGK), 1998 WL 150981 at *7 n. 7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

**\*18** The claimant bears the initial burden of proving disability with respect to the first four steps. *Burgess v. Astrue, supra,* 537 F.3d at 128; *Green–Younger v. Barnhart, supra,* 335 F.3d at 106; *Balsamo v. Chater, supra,* 142 F.3d at 80. Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step —that the claimant's RFC allows the claimant to perform some work other than the claimant's past work. *Balsamo v. Chater, supra,* 142 F.3d at 80; *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986).

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.

*Gray v. Chater,* 903 F.Supp. 293, 297–98 (N.D.N.Y.1995) (Koeltl, D.J.). When a claimant retains the RFC to perform at least one of the categories of work listed on the Grid, and when the claimant's educational background and other characteristics are also captured by the Grid, the ALJ may rely exclusively on the Grid in order to determine whether the claimant retains the RFC to perform some work other than his or her past work. *Butts v. Barnhart, supra,* 388 F.3d at 383 ("In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the [Grid] ).") (internal quotation marks and citation omitted).

However, "exclusive reliance on the [Grid] is inappropriate" where non-exertional limitations "significantly diminish [a claimant's] ability to work." *Butts v. Barnhart, supra,* 388 F.3d at 383 (internal

quotation omitted); *Bapp v. Bowen, supra,* 802 F.2d at 603. When a claimant suffers from a non-exertional limitation such that she is "unable to perform the full range of employment indicated by the [Grid]," *Bapp v. Bowen, supra,* 802 F.2d at 603, or the Grid fails "to describe the full extent of [the] claimant's physical limitations," *Butts v. Barnhart, supra,* 388 F.3d at 383, the Commissioner must introduce the testimony of a vocational expert in order to prove "that jobs exist in the economy which the claimant can obtain and perform." *Butts v. Barnhart, supra,* 388 F.3d at 383 (internal quotation marks and citation omitted); *see* 20 C.F.R. § 1569a(d), pt. 404, subpt. P, app. 2, § 200.00(e); *see also Heckler v. Campbell,* 461 U.S. 458, 462 n. 5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

## B. *The ALJ's Decision*
**\*19** The ALJ began by summarizing the applicable law and plaintiff's medical records (Tr. 24–28). The ALJ then found that plaintiff met the disability insured status requirements through December 31, 2008 (Tr. 28). Following this determination, the ALJ applied the five-step analysis described above, relying on the medical evidence, plaintiff's testimony, and the testimony of the vocational expert to determine that plaintiff was not disabled (Tr. 28–33).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity from February 12, 2003, the alleged onset date of her disability, through December 31, 2008, her last insured date (Tr. 28).

At step two, the ALJ found that plaintiff had the following severe impairments through her last insured date: "obesity, a history of atrial fibrillation, hypertension, diabetes mellitus, generalized osteoarthritic pains for multiple joints, a depressive disorder, an anxiety disorder, and intermittent alcohol abuse" (Tr. 28). The ALJ found no documentation, however, of "any medically determinable impairments referable to bilateral carpal tunnel syndrome, cognitive loss, or left knee derangement prior to the last date insured" (Tr. 28).

At step three, the ALJ found that none of plaintiff's physical or mental impairments, either singly or in combination, were severe enough to meet or medically equal the impairments listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1 (Tr. 28). The ALJ noted that he did not grant "significant probative weight" to the opinion of Marie Brown, which "amount[ed] to listing-level severity in terms of mental compromise," because "a social worker is not an acceptable medical source under the regulations, and there is no indication that this treating relationship commenced until well after the date last insured" (Tr. 29).

At step four, the ALJ found that "through the date last insured, [plaintiff] had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), that did not entail greater than occasional interaction with members of the general public" (Tr. 29). He determined that plaintiff "was [ ] able to lift/carry up to 20 pounds occasionally and 10 pounds frequently," and that "[d]uring the course of an eight-hour workday, she could stand and/or walk for a total of 6 hours, and sit for a total of at least 6 hours" (Tr. 29).

With respect to plaintiff's mental status, the ALJ concluded that the evidence showed "intermittent manifestations of a depressive disorder, an anxiety disorder, and alcohol abuse," but that "[t]hese conditions resulted in no limitations of [plaintiff's] activities of daily living; a moderate restriction in terms of social functioning; and a mild limitation for maintaining concentration, persistence an pace" (Tr. 29). The ALJ noted that he based this conclusion on the findings of Dr. Helprin and Dr. Giudici, "whose reports also generally coincide with the date last insured" (Tr. 29). The ALJ also found that plaintiff's depression "was well controlled upon a psychotropic medication regimen," and that "[t]he evidence simply does not corroborate allegations of mental compromise that would have been preclusive of any work-related activity" (Tr. 30).

*20  The ALJ next turned to plaintiff's atrial fibrillation, which he concluded had "remained essentially quiescent following a cardioversion procedure" (Tr. 30). He noted that all testing subsequent to this procedure had "produced normal findings," and that, "[e]ven well after the last date insured," Dr. Gapay had certified plaintiff as a "low surgical risk in terms of her cardiac status" (Tr. 30).

Regarding plaintiff's diabetes, the ALJ remarked that the condition was not diagnosed until 2007, and that there was "no documentation whatsoever regarding any associated complications" from the condition (Tr. 30). The ALJ further stated that plaintiff's "obesity is also

not chronicled as significantly impacting her breathing or mobility" (Tr. 30).

With respect to plaintiff's "musculoskeletal complaints," the ALJ relied on Dr. Rocker's "essentially wholly benign" examination, as well as radiographic studies that "failed to substantiate greater than slight orthopedic pathology" (Tr. 30). The ALJ stated that he "accord[ed] substantial probative weight" to Dr. Rocker's examination results, because they were "contemporaneous to the last date insured," and somewhat circularly, "because they [were] wholly consistent with his own examination findings" (Tr. 31).

The ALJ noted that plaintiff was "quite functional with respect to her activities of daily living," which included showering, grooming, dressing, cooking, cleaning, doing laundry, and shopping (Tr. 30). He remarked that plaintiff was "able to drive a car by herself for substantial distances, such as the 60–mile round trip to and from psychologist Helprin's office" (Tr. 30). The ALJ also took note of plaintiff's ability to "engage in long-distance travel, such as going on a cruise to the Bahamas (merely one month after the alleged disability onset) and solitary travel to and from Texas to visit family members" (Tr. 30).

The ALJ next addressed plaintiff's other sources of income and stated: "Moreover, it must be pointed out that [plaintiff] has lacked a financial incentive to return to the active workforce given her receipt of a monthly Post Office pension and income from her husband's employment" (Tr. 31).

The ALJ then discussed his own observations of plaintiff during the hearing, stating that "she was not in any obvious pain or discomfort," and that "[s]he lacked the general physical appearance of an individual who might have been experiencing prolonged or severe pain" (Tr. 31). He also noted that she was able to answer questions "promptly and appropriately without any evidence of a memory or concentration problem," and further opined that there was "no obvious evidence of any significantly limiting mental or emotional problem demonstrated during the hearing" (Tr. 31).

The ALJ gave "some credence" to Dr. Helprin's psychological assessment, but found Dr. Giudici's more compelling, because Dr. Giudici's treatment came later and because his "records chronicle a prompt remission of

her depression" (Tr. 31). The ALJ found Dr. Helprin's diagnosis of agoraphobia to be unconvincing, because it was inconsistent with plaintiff's "recent sole travel to Texas or her driving alone to and from the psychologist's office" (Tr. 31).

**\*21** The ALJ rejected Dr. Gapay's August 2009 assessment that plaintiff had been unable to work since 2003, because it was "primarily based on [plaintiff's] subjective symptom reports as opposed to objective clinical medical findings" (Tr. 31). The March 2008 note from Middletown Medical, which also discussed plaintiff's inability to work, was also rejected by the ALJ because it was "vague in terms of specific functional restrictions" (Tr. 31).

At the end of step four, the ALJ determined that, at all times through the last insured date, plaintiff could not return to her previous jobs as a mail carrier and nurse's assistant because these jobs "entailed exertional demands that exceeded the parameters of light work" (Tr. 31)

At step five, the ALJ found that based on plaintiff's age, education, work experience, and RFC, there were several jobs that existed in significant numbers in the national economy that she could perform (Tr. 31–33). Relying on VE Garozzo's testimony at the administrative hearing, the ALJ stated that plaintiff could perform the following light exertional level positions: (1) housekeeper (DOT § 323.687–014), (2) assembly worker (DOT § 706.687–010) and (3) electronics assembler (DOT § 729.687–010) (Tr. 32). The ALJ also found that, even if plaintiff's RFC was restricted to sedentary work, she would have had transferable skills to perform the semi-skilled job of a mail sorter (DOT § 209.687–022). Thus, the ALJ concluded that plaintiff was not disabled under the Social Security Act.

### C. *Plaintiff's Arguments*
Plaintiff claims that the Commissioner's decision should be reversed because it "is not supported by substantial evidence, is contrary to Social Security law," and because plaintiff "did not have a full and fair hearing" (Pl.'s Mem. at 1). However, plaintiff's brief, which was prepared by counsel, is so poorly drafted and devoid of pertinent legal authority that it is difficult to identify any specific bases for these broad, conclusory arguments.

Broadly, plaintiff seems to be arguing that the ALJ's determination of plaintiff's RFC was not supported by substantial evidence and that the ALJ did not properly weigh plaintiff's credibility. After summarizing her medical history, plaintiff states that the ALJ failed to establish how her "depression and anxiety equate to being able to have no more than occasional interaction with the general public" (Tr. 13). Plaintiff also argues that she would be unable to perform any of the jobs identified by the VE because of her "restrictions with regard to concentration, persistence and pace" (Tr. 15). Plaintiff relies on the statements made by Dr. Helprin that she "would have difficulty dealing appropriately with the stress of an independent job in a competitive workplace due to her significant depression," (Tr. 404), as well as the findings of Dr. Giudici (Tr. 585–97) and Dr. Gapay (Tr. 321–23) (Pl.'s Mem. at 15–16). If the ALJ had properly weighted plaintiff's mental impairments in combination with her exertional impairments, plaintiff argues, he would have found that "there [were] no jobs that exist[ed] in significant numbers in the national economy that [ ] plaintiff would [have been] capable of performing" (Tr. 15).

**\*22** With respect to her credibility, plaintiff first asserts, without citing any cases, that "plaintiffs who have good work histories should be given credence when they describe why they cannot work" (Pl.'s Mem. at 7). Plaintiff argues that the ALJ improperly determined "not to give much credibility to [her] statements" due to her disability pension from the Postal Service and her husband's income (Pl.'s Mem. at 7). She states that "[p]rior court cases have held that a plaintiff should not be held to a higher standard because of the receipt of a disability pension," but again cites no authority for this proposition (Pl.'s Mem. at 8). Finally, plaintiff argues that the ALJ improperly took note of the fact that she drove "sixty miles round trip" for a consultive examination (Pl.'s Mem. at 8). Not only was the distance less than sixty miles, argues plaintiff, but individuals will often "extend themselves" to obtain Social Security benefits (Pl.'s Mem. at 8).

### D. *Analysis of the ALJ's Decision*
Before considering whether the Commissioner's decision is supported by substantial evidence, I first review it for application of the correct legal standards. *See Tejada v. Apfel, supra,* 167 F.3d at 773; *Johnson v. Bowen, supra,* 817 F.2d at 985; *Ellington v. Astrue, supra,* 641 F.Supp.2d at 327–28. I find that the ALJ applied the

correct legal standards to plaintiff's appeal by applying the five-step sequential analysis required in all disability determinations (*see* Tr. 23–33).

With regard to determining whether there is substantial evidence to corroborate an ALJ's RFC determination, the Second Circuit recently provided following guidance in *Campbell v. Astrue,* 465 F. App'x 4, 6 (2d Cir.2012):

> Although an ALJ's RFC determination "must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence," *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984), "we do not require that [the ALJ] have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability," *Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir.1983); *see also Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981) (rejecting argument that the ALJ must explicitly reconcile every shred of conflicting testimony).

After reviewing the record, I conclude that the ALJ's determination that plaintiff could perform "light work" is supported by substantial evidence. In making this determination, the ALJ specifically discussed plaintiff's ability to perform the functions listed in 20 C.F.R. § 404.1567(b), [37] including her ability to "lift/carry up to 20 pounds occasionally and 10 pounds frequently," and that "[d]uring the course of an eight-hour workday, she could stand and/or walk for a total of 6 hours, and sit for a total of at least 6 hours" (Tr. 29). This determination, as the ALJ noted, was strongly supported the findings of Dr. Rocker, whose July 16, 2008 consultative examination found that plaintiff had "[n]o limitation for hearing speaking, sitting, or handling," and only "mild limitation for standing, walking, lifting, and carrying" (Tr. 406). Plaintiff's testimony at the hearing also supports the ALJ's determination; her daily activities at her last insured date included showering, grooming, dressing, cooking, cleaning, doing laundry, shopping and driving (Tr. 30). At the time plaintiff applied for benefits, the record also discloses that plaintiff tried to "get out everyday," occasionally helped care for her two dogs, would go on walks "3 times a week," and attended church "most Sundays" (Tr. 204–08). The ALJ's statement that plaintiff's atrial fibrillation remained "essentially quiescent" following a 2003 cardioversion procedure is

accurate (*see* Tr. 347, 352, 367, 374, 392, 613), as are his statements regarding plaintiff's diabetes, which appears to have imposed no totally debilitating restrictions on her behavior, and in any event, was not diagnosed until 2007 (Tr. 30). Finally, the ALJ's determination was consistent with disability examiner Crumb's August 14, 2008 Physical Residual Functional Capacity Assessment, which determined that plaintiff could perform light work (Tr. 430–35). Thus, while the medical evidence unequivocally shows that plaintiff suffered from certain physical impairments, nothing indicates that any of these impairments were so severe as to prevent plaintiff from performing light work during the relevant time period.

**\*23** Regarding her mental impairments, plaintiff argues that "[i]t is unknown how her depression and anxiety equate to being able to have no more than occasional interaction with the general public" (Pl.'s Mem. at 13). However, to the extent that this is an argument that the ALJ did not give proper weight to plaintiff's mental infirmities, it is unpersuasive. The ALJ specifically noted that "the evidence documents intermittent manifestations of a depressive disorder, an anxiety disorder, and alcohol abuse within the context of medical listings 12.04, 12.06 and 12.09," and that these conditions resulted in "a moderate restriction in terms of social functioning," which, in turn, limited her to jobs that "did not require greater than occasional interaction with members of the general public" (Tr. 29). This conclusion was in accord with the findings of findings of Dr. Harding (Tr. 412–28), and also consistent with the assessments of both Dr. Helprin and Dr. Giudici, whose evaluations, as stated by the ALJ, invariably "found the claimant to be alert and fully oriented, with no indicia of any cognitive or perceptual disturbances" (Tr. 30). At the time of plaintiff's last insured date, her depression was controlled by medication, and Dr. Giudici assessed it as being in remission (Tr. 29, 589–92). The ALJ's determination is further supported by Dr. Helprin's statement that plaintiff would be able to "relate adequately with others" (Tr. 404). Finally, plaintiff's cruise to the Bahamas, taken immediately after her alleged disability onset date, and her later trip to Texas, belie her claims that she was prevented by her disorders from all social interaction (Tr. 360, 404). Again, while the medical evidence discloses that plaintiff indeed suffered from certain mental impairments during the relevant time period, it does not support the proposition that plaintiff was wholly incapable of having

"occasional interaction with members of the general public" (Tr. 29).

Plaintiff's reliance on Dr. Helprin's assertion that she "would have difficulty dealing appropriately with the stress of an independent job in a competitive workplace due to her significant depression" (Tr. 404) is misplaced. Indeed, immediately prior to that statement, Dr. Helprin noted that plaintiff was "able to follow and understand simple directions and instructions and perform simple rote tasks and some complex tasks independently, maintain attention and concentration for simple tasks, maintain a regular schedule, make appropriate simple decisions, [and] relate adequately with others" (Tr. 404). Thus, when the assessment is read as a whole, it becomes clear that Dr. Helprin's reference to an "independent job in a competitive workplace," is only referring to a limited class of jobs that plaintiff would be unable to perform; she did not conclude that plaintiff would be incapable of working in a more structured, non-competitive environment. This view is corroborated by the testimony of the vocational expert at plaintiff's hearing, who, when asked about Dr. Helprin's statements, testified that plaintiff would still be able to perform the jobs he identified because they were "routine in nature" (Tr. 76–77).

**\*24** The ALJ's decision not to grant "significant probative weight" to the opinion of social worker Marie Brown, who assessed severe mental compromise, was proper (Tr 29). A social worker not an "acceptable medical source" under the Social Security Administration regulations (*see* 20 C.F.R. §§ 404.1513(a), 404.1527(a)(2)), and although the ALJ was not free to disregard Brown's opinion solely for that reason, he was not required to give it controlling weight. *See Genovese v. Astrue,* 11–CV–02054 KAM, 2012 WL 4960355 at \*15 (E.D.N.Y. Oct. 17, 2012). In addition, as the ALJ noted, Brown's treatment of plaintiff, which began in 2010, postdated plaintiff's last insured date by more than a year (Tr. 29). Thus, even if Brown were an acceptable medical source, the probative weight of her opinion is diminished by its temporal remoteness.

The ALJ's decision not to grant "significant probative weight" to the March 2008 and August 2009 Middletown Medical assessments regarding plaintiff's inability to work, at least one of which was made by Dr. Gapay, was also proper because the statements were vague and embraced the ultimate issue to be decided by the ALJ. *See*

20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled"); *see also Micelli v. Astrue,* 11–4756–CV, 2012 WL 5259138 at \*3 (2d Cir. Oct. 25, 2012) ("It is the Commissioner who is 'responsible for making the determination or decision about whether [the claimant] meet[s] the statutory definition of disability.' ").

With regard to plaintiff's credibility, in *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010), the Second Circuit described the framework an ALJ must follow in weighing the credibility of a plaintiff's subjective complaints when making an RFC finding:

> When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929; *see McLaughlin v. Sec'y of Health, Educ. & Welfare,* 612 F.2d 701, 704–05 (2d Cir.1980), but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. *Id* . The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." 20 C.F.R. § 404.1512(b)(3); *see also* 20 C.F.R. § 404.1529(a); S.S.R. 96–7p.

**\*25** *Genier v. Astrue,* 606 F.3d at 49. It is "within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology. *Gernavage v. Shalala,* 882 F.Supp. 1413, 1419 (S.D.N.Y.1995) (Leisure, D.J.); *accord Mimms v. Heckler,* 750 F.2d 180, 186 (2d Cir.1984); *Richardson v. Astrue,* 09 Civ. 1841(SAS), 2009 WL 4793994 at \*6 n. 97 (S.D.N.Y. Dec. 14, 2009) (Scheindlin, D.J.); *see Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir.1984); *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983) ("It is the function of the [Commissioner], not [the reviewing courts] to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.").

Here, the ALJ's determination of plaintiff's credibility is also supported by substantial evidence. Applying the two-part framework, the ALJ found that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of these symptoms [were] not fully credible" (Tr. 31). The ALJ properly weighed plaintiff's subjective complaints of symptoms amounting to total disability with medical evidence that seemed to suggest only partial limitations, as well as plaintiff's own testimony, which demonstrated that she was quite capable of performing a wide variety of daily activities (Tr. 30). Plaintiff's hearing testimony was also, at times, inconsistent with the record. For example, plaintiff testified at her hearing that she had not applied for any jobs since 2004 (Tr. 65), but in 2008 told Dr. Guidici that she was undergoing stress because she "[could not] find work" (Tr. 585).[38] It was thus not unreasonable for the ALJ to conclude that plaintiff's complaints about the magnitude of her symptoms were not entirely credible.

Plaintiff argues that disability claimants "should be given credence when they describe why they cannot work," (Pl.'s Mem. at 7) but cites no authority in support of such this assertion. "Although it is true that 'a good work history may be deemed probative of credibility,' it remains 'just one of many factors' appropriately considered in assessing credibility." *Campbell v. Astrue,* 465 F. App'x 4, 7 (2d Cir.2012), *quoting Schaal v. Apfel,* 134 F.3d 496, 502 (2d Cir.1998). Thus, in the absence of an affirmative duty to take plaintiff's work history into account, the failure to do

so cannot serve as a basis for reversing the Commissioner's determination.

Plaintiff's argument regarding the ALJ's taking note of her "60–mile round trip to and from psychologist Helprin's office" is also unpersuasive (Tr. 30). Even if the total distance plaintiff drove was closer to 40 miles than 60 miles, the ALJ's ultimate point, that plaintiff was "able to drive a car by herself for substantial distances" is not undermined (Tr. 30). Moreover, there is substantial other evidence in the record supporting plaintiff's ability to drive (*see* Tr. 60–61, 62–63, 206, 401).

**\*26** The ALJ's statement regarding the implications of plaintiff's receipt of a Postal Service disability pension is more troubling. Although the Commissioner argues that "the ALJ is permitted to consider an individual's receipt of a disability pension as an 'other factor' in a credibility evaluation" under 20 C.F.R. § 404.1529(c)(3) (vii) (Def.'s Reply Mem. at 3), judges within this Circuit have found the use of other sources of income to make an adverse credibility determination improper. For example, in *Parikh v. Astrue,* 07–CV–3742 (JG), 2008 WL 597190 (E.D.N.Y. Mar. 2, 2008), another case involving ALJ Lemoine, the Honorable John Gleeson, United States District Judge for the Eastern District of New York, made the following observation under similar circumstances:

> ALJ [Lemoine] also, curiously, took the fact that Parikh had a pending application for a state disability pension to impeach her credibility by giving her a disincentive to work while waiting for the pension to be approved. I am at a loss to understand why Parikh's situation is different in this regard than the situation of any claimant of Social Security disability benefits, but whatever probative value either of these findings may have, they have little bearing on whether Dr. Shpitalnik's findings are inconsistent with the record as a whole.

*Parikh v. Astrue, supra,* 2008 WL 597190 at \*8 n. 10 (internal citation omitted). Other courts within this Circuit have reached similar conclusions. *See Goldthrite v. Astrue,* 535 F.Supp.2d 329, 337–38 (W.D.N.Y.2008) ("[T]his court finds it problematic that a Plaintiff would be found

less credible simply because they are of limited means. The fact that the Plaintiff was receiving other income from public assistance does not, by itself, mean that she is less credible when testifying about her pain."); *Rinker v. Chater,* 95 Civ. 3923(CSH), 1997 WL 47791 at *9 (S.D.N.Y. Feb. 6, 1997) (Haight, D.J.) ("The fact that an applicant for disability benefits receives other income which will be lost upon finding employment undoubtedly constitutes a financial disincentive to his returning to work. This fact, by itself, does not mean that such an individual is less credible when testifying about the pain he or she suffers from a particular impairment.").

Here, it was clearly improper for the ALJ to use plaintiff's receipt of a monthly pension and her husband's income as a means to impugn her credibility. However, such an error, standing alone, does not require remand, because the ALJ's credibility determination was independently supported by other substantial evidence, including medical documentation and plaintiff's testimony as to her daily activities and capabilities. *See Bartley v. Astrue,* 07–89–B–W, 2008 WL 2704827 at *7 (D. Me. June 30, 2008), *report and recommendation adopted,* CIV. 07–89–B–W, 2008 WL 2858809 (D.Me. July 22, 2008).

Accordingly, I conclude that the ALJ's determination that plaintiff was not disabled under the Social Security Act is supported by substantial evidence in the record that was before him. Though plaintiff claims generally that she did not have a full and fair hearing, and that the Commissioner's decision was not supported by substantial evidence and was contrary to the law, she has not pointed to any specific aspect of the opinion that was erroneous, other than those addressed above, and I have found none in my review.

IV. *Conclusion*

**\*27** For all the foregoing reasons, I respectfully recommend that the Commissioner's motion for judgment on the pleadings (Docket Item 12) be granted and that plaintiff's motion for judgment on the pleadings (Docket Item 10) be denied.

V. *OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1)(c)) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–238 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3879727

Footnotes

1  "Tr." refers to the administrative record that the Commissioner filed as part of its answer, as required by 42 U.S.C. § 405(g).

2  "Syncope" is "[l]oss of consciousness and postural tone caused by diminished cerebral blood flow." *Stedman's Medical Dictionary* at 1745 (27th ed. 2000) (*"Stedman's"* ).

3  Atrial fibrillation is "fibrillation in which the normal rhythmical contractions of the cardiac atria are replaced by rapid irregular twitchings of the muscular wall; the ventricles respond irregularly to the dysrhythmic bombardment from the atria." *Stedman's* at 668.

4  In a cardioversion procedure, the heart's rhythm is restored to normal "by electrical countershock or by medications." *Stedman's* at 291.

5  Bradycardia is "[s]lowness of the heartbeat, usually defined (by convention) as a rate under 50 beats/min." *Stedman's* at 232.

6  Sinus bradycardia is "bradycardia originating in the normal sinus pacemaker." *Stedman's* at 232.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 7:14-cv-09733-VB   Document 25   Filed 07/21/16   Page 54 of 88

7   In an electrocardiogram, a "PR interval" is "the time elapsing between the beginning of the P wave and the beginning of the next QRS complex;" a "QRS interval" is "the duration of the QRS complex in the electrocardiogram;" a "QT interval" is the "time from electrocardiogram Q wave to the end of the T wave corresponding to electrical systole." *Stedman's* at 914–15.

8   A paroxysm is "1. A sharp spasm or convulsion," or "2. A sudden onset of a symptom or disease, especially one with recurrent manifestations such as the chills and rigor of malaria." *Stedman's* at 1318.

9   INR is a measure of blood coagulation. *Stedman's* at 906, 1465, 1521, 1836.

10   Crepitus is "the grating of a joint, often in association with osteoarthritis." *Stedman's* at 424.

11   Bursitis is the "[i]nflammation of a bursa," and "tendinitis" is the "[i]nflammation of a tendon." *Stedman's* at 262, 1794.

12   The trochanter is "[o]ne of the bony prominences developed from independent osseous centers near the upper extremity of the femur." *Stedman's* at 1878.

13   "SPECT" stands for "single photon emission computed tomography," and is the "tomographic imaging of metabolic and physiologic functions in tissues, the image being formed by computer synthesis of photons of a single energy emitted by radionuclides administered in suitable form to the patient." *Stedman's* at 1663, 1842.

14   Abduction is the "[m]ovement of a body part away from the median plane (of the body, in the case of limbs; of the hand or foot, in the case of digits)." *Stedman's* at 2.

15   "Relating to the acromion and the clavicle; denoting the articulation and ligaments between the clavicle and the acromion of the scapula." *Stedman's* at 18.

16   "Heparin is used to prevent blood clots from forming in people who have certain medical conditions or who are undergoing certain medical procedures that increase the chance that clots will form." Heparin Injection: MedlinePlus Drug Information, http://www . nlm.nih.gov/medlineplus/druginfo/meds/a682826.html (last visited Dec. 27, 2012).

17   "Sotalol is used to treat irregular heartbeats." Sotalol: MedlinePlus Drug Information, http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a693010.html (last visited Dec. 27, 2012).

18   Hypomagnesemia is a low concentration of magnesium in the blood. *Stedman's* at 862.

19   Prothrombin time is "the time required for clotting after thromboplastin and calcium are added in optimal amounts to blood of normal fibrinogen content; if prothrombin is diminished, the clotting time increases; used to evaluate the extrinsic clotting system." *Stedman's* at 1836.

20   Digoxin, like sotalol, is a drug used to treat irregular heart rhythms. *See* Digoxin Oral: MedlinePlus Drug Information, http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a682301.html (last vistited Dec. 27, 2012).

21   A Holter monitor is a device designed for "long-term, continuous usually ambulatory, recording of electrocardiographic signals on magnetic tape for scanning and selection of significant but fleeting changes that might otherwise escape notice" *Stedman's* at 1126.

22   Supraventricular means "[a]bove the ventricles; especially applied to rhythms originating from centers proximal to the ventricles, namely in the atrium, AV node, or AV junction, in contrast to rhythms arising in the ventricles themselves;" ectopic, is this context "denot[es] a heartbeat that has its origin in some abnormal focus; developing from a focus other than the sinoatrial node." *Stedman's* at 1732.

23   Dysphoria is a "mood of general dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort." *Stedman's* at 554.

24   Dysthymia is a "chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." *Stedman's* at 556.

25   Scoliosis is "[a]bnormal lateral and rotational curvature of the vertebral column." *Stedman's* at 1606.

26   Kyphosis is an excessive forward curvature of the thoracic spine. *Stedman's* at 955.

27   A subluxation is "[a]n incomplete luxation or dislocation; though a relationship is altered, contact between joint surfaces remains." *Stedman's* at 1716.

28   A contracture is a "[s]tatic muscle shortening due to tonic spasm or fibrosis, to loss of muscular balance, the antagonists being paralyzed or to a loss of motion of the adjacent joint." *Stedman's* at 405.

29   Ankylosis is "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint." *Stedman's* at 90.

30   Arthralgia is "[p]ain in a joint, especially one not inflammatory in character" *Stedman's* at 149

31   Hyperkalemia is "[a] greater than normal concentration of potassium ions in the circulating blood." *Stedman's* at 850.

32   The lateral meniscus is the "crescent-shaped intraarticular cartilage of the knee joint attached to the lateral border of the upper articular surface of the tibia, occupying the space surrounding the contacting surfaces of the femur and tibia;" the medial meniscus, as its name suggests, is attached to the medial border. *Stedman's* at 1091–92.

Cordero v. Astrue, Not Reported in F.Supp.2d (2013)
Case 7:14-cv-09733-VB   Document 25   Filed 07/21/16   Page 55 of 88
2013 WL 3879727

33  Osteonecrosis is "[t]he death of bone in mass, as distinguished from caries ('molecular death') or relatively small foci of necrosis in bone." *Stedman's* at 1284.

34  Nocturia is "[p]urposeful urination at night, after waking from sleep; typically caused by increased nocturnal secretion of urine resulting from failure of suppression of urine production during recumbency or incomplete emptying of the bladder because of obstructive lesions in the lower urinary tract or detrusor instability." *Stedman's* at 1221.

35  The "GAF" scale ranges from 0–100 and represents a clinician's judgment of an individual's overall level of functioning. *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. text rev.2000). A "GAF" score of 51–60 is defined as "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Diagnostic and Statistical Manual of Mental Disorders, supra,* at 34.

36  The Appeals Council's decision constitutes a final decision of the Commissioner. *Sims v. Apfel,* 530 U.S. 103, 106–07 (2000).

37  20 C.F.R. § 404.1567(b) provides the following definition of "light work":

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

38  Plaintiff's hearing testimony in this respect was also inconsistent with a written statement prepared by her husband Abraham Maldonado in 2008, which stated that "Ivette has applied for many jobs but due to her medical limitations and drugs no one will hire her" (Tr. 230).

---

End of Document                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 68828
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Marilyn GREEN,
v.
Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 07–CV–0023.
|
Jan. 6, 2009.

## ORDER

MICHAEL A. TELESCA, District Judge.

**\*1** This action was initially brought pursuant to 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security (the "Commissioner") which denied plaintiff's claim for Disability Insurance Benefits and Supplemental Security Income payments pursuant to Title XVI of the Social Security Act. Thereafter, both parties moved for judgment on the pleadings. The parties' motions were referred to Magistrate Judge Jeremiah J. McCarthy for consideration of the factual and legal issues presented, and to prepare and file a Report and Recommendation containing a recommended disposition of the issues raised.

By Report and Recommendation dated December 8, 2008, Magistrate Judge McCarthy found that the Commissioner's determination denying plaintiff's application for benefits was not supported by substantial evidence, and recommended that the case be remanded for further administrative proceedings in accordance with his findings. Although the parties were advised of their right to file objections to Judge McCarthy's Report and Recommendation, the potential consequences of failing to file objections, and the deadline for filing such objections, neither party has filed any objection to Judge McCarthy's Report.

Because neither party has filed an objection to the December 8, 2008 Report and Recommendation, the parties have waived their rights to *de novo* review pursuant

to 28 U.S.C. § 636(b)(1). *See Caidor v. Onondaga County,* 517 F.3d 601, 604 (2d Cir.2008); *U.S. v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). In addition, the Second Circuit has by rule adopted the position that where the parties have received notice of the consequences of failing to object to a Magistrate Judge's Report and Recommendation, such a failure will preclude any further review of a Decision adopting a Magistrate Judge's Report and Recommendation. *See Small v. Secretary of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see also Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988).

I find that Magistrate Judge McCarthy's recommendation that the matter should be remanded to the Commissioner is supported by the record. Moreover, because there is no clear error in Magistrate Judge McCarthy's Report and Recommendation, I adopt his December 8, 2008 Report and Recommendation in its entirety, and Order that the defendant's motion for judgment on the pleadings is denied; plaintiff's motion for judgment on the pleadings is granted; and this case be remanded to the Commissioner for further administrative proceedings.

**ALL OF THE ABOVE IS SO ORDERED.**

MARILYN GREEN

Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

Defendant.

## REPORT AND RECOMMENDATION

JEREMIAH J. McCARTHY, United States Magistral Judge.

This case was referred to me by Hon. Richard J. Arcara to hear and report in accordance with 28 U.S.C. § 636(b) (l) (Dkt.# 7)[1]. Before me are the parties' cross-motions for judgment on the pleadings pursuant to Fed.R.Civ.P. ("Rule") 12(c) (Dkt.9, 11). For the following reasons, I

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

recommend that defendant's motion for judgment on the pleadings be DENIED and that plaintiff's cross-motion be GRANTED.

## PROCEDURAL BACKGROUND

**\*2**  Pursuant to 42 U.S.C. § 405(g), plaintiff seeks review of the final decision of the Commissioner of Social Security, denying her application for Social Security Disability Insurance ("SSD") and Supplemental Security Income Benefits ("SSI") (Dkt.# 1). Plaintiff filed an application for SSD and SSI on March 26, 2003 (T44–46, 169–170). [2] These claims were initially denied on July 16, 2003 (see T23–24, 27–31, 170A–170C). A hearing on both claims was conducted before Administrative Law Judge Eugene F. Wisniewski on September 20, 2004 (T178–208). Plaintiff was represented at the hearing by Jeffrey E. Marion, Esq. (T36–37). On November 8, 2004 ALJ Wisniewski issued a decision denying plaintiff's claim on the grounds that plaintiff was not under a disability as defined in the Social Security Act and that there were a significant number of jobs in the national economy that plaintiff could perform (T13–22). ALJ Wisniewski's determination became the final decision of the Commissioner on March 19, 2007, when the Appeals Council denied plaintiff's request for review (T5–9).

## THE ADMINISTRATIVE RECORD

### I. Medical Evidence

On January 26, 2001 plaintiff began treatment with Susan Szimonisz, M.D., a gynecologist (T138). Plaintiff complained of lower back pain on June 20, 2001 and Dr. Szimonisz recommended that plaintiff not lift any weight greater than twenty pounds (T134). On June 25, 2001 plaintiff complained of leg pain and swelling and Dr. Szimonisz informed her that she had degenerative disc disease (T133). Plaintiff continued to complain of left extremity swelling on June 28, 2001 and Dr. Szimonisz found that plaintiff's ability to stand and walk were limited (T131). She also began treatment for sleep apnea in the following months (T128–130).

In February 2002, Dr. Szimonisz treated plaintiff for sinusitis (T120) and informed plaintiff, in March 2002, that her limited range of motion was due to her obesity (T119). To improve plaintiff's condition, Dr. Szimonisz

referred plaintiff for breast reduction surgery, a chest x-ray, and recommended that she lose weight (Id.). Plaintiff reported feeling better in April 2002 (T117), but complained of intermittent back spasms in November 2002, for which Dr. Szimonisz scheduled a lumbosacral spine x-ray (T113). In December 2002 Dr. Szimonisz did not find evidence of disc herniation, but noted that weight reduction was an issue, and recommended chiropractic evaluation (T110). Plaintiff continued to report back and foot pain (T102).

On March 10, 2003 Lynne Fries, a physical therapist, and David Bagnall, M.D., a spine and musculoskeletal specialist, jointly evaluated plaintiff's condition (165–167). At this time plaintiff claimed no improvement in her symptoms despite attending physical therapy and undergoing breast reduction surgery (T165). During the examination, plaintiff reported an "insidious onset of low back pain and locking", "aching in her bilateral posterior thighs", and "aching at the lateral border of her right foot" (Id.). She also complained of aching and tightness in her legs, which forced her to sit, and stated that "the catching in her back can be quite severe with ambulation" (Id.). Plaintiff further complained of occasional shortness of breath and swelling of her fingers (Id.). She reported using a CPAP machine for sleeping (Id.). Plaintiff graded her pain intensity, at that point, as an eight out of ten (Id.). Ms. Fries and Dr. Bagnall found no signs of any unexplained weight loss, fever, rash or edema of her lower extremities (Id.).

**\*3**  Ms. Fries and Dr. Bagnall noted that plaintiff's active lumbar range of motion was 50% restricted in side bending bilaterally, and also noted a 25% restriction in her flexion and extension (T166). They also noted that plaintiff had a "general decreased recruitment in the lumbar spine" (Id.). Plaintiff "showed no abnormal pain behaviors ... and appeared to give a good effort" (Id.). Plaintiff's deep tendon reflexes were equal and normal in the lower extremities and her light touch was grossly intact (Id.). Ms. Fries and Dr. Bagnall concluded that plaintiff suffered from "chronic lower back pain, discogenic ... in nature. Radicular complaints to the distal lower extremities, right greater than left, with stenotic features per patient history" (Id.). They prescribed 600 mg. of Daypro and ordered a MRI of the lumbar spine (Id.). Ms. Fries and Dr. Bagnall also gave plaintiff a prescription to continue physical therapy as needed for four to eight weeks, and

recommended that plaintiff consider a short course of chiropractic intervention (T167).

At a follow-up examination with Dr. Bagnall on March 24, 2003, plaintiff's condition remained unchanged (T163). Dr. Bagnall reviewed a MRI and opined that plaintiff's pain was a result of normal aging and did not believe that any form of epidural injection would be helpful at that time (T163). Rather, he recommended mild pain medications and that plaintiff undertake an exercise program (*Id.*). Plaintiff was also advised to avoid "certain activities that make her symptoms worse" and to attend a brief period of chiropractic care (*Id.*).

On May 14, 2003 plaintiff was seen by Dr. Szimonisz with complaints of carpal tunnel syndrome (T98). Upon examination, Dr. Szimonisz stated that plaintiff was obese but in no apparent distress, and had a full range of motion in her shoulders and neck (*Id.*). Dr. Szimonisz diagnosed plaintiff with degenerative disc disease of the lumbar spine and upper extremity paresthesias (*Id.*).

On May 19, 2003, September 22, 2003, and December 22, 2003 Dr. Bagnall completed follow-up evaluations and checked the box entitled "NA" under the category "return to work" or should not return to work (T159, 160, 162).[3] On August 21, 2003 Dr. Bagnall performed an epidural steroid injection and diagnosed plaintiff with a lumbar disc herniation (T161). On December 22, 2003 Dr. Bagnall noted that the epidural injection provided only temporary relief and referred plaintiff to Dr. Anthony Leone[4], a spinal surgeon, for an opinion (T158). He continued plaintiff on Celebrex, prescribed Ultram, and scheduled her to return in three months (*Id.*).

**B. Consultative Examinations**
On May 17, 2003, George A. Sirotenko, D.O., a consultative physician, performed an internal medical examination (T139). At this time, plaintiff complained of a two and a half year history of back problems and/or of intermittent numbness in her hands and fingers at night (T139). Dr. Sirotenko noted that plaintiff's current physical therapy and medications provided moderate improvement of her symptoms, but that she was not considered a surgical candidate (T139–140).

**\*4** Dr. Sirotenko diagnosed plaintiff with a history of low back pain, a history of sleep apnea (which

improved when plaintiff utilized a CPAP machine), and a history of nocturnal carpal tunnel syndrome (T139). He concluded that plaintiff should avoid maintaining one position for greater than two hours at a time and be allowed frequent opportunity to alternate between sitting, standing and walking throughout an eight-hour day (T142). Dr. Sirotenko also found that given her current weight of 260 lbs on a 5#4# frame" she should "avoid repetitive kneeling, squatting or bending stairs, inclines or ladders on a repetitive basis" (*Id.*). Plaintiff's sleep apnea was "subjectively currently controlled with CPAP machine" (*Id.*)

On June 30, 2003 W. Poole, M.D., a state agency review physician, prepared a physical residual functional capacity assessment (T148–153). Dr. Poole opined that plaintiff could "occasionally lift or carry 20 pounds" and "could frequently lift and/or carry 10 pounds" (T149). He also opined that plaintiff could stand and/or walk, with normal breaks for a total of about 6 hours in an 8 hour workday, and sit, with normal breaks, for a total of about 6 hours in an 8 hour workday. Dr. Poole concluded that "plaintiff's claims were credible, but not to the extent alleged" (T151).

Dr. Poole based his findings on the information provided in the June 30, 2003 "Request for Medical Advice" form completed by Verna Yu, M.D., a physical medicine and rehab review physician, which noted that plaintiff had a "RFC-light= restriction in frequent movement of the [right] hand" (T154).

**II. Administrative Hearing Conducted on September 20, 2004**

**A. Plaintiff's Testimony**
Plaintiff was 49 years old at the time of the hearing and testified that she had an eleventh grade education (T184). She worked as a home-care health aide from 1990 to 2001, as a babysitter from 2001 to 2003 (T184–185), and was currently a foster mother to two children (T186). Plaintiff testified that she could no longer perform the required duties of a babysitter or a home-care health aide (T186–187).

Regarding her physical condition, plaintiff testified that she had difficulty bending at the waist due to swelling in her right leg and knee and also complained of radiating symptoms that ran down her leg (Tl 87). Plaintiff testified

that she was only able to sit for approximately twenty minutes before standing to relieve the pressure (T189). Plaintiff rated her pain as a nine out of ten (T197). She also reported using a "CPFE machine" at night to assist with her sleep apnea (T190) and admitted having high blood pressure, which she treated with medications (T194, 198).

Plaintiff then testified that each morning she makes breakfast for her foster children and prepares them for school (T191). After the children leave, the pain forces her to either sit or lay down for a couple of hours (T192). Before the children come home, plaintiff completes some household chores and then prepares dinner, which primarily consist of TV dinners because the pain prevents her from cooking and lifting anything heavy (T194–195).

**\*5** Plaintiff also testified that her pain prevents her from driving and that she could only ride in a car for fifteen minutes on average (Tl 94). The pain also interferes with her ability to climb stairs, stand, wash dishes, mop (T190) and forces her to rest every twenty to forty steps when she walks around her neighborhood (T195). Plaintiff testified that she has not undergone surgery because her doctors could not guarantee it would alleviate her pain (T200).

During the hearing ALJ Wisniewski asked plaintiff's attorney if he possessed plaintiff's March 2003 MRI report because he wanted to determine if there was "any impingement or stenosis" in plaintiff's lower sacral spine, stating that "by itself, a herniated disc has little or no significance.... Because if there's no stenosis and no impingement, we don't have very much" (T187–189). Plaintiff's attorney was unable to locate the MRI (T188). ALJ Wisniewski noted that "a person having a disc herniation was not itself significant. Half the population above 50 has disc herniation and don't even know it" (T187).

### B. Vocational Expert's Testimony

James Ryan, a vocational expert, testified that plaintiff's employment as a home-care health aide was heavy unskilled work, babysitting was medium unskilled work, and a foster care provider was light, unskilled work (T202).

ALJ Wisniewski then asked Mr. Ryan to describe any careers available for a woman with plaintiff's limitations (T202–203). Mr. Ryan testified that an individual with

these limitations would be able to perform the following occupations: machine tender, sales clerk, fast food worker, dispatcher, general clerical worker, and receptionist (T204). When asked if there was any vocation that would allow an individual time to lie down during the day, Mr. Ryan testified that this was a significant vocational limitation, which would prevent an individual from performing any "substantial gainful activity that exists in significant numbers in the United States" (T205).

### III. ALJ Wisniewski's November 8, 2004 Decision

ALJ Wisniewski determined that plaintiff suffered from severe impairments of low back pain, shortness of breath, and obesity, but concluded that plaintiff "did not have an impairment or combination of impairments that met or medically equaled the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, Regulations No. 4" (T21). He regarded plaintiff's carpel tunnel syndrome and sleep apnea as non-severe impairments because they were "subjective allegations" that only had a minimal affect on plaintiff's basic work activity (T17). He also found plaintiff's claims of disabling pain to be "excessive, not fully credible and they have been treated accordingly" (T19).

ALJ Wisniewski determined that the opinions of the treating physicians, state agency medical experts and consultative internist examiner were "supported by and consistent with the clinical signs and findings of the record" and accorded them "great weight" (*Id.*). Based upon the evidence in the record, ALJ Wisniewski concluded that the plaintiff had the residual functional capacity "to perform light exertion work with the need for a sit/stand option; nonexertionally, she should avoid repetitive kneeling, squatting, bending or climbing stairs, inclines or ladders" (T21).

**\*6** Relying on the testimony of the vocational expert, ALJ Wisniewski found that plaintiff was unable to perform her past relevant work, but acknowledged that there were a significant number of jobs in both the local and national economy that she could perform, including machine tender, sales clerk, fast food worker, dispatcher, general clerical, and receptionist (T22). Based upon plaintiff's exertional capacity for light work, her age, education, and work experience, ALJ Wisniewski concluded that plaintiff was "not disabled" (*Id.*).

## IV. Post Hearing Submission

On November 16, 2004, plaintiff's attorney sent the Appeals Council the March 17, 2003 MRI report (T171) that ALJ Wisniewski requested at the hearing and on May 26, 2005 plaintiff's attorney mailed a letter arguing for the reversal of the unfavorable decision (T173). The March 17, 2003 MRI report showed "degenerative disc disease at the lower three lumbar spine levels", a "far right lateral L4–5 disc herniation", and "a broad, right lateral L5–S1 disc herniation" (T171). It also noted a "right lateral disc herniation at L4–5 contacting the right L4 nerve root" and that the L5–S1 herniation "slightly contacts the right S1 nerve root at its origin producing no significant displacement" (*Id.*).

## V. Appeals Council's March 19, 2007 Decision

The Appeals Council considered the additional evidence and found that:

> "At the hearing the Administrative Law Judge stated that herniation, by itself, is not that significant unless there was impingement or stenosis. Your representative submitted an MRI that shows L4–5 herniation that slightly narrows the neural foramin and an L5–S1 herniation that causes no significant displacement of the nerve root. This evidence is consistent with your treatment records that note the presence of disc herniation, but not significant neurological deficits. This new evidence does not show that you have any limitations beyond those found by the Administrative Law Judge. The council found no basis for your representative's contention with respect to bias" (T6).

The Appeals Council concluded that the information did not provide a basis for reviewing ALJ Wisniewski's decision (T5–6). The denial made ALJ Wisniewski's decision the final decision for the Commissioner of Social Security (T5).

## DISCUSSION AND ANALYSIS

### I. Scope of Judicial Review

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "[t]he findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g). Substantial evidence is that which "a

reasonable mind might accept as adequate to support a conclusion". *Consolidated Edison Co. of New York, Inc. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

Under this standard, the scope of judicial review of the Commissioner's decision is limited. This Court may not try the case *de novo,* nor substitute its findings for those of the Commissioner. *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984). Rather, the Commissioner's decision may be reversed only when it is based on legal error or is not supported by substantial evidence in the record as a whole. *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). If supported by substantial evidence, the Commissioner's decision must be sustained "even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner. *Martin v. Shalala,* 1995 WL 222059, *5 (W.D.N.Y.).

**\*7** However, before deciding whether the Commissioner's determination is supported by substantial evidence, I must first determine "whether the Commissioner applied the correct legal standard". *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999). "Failure to apply the correct legal standards is grounds for reversal." *Townley, supra,* 748 F.2d at 112.

### II. The Disability Standard

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U .S.C. § 1382c(a)(3) (A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 1382c(a)(3) (B).

The determination of disability entails a five-step sequential evaluation process:

> "1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps."

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

### III. Analysis

### A. ALJ Wisniewski Did Not Substitute His Judgment for That of the Medical Experts

Plaintiff argues that ALJ Wisniewski improperly substituted his own opinion for the opinion of the medical expert, when he stated that "a person having a disc herniation is not itself that significant. Half the population over the age of 50 have disc herniations and don't even know it" (Dkt # 11, p. 6). Plaintiff argues that there "is absolutely nothing in the record" that supports his opinion and the only interpretation of this statement is that ALJ Wisniewski substituted his own opinion in place of the medical expert's opinion (*Id.*). In response, defendant argues that ALJ Wisniewski's statement is consistent with the Commissioner's Listing of Impairments, which requires nerve root impingement in addition to a herniation (Dkt # 12, p. 3). Defendant further argues that ALJ Wisniewski examined sufficient information, such as laboratory evidence (T171) and Dr.

Bagnall's records (T156, 163), to support his conclusion (*Id.*).

**\*8** "An ALJ must rely on the medical findings contained within the record and cannot make his own diagnosis without substantial medical evidence to support his opinion." *Goldthrite v. Astrue,* 535 F.Supp.2d. 329, 339 (W.D.N.Y.2008) (Telesca, J.). "In analyzing a treating physician's report, 'the ALJ cannot arbitrarily substitute [her] own judgment for competent medical opinion,' nor can [she] 'set [her] own expertise against that of a physician who submitted an opinion or testified before [her].' " *Gilbert v. Apfel,* 70 F.Supp.2d 285, 290 (W.D.N.Y.1999) (Larimer, J.) (quoting *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998)).

ALJ Wisniewski evaluated plaintiff's low back pain under listing 1.04(T18). "A claimant is automatically entitled to benefits if his or her impairment(s) meets the criteria set forth in Appendix 1 to Subpart P of Part 404". *McKinney v. Astrue,* 2008 WL 312758, *4 (N.D.N.Y.2008). Listing 1.04(A) provides in relevant part:

"1.04. Disorders of the spine (e.g., herniated nucleus pulposus, ... ), **resulting in compromise of a nerve root** (including the cauda equina) or the spinal cord. With:

A. **Evidence of nerve root compression** characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.04 (emphasis added).

"Thus, in order to satisfy this listing", plaintiff must establish that (1) she has a disorder of the spine which compromises a nerve root or the spinal cord, and (2) that this disorder is manifested by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)". *McKinney, supra .* 2008 WL 312758 at *4.

Here, I find that ALJ Wisniewski did not substitute his own opinion in place of the medical experts' opinions. Rather, his was merely applying the Commissioner's rules

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

regarding spinal disorders to the medical evidence, which demonstrated that while plaintiff suffered from a disc herniation, there was no nerve root compromise necessary to qualify it as a disabling condition. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04.

## B. ALJ Wisniewski Properly Developed the Record by Including the June 20, 2001 Physician Note

Plaintiff argues that ALJ Wisniewski erred in considering a June 20, 2001 treatment note from Dr. Szimonisz (T134) that stated plaintiff should not lift more than 20 pounds to support his conclusion that plaintiff was not disabled, because it was written seven months before plaintiff's onset date and irrelevant (Dkt # 11, p. 6). In response, defendant argues that the June 20, 2001 treatment note is relevant because while the Commissioner is charged with developing the record at least twelve-months prior to the date claimant applies for benefits, he can consider earlier evidence, if necessary (Dkt # 12, p. 4).

**\*9** "The ALJ may consider all evidence of record, including medical records and opinions dated prior to the alleged onset date, when there is no evidence of deterioration or progression of symptoms." *Pirtle v. Astrue,* 479 F.3d 931, 934 (8th Cir.2007); *see Ward v. Shalala,* 898 F.Supp. 261, 263 (D.Del.1995) ("While evidence of her condition prior to the onset date and after the insured date is to be considered by the ALJ in furtherance of evaluating whether the applicant qualifies for benefits, the period between onset of disability and expiration of insured status is the focus of the inquiry.").

Here there is no indication that there was a rapid deterioration or progression of plaintiff's symptoms in the seven month period prior to her alleged January 18, 2002 onset (T44). Notably, plaintiff continued to work during this period (T185).

Moreover, a review of the record does not indicate that any subsequent medical evaluations of plaintiff's condition contradict the information contained in the June 20, 2001 evaluation. Dr. Poole, the state agency review physician, reinforced this information on June 30, 2003, when he opined that plaintiff could "occasionally lift or carry 20 pounds" and "could frequently lift and/ or carry 10 pounds" (T149). Accordingly, I conclude that ALJ Wisniewski properly considered the June 20, 2001 treatment note.

## C. The Appeals Council Properly Denied Review of ALJ Wisniewski's Findings After Examining the MRI Report

Plaintiff argues that the Appeals Council failed to adequately explain why they refused to review ALJ Wisniewski's findings after they received the March 17, 2003 MRI report (Dkt.# 11, pp. 7–8). Plaintiff also argues that the Appeals Council failed to develop the record appropriately after receiving the new evidence (*Id.*). Defendant responds that the evidence submitted to the Appeals Council would not have changed ALJ Wisniewski's decision because the MRI only reaffirmed information that he already examined (Dkt.# 12, p. 4). Defendant also argues that the Appeals Council did not have to review the new evidence under the treating physician regulations because they were inapplicable in this instance (*Id.*).

The regulations expressly authorize a claimant to submit "new and material" evidence to the Appeals Council when requesting review of the ALJ's decision, without a "good cause" requirement. *See Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996). "When the Appeals Council denies review after considering new evidence, the Secretary's final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence". *Perez, supra,* 77 F.3d at 45. Accordingly, the additional evidence also becomes part of the administrative record on appeal when the Appeals Council denies review. *See Schaal v. Apfel,* 134 F.3d 496, 505 n. 8 (2d Cir.1998).

"The Appeals Council is only required to review the entire record, which includes any new, material evidence submitted, and to determine if any of the ALJ's determinations go against the weight of the evidence." *Fernandez v. Apfel,* 1999 WL 1129056, \*3 (E.D.N.Y.1999). "No requirement is imposed on the Council to give a detailed description of the new medical evidence submitted or to explain its impact on the claimant's case." *Id.; see Riley v. Apfel,* 88 F.Supp.2d 572, 580 (W.D.Va.2000) ("The regulations do not explicitly require the Appeals Council to provide written findings with respect to any new evidence and its impact in light of the overall record and that this facilitates orderly decision-making within the agency").

**\*10** Nevertheless, in its "Notice of Appeals Council Action" letter, dated March 19, 2007 the Appeals Council stated:

"At the hearing the Administrative Law Judge stated that herniation, by itself, is not that significant unless there was impingement or stenosis. Your representative submitted an MRI that shows L4–5 herniation that slightly narrows the neural foramin and an L5–S1 herniation that causes no significant displacement of the nerve root. This evidence is consistent with your treatment records that note the presence of disc herniation, but not significant neurological deficits. This new evidence does not show that you have any limitations beyond those found by the Administrative Law Judge. The council found no basis for your representative's contention with respect to bias" (T6).

This section clearly explains that the Appeals Council did not review ALJ Wisniewski's decision because the MRI did not show the required nerve impingement or stenosis. Because the MRI report only reaffirmed the evidence in the record, which ALJ Wisniewski already had the opportunity to examine, the Appeals Council did not have to develop the record to support the MRI report, because the record already reflected the information. *See Law v. Barnhart,* 439 F.Supp.2d 296, 306 (S.D.N.Y.2006) (rejecting the claimant's argument the ALJ was required to obtain the actual results of a MRI, the court held that the ALJ had fully developed the record by relying on medical records provided by the treating and consulting physicians, which referenced and interpreted the MRI).

Plaintiff's reliance on *Amidon v. Apfel,* 3 F.Supp.2d 350, 356 (W.D.N.Y.1998) (Laimer, J.) is misplaced. In that case, the Appeals Council refused to review the ALJ's decision although it had received submissions from the plaintiff's *treating physician* refuting the findings contained in the ALJ's decision. *Amidon, supra,* at 356. However, here, no treating physician's opinion refuting the ALJ's finding was presented to the Appeals Council. The report was merely an interpretation of plaintiff's MRI, not an assessment by a physician with a treating relationship with plaintiff of her physical limitations.

Therefore, I find that the Appeals Council satisfied its obligation by examining the MRI report and finding that it did not provide an adequate basis for changing ALJ Wisniewski's decision.

**D. However, ALJ Wisniewski Failed to Properly Assess Plaintiff's Credibility**

As noted previously, plaintiff testified at the hearing that she needs to sit and lie down for "a couple hours" each day, "because the pain—the more I stay on my feet, the worse it gets." (T192). In questioning Dr. Ryan, ALJ Wisniewski noted that "there was testimony here today from the Claimant that she finds it necessary to lie down during the course of the day for a period of up to two hours. If that were to occur during the work hours ... what effect would that have upon occupations that exist in substantial [numbers] within the regional or national economy" (T205). Dr. Ryan responded: "Your Honor, this is a significant vocational limitation, and with this limitation this individual could not perform any substantial gainful activity that exists in significant numbers in the United States today" (*Id.*).

 **\*11**  However, ALJ Wisniewski did "not accept that response to be accurate, because the hypothetical factors upon which it is based are considered to be a material exaggeration of the substantial evidence of record. As previously referenced, I do not consider the claimant to be entirely credible in her testimony, *the extent of her subjective protestations remaining unsupported by clinical proof and other relevant evidence"* (T20–21, emphasis added).

In so ruling, he appears to have violated Social Security Ruling ("SSR") 96–7P (1996 WL 374181), which cautions that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence". *Davidow v. Astrue,* 2007 WL 1428430, *4 (W.D.N.Y.2007)* (Siragusa, J.). "The ALJ misapplied this ruling's requirements with regard to plaintiff's credibility .... [by] discredit[ing] plaintiff's testimony because it ... is unsubstantiated by objective medical evidence." *Id.,* *5.

Since ALJ Wisniewski found that plaintiff "has severe low back pain, shortness of breath, and obesity" (T21, ¶ 3), it is certainly not inconceivable that these factors would require her to lie down for two hours during the day. "Symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." SSR 96–7P, 1996 WL 374186, *1. Accordingly, plaintiff "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could

reasonably have caused *some degree* of the symptom." *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir.1996) (emphasis added).

Moreover, ALJ Wisniewski's decision does not specifically indicate whether he found her testimony concerning her need to lie down to be credible or incredible. Instead, he states merely that she is not "entirely" or "fully" credible. This vague conclusion fails to satisfy the requirements of SSR 96–7P: "The determination or decision on credibility ... must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." 1996 WL 374186, *2.

Plaintiff's credibility on this issue is absolutely critical to the disability determination, because if she is credible, then there is no doubt that she is disabled. Because ALJ Wisniewski failed to properly evaluate her credibility in that regard, I recommend that this case be remanded for reconsideration and clarification by the ALJ. "Remand is particularly appropriate where, as here, we are 'unable to fathom the ALJ's rationale in relation to the evidence in the record' without 'further findings or clearer explanation for the decision.' " *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996).

## CONCLUSION

**\*12** For these reasons, I recommend that defendant's motion for judgment on the pleadings (Dkt.# 9) be DENIED, that plaintiff's cross-motion (Dkt.# 11) be GRANTED, and that this matter be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation. Pursuant to 28 U.S.C. § 636(b)(l), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a) (3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. *See, e.g., Patterson–Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a) (3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a) (3). or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judge's refusal to consider the objection.*

## SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 68828

---

Footnotes

1    Judge Arcara later reassigned the case from himself to Hon. Michael A. Telesca (Dkt.# 13).

2    References to "T" are to the certified transcript of the administrative record filed by the defendant in this action.

3    Plaintiff interprets the checked "NA" box, on the "Return to work" line of Dr. Bagnall's "Follow-up evaluation" form, to mean "Not Able", as opposed to "Not Applicable". Defendant does not dispute this interpretation.

4    The record does not contain any treatment notes from Dr. Anthony Leone or indicate if plaintiff actually saw the surgeon.

Case 7:14-cv-09733-VB   Document 25   Filed 07/21/16   Page 65 of 88

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5676289
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Debbie MITCHELL, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner
of Social Security,[1] Defendant.

No. 09–CV–5429 (ENV).
|
Oct. 17, 2013.

**Attorneys and Law Firms**

William D. Kaplan, Queens Legal Services Corporation,
Long Island City, NY, for Plaintiff.

John Vagelatos, United States Attorney's Office,
Brooklyn, NY, for Defendant.

*MEMORANDUM & ORDER*

VITALIANO, District Judge.

 **\*1** Pursuant to 42 U.S.C. § 405(g), plaintiff Debbie
Mitchell seeks review of the final order of the
Commissioner of the Social Security Administration (the
"Commissioner") denying her application for disability
benefits under the Social Security Act ("the Act"). She
seeks reversal of the Commissioner's order and a finding
that she is disabled within the meaning of the Act, or,
in the alternative, a remand for further proceedings. The
parties have filed cross-motions under Federal Rule of
Civil Procedure 12(c) for judgment on the pleadings. For
the reasons discussed below, the Commissioner's motion
is denied, and Mitchell's motion is granted insofar as this
case is remanded to the Social Security Administration
("SSA") for further proceedings and a rehearing before a
different administrative law judge ("ALJ").

*Background*

**I. Procedural History**
On July 26, 2006, Mitchell applied for Supplemental
Security Income ("SSI") disability benefits due to various
psychological impairments, including depression and an
anxiety disorder. (Tr. at 99).[2] Mitchell alleged an onset
date of January 1, 2005. (Tr. at 99). SSA denied her
application on February 12, 2007; she requested a hearing
before an ALJ. (Tr. at 14). On November 24, 2008 that
hearing was held in Queens before ALJ Seymour Fier.
Mitchell appeared and testified, along with medical expert
Dr. Edward Halpern. (Tr. at 14).

In a January 26, 2009 written decision, the ALJ denied
Mitchell's claim for benefits. The ALJ concluded that,
while several of her conditions constituted minor or
moderate impairments, Mitchell retained the residual
functional capacity ("RFC") to perform simple tasks in a
low stress environment and was capable of performing her
past relevant work. (Tr. at 14–20). Consequently, the ALJ
determined that she was not disabled within the meaning
of the Act and denied her claim for benefits. (Tr. at 20).
That decision became the final order of the Commissioner
on October 9, 2009, when the Appeals Council denied
Mitchell's request for review. (Tr. at 5–7). Mitchell timely
filed this action on December 11, 2009.

**II. Factual Background**

*a. Personal and Work History*
At the time of the Commissioner's order, Mitchell was 31
years old and had completed a sixth grade education. (Tr.
at 23; *see also* Compl. (Dkt. No. 1) at 3). She then lived
with her three children, then aged 10, 8, and 2. (Tr. at
17). Apart from weekly therapy sessions, Mitchell's days
consisted mostly of light housework, taking care of her
children, and watching television. (Tr. at 30–32, 109–114).
She does not take public transportation and her social
interactions are minimal. (Tr. at 30–32, 109, 113).

According to forms Mitchell submitted to SSA, she
previously worked as a home caretaker between 1998 and
2004. (Tr. at 118). Her eight-hour workdays consisted
of cooking, cleaning, doing laundry, and taking care
of children, and she sometimes performed these tasks
concurrently. (Tr. at 118). On May 22, 2004, Mitchell
suffered a panic attack after an argument with her
boyfriend and was taken to Jamaica Hospital Medical
Center by ambulance. (117, 239–40). Soon thereafter, she
was fired from her job because her employer felt she was
no longer capable of caring for children. (Tr. at 168). She
has not worked in any capacity since that time. (Tr. at 24,
114, 168).

### b. Evidence from Medical Sources

**\*2** "[O]ut of desperation," Mitchell visited the New York Psychotherapy and Counseling Center ("NYPCC") on January 24, 2006 seeking treatment for her inability to function in social situations. (Tr. at 152–53). Her reported symptoms included anxiety, depressed mood, lack of sleep, and paranoid delusions. (Tr. at 189). On February 20, 2006, Mitchell started monthly appointments with Dr. Samuel Lustgarten, M.D., a psychiatrist affiliated with NYPCC. (Tr. at 221). In his initial examination, Dr. Lustgarten administered a GAF test, [3] on which Mitchell scored a 65; she was later re-evaluated at a score of 50. (Tr. at 276, 278). Over the course of treatment Dr. Lustgarten diagnosed Mitchell with Anxiety Disorder NOS [4] with psychotic features and found her to be "suffer[ing] from paranoid delusions, depress[ion], mood [iness], anxiety, [and] panic attack[s]." (Tr. at 221; *see also* Tr. at 152, 222–27, 276). Dr. Lustgarten prescribed a host of medications to ameliorate Mitchell's symptoms, including Prozac, Buspar, Klonapin, Lithium, Risperidone, Lamictal, Fluoxetine, Propranolol and Ambien. (Tr. at 27, 253, 279–284). On August 31, 2006, he determined that Mitchell could not work for at least 12 months from that time, (Tr. at 251–52), and indicated in a May 2007 report that Mitchell showed "marked" limitations [5] in all work-related mental characteristics.

At the Comissioner's request, Dr. Arlene Rupp–Goolnick, Ph.D., a consulting psychologist, examined Mitchell on October 18, 2006. Dr. Rupp–Goolnick completed a full evaluation of plaintiff, diagnosed her with depressive and bipolar disorders, and stated that her condition would affect her "ability to function on a daily basis." (Tr. at 171). Dr. Nissan Schliselberg, M.D., a non-examining psychiatrist working for SSA, evaluated Mitchell's medical records on February 12, 2007. He determined that plaintiff suffered from anxiety related to disorders, but found insufficient clinical evidence to support the diagnoses of depression and bipolar disorder. (Tr. at 216–218). He also detected moderate limitations in Mitchell's work-related skills, but sight unseen concluded that her "attention, concentration and memory were intact," and that she could "remember, understand and carry out simple tasks." (Tr. at 218).

### c. Evidence from Non–Medical Sources

On March 4, 2006, plaintiff began weekly therapy sessions with Jorge Niveyro, a licensed mental health counselor at NYPCC, which she apparently continued at least through November 2008. (Tr. at 180–87, 293–311). Niveryo's findings essentially mirrored those of Dr. Lustgarten: he determined that Mitchell was suffering from anxiety and depression, and assessed her judgment, insight, sensorium, and intellectual functioning as generally poor. (Tr. at 184–85, 293–94). Like Dr. Lustgarten, Niveyro concluded that Mitchell was unable to work on account of her limitations. (Tr. at 185). However, both Niveyro and Dr. Lustgarten agreed that, over the course of her treatment at NYPCC, Mitchell displayed some improvement from the combined effects of weekly therapy sessions and medication. (*See* Tr. at 252, 288, 304, 306, 308)

**\*3** It appears from the record that plaintiff began visiting other therapists at NYPCC at the beginning of 2008. For instance, the record includes a report and evaluation by Arthur Counts, a licensed clinical social worker dated January 4, 2008. (Tr. at 312). Other NYPCC therapists and/or supervisors who signed Mitchell's treatment review plans over the course of 2008 (and who therefore likely played a role in her treatment) include licensed clinical social workers Werner Perlman, John Montalto, Paul Ney, and Angel Maldonado. (Tr. at 220, 312–323). However, none of these individuals are mentioned in the ALJ's decision. [6]

### d. The Hearing

Presented at the November 2008 hearing before ALJ Fier was testimony from Mitchell herself and Dr. Edward Halpern, a non-examining medical expert who had reviewed Mitchell's medical records at the ALJ's request. Mitchell's testimony reaffirmed the information she had provided in forms filed with SSA and provided further details about her earlier life, the welfare assistance she was then receiving, and the extent of her impairments. (Tr. at 23–38). Dr. Halpern's testimony was largely a summary and, essentially, provided a review of reports made by other professionals. (Tr. at 38–42). He testified that, while Mitchell appeared to be suffering from an anxiety disorder and depression, he saw no evidence of bipolar disorder. (Tr. at 38–39). He also asserted that plaintiffs anxiety disorder was not severe enough to meet the listed criteria in the regulations at Step 3, and that her limitations were only "moderate." (Tr. at 38, 42). [7]

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

### e. ALJ's Decision

The ALJ's January 26, 2009 written decision denied plaintiff's claim for benefits. (Tr. 14–20). Although he found that Mitchell suffered from severe anxiety, the ALJ nonetheless determined that her impairment did not qualify as a listed condition, and, affirmatively, that she could work at all exertional levels if assigned simple tasks in a low-stress environment. (Tr. at 16–19). In line with these findings, the ALJ concluded that Mitchell could perform her past relevant work and was not disabled within the meaning of the Act. (Tr. at 19–20). The decision explained that, of the two physicians that examined Mitchell–Drs. Lustgarten and Rupp–Goolnick–he granted "greater weight" to the latter's opinion. (Tr. at 19). He asserted that Dr. Lustgarten's assessment that "claimant was markedly limited in every area of functioning ... cannot be given special consideration because ... [it is] not consistent with the sparse positive findings on examination." (Tr. at 19). By contrast, he found that Dr. Rupp–Goolnick's findings were "consistent with the residual functional ability found by the undersigned and based on actual positive findings and examination." (Tr. at 19). Except for a single, catch-all paragraph that named no individual expert, the ALJ did not address any of the reports by, or opinions of, the counselors or social workers from NYPCC.

**\*4** Plaintiff now argues that the ALJ committed legal error by discounting the opinion of her treating physician, Dr. Lustgarten. (Pl.'s Mem. at 1, 9, 16). The Commissioner maintains that the ALJ's decision rests on sound legal footing.

### Discussion

### I. Standard of Review

Section 405(g) of the Act empowers district courts to review a disability decision of the Commissioner and affirm, reverse, or modify that decision "with or without remanding ... for a rehearing." 42 U.S.C. § 405(g); *see Butts v. Barnhart,* 388 F.3d 377, 385 (2d Cir.2004). Yet, this power of review is not unbounded. When evaluating a determination by the Commissioner to deny a claimant disability benefits, a court may reverse the decision only if it is based upon legal error or if the factual findings are not supported by substantial evidence. *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000) (citing 42 U.S.C. § 405(g)).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

Courts are advised to "keep[ ] in mind that it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998). When evaluating the evidence, "the court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991).

### II. Standards for Entitlement to Benefits

To be eligible for disability benefits, a claimant must establish disability within the meaning of the Act having an onset prior to the expiration of the claimant's insured status. 42 U.S.C. §§ 423(a)(1)(A), 423(c). SSA has promulgated a five-step sequential analysis that an ALJ must use to determine whether a claimant qualifies as disabled. *See, e.g., Rosa v. Callahan,* 168 F.3d 72, 77–78 (2d Cir.1999). First, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C .F.R. § 404.1520(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the ALJ must determine whether the claimant has a "severe" impairment that limits her work-related activities. *Id.* § 404.1520(a)(4)(h). Third, if such an impairment exists, the ALJ evaluates whether the impairment meets or equals the criteria of an impairment identified in the Commissioner's appendix of listed impairments. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is entitled to benefits. If not, the ALJ proceeds to the fourth step and determines whether the claimant has the residual functional capacity to perform her past relevant work. [8] *Id.* § 404.1520(a)(4)(iv). This step requires that the ALJ first make an assessment of the claimant's residual functional capacity generally. *Id.* § 404.1520(e); *see also id.* § 404.1545. Fifth, if the claimant cannot perform her past work, the ALJ determines whether there is other work that the claimant could perform. *Id.* § 404.1520(a)(4)(v). At this step, the ALJ must consider four factors: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience." *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999) (internal quotations omitted).

**\*5** The claimant bears the burden of proof as to the first four steps of the process for determining disability status. *See, e.g., Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003). If the claimant proves that her impairment prevents her from performing past relevant work, the burden shifts to the Commissioner at the final step. *Id.* In the fifth step, the Commissioner must show that the claimant retains the residual functional capacity to perform a certain category of work, such as light work or sedentary work, and that such work is available in the national economy. *Curry v. Apfel,* 209 F.3d 117, 122–23 (2d Cir.2000). Subsequent SSA regulations have removed the requirement that the Commissioner bear the burden of showing residual functional capacity, at least in cases in which the onset of disability postdates August 26, 2003. 20 C.F.R. § 404.1560(c)(2); *see Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009). [9]

III. The Treating Physician Rule
Under SSA regulations, "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan,* 168 F.3d 72, 78–9 (2d Cir.1999) (*citing* 20 C.F.R. § 404.1527(c)(2)). This is known as "the treating physician rule." Although "[a] treating physician's statement that the claimant is disabled cannot itself be determinative," since that question is ultimately reserved for the Commissioner, the treating physician's opinion as to *"the nature and severity of [a claimant's] impairment(s)" is* determinative if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003) (*citing* 20 C.F.R. § 404.1527(c)(2)) (emphasis in original). The Second Circuit has previously held that a treating physician's RFC assessment for a claimant relates to the nature and severity of an impairment, and, hence, is subject to controlling weight evaluation under the treating physician rule. *See, e.g., Sanders v. Comm'r of Soc. Sec.,* No. 11–2630–CV, 2012 WL 6684569, at ——2–3 (2d Cir. Dec.26, 2012) (remanding the case because ALJ had not justified his failure to accord controlling weight to the treating physician's RFC assessment).

As Mitchell's treating physician, Dr. Lustgarten found that Mitchell's mental health limitations were "marked" in every area of functioning, and that she was unable to work for at least 12 months as a result. (Tr. at 226, 251–52). However, ALJ Fier discounted that opinion in favor of Dr. Rupp–Goolnick's views on the grounds that the former was "not consistent with the sparse positive findings on examination." (Tr. at 19). By contrast, the ALJ deemed Dr. Rupp–Goolnick's report "consistent with the residual functional ability found by the undersigned and based on actual positive findings." (Tr. at 19). In short, the ALJ chose the views most consistent with his own findings.

**\*6** The ALJ's assignment of lesser weight to Dr. Lustgarten's assessment of Mitchell cannot pass muster under the treating physician rule. First, courts have repeatedly cautioned ALJs not to place substantial reliance on one-time consultative evaluations such as Dr. Rupp–Goolnick's evaluation and report. *See, e.g., Simmons v. U.S. R.R. Retirement Bd.,* 982 F.2d 49, 55 (2d Cir.1992) ("The opinion of a consulting physician who examined the claimant once generally does not constitute substantial evidence on the record as a whole, particularly when contradicted by other evidence."); *Cruz v. Sullivan,* 912 F.2d 8, 13 (2d Cir.1990) ("[I]n evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight."). Eerily instructive on this point is *Spielberg v. Barnhart,* 367 F.Supp.2d 276, 283 (E.D.N.Y.2005), where the court observed that "although there was disagreement over whether plaintiffs limitations were moderate or marked, the one-time assessments should not have been considered 'substantial evidence.' " *See also Moore v. Astrue,* No. 07–CV–5207 (NGG), 2009 WL 2581718, at \*10 n. 22 (E.D.N.Y. Aug.21, 2009) ("[A]n inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician.").

Pointedly, Dr. Rupp–Goolnick examined Mitchell on one occasion only, while Dr. Lustgarten met with her on a monthly basis for over two years. Both doctors found impairments. In discounting the treating physician's assessment the ALJ merely posited that Dr. Lustgarten's findings were "not consistent with the sparse positive findings on examination," whereas Dr. Rupp–Goolnick's were "consistent with the residual functional ability" the ALJ himself had found that was, seemingly in *ipse*

*dixit* fashion, "based on actual positive findings." (Tr. at 19). In the absence of further explanation and analysis, this justification is virtually meaningless. Specifically, ALJ Fier does not explain what these "sparse positive findings" actually are and who made them, or whether Dr. Lustgarten's monthly observations of Mitchell over the course of two years were included or excluded from his consideration. Although the memory and counting tests were administered by Dr. Roop–Goolnick, there is no way to tell whether the ALJ anchored his findings in these results, and if so, why. These simple tests, moreover, neither contradict nor displace Dr. Lustgarten's findings. In fact, Mitchell did not perform particularly well on them: she could only remember two out of three objects after five minutes, and was able to count in serial threes up to six digits forwards and four digits backwards. (Tr. at 170.) Neither Dr. Roop–Goolnick nor ALJ Fier offered any indication of how Mitchell's performance compared to the average test-taker, thus limiting the usefulness of the test. Clearly, this does not constitute substantial evidence undercutting Dr. Lustgarten's opinion. Bluntly, both experts found significant impairments, disagreed about their severity, and the ALJ improperly chose to credit the one-time examinor's conclusions over that of the long-time treating physician.

**\*7** On a related front, ALJ Fier also makes much of the fact that plaintiff was capable of performing some household chores and activities, such as feeding herself and her children, paying her bills, walking, and communicating with neighbors in order to receive help from them. (Tr. at 18–19). Yet, these facts prove little. As courts have held, evidence of a claimant's ability to complete household chores does not defeat a claim for disability, "as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Woodford v. Apfel,* 93 F.Supp.2d 521, 529 (S.D.N.Y.2000); *see also Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998) ("We have stated on numerous occasions that a claimant need not be an invalid to be found disabled under the Social Security Act.") (internal quotations omitted). Plaintiff's ability to perform basic tasks in the confines of her home and neighborhood in order to live and care for her children does not undermine Dr. Lustgarten's medical opinion.

Furthermore, in the first place, the ALJ inaccurately declares that Dr. Roop–Goolnick's findings are "consistent with the residual functional ability found by

the undersigned." (Tr. at 19). As previewed above, this assertion, since it suggests this congruency was the basis for the ALJ's favorable consideration, is problematic enough on its face. ALJs are instructed to base their RFCs determinations on all the evidence before them—including all medical opinions—rather than self-formulate them and *then* compare them to the various medical opinions in the record, as ALJ Fier seems to have done, and give controlling weight to the medical opinion that best fits. *See* 20 C.F.R. § 404.1545(a)(3)-(4). That would be bad enough. However, here, the ALJ is also simply incorrect in seeing congruency: Dr. Roop–Goolnick's findings do not reflect the determination espoused by the ALJ that Mitchell "has no restriction" in "activities of daily living" and only mild or moderate limitations otherwise, enabling her to "perform the entire range of work at all exertional levels ... [if given] simple tasks ... in a low-stress environment." (Tr. at 17, 19).

In fact, Dr. Rupp–Goolnick found that, while plaintiff could complete simple tasks, maintain concentration, and relate adequately to others, she could *"not* maintain a regular schedule due to depression," could *not* "perform complex tasks independently ... [or] make appropriate decisions," and was *"overwhelmed and overburdened"* as a mother. (Tr. at 170) (emphasis added). She concluded in the *coup de grace,* that Mitchell's "psychiatric problems ... may significantly interfere with [her] ability to function on a daily basis." (Tr. 171). In rummaging through Dr. Rupp–Goolnick's opinion ALJ Fier selectively chose to leave these findings out in favor of ones more in harmony with his own RFC determination. *See Gecevic v. iSecretary of Health and Human Services,* 882 F.Supp. 278, 286 (E.D.N.Y.1995) (an ALJ "cannot simply selectively choose evidence in the record that supports his conclusions").

**\*8** Quite simply, the ALJ, in failing to identify substantial evidence casting doubt on Dr. Lustgarten's findings, also failed to identify substantial evidence supporting his mischaracterized version of the favored opinion of Dr. Rupp–Goolnick. But even if he *had* articulated a valid record basis for granting less than controlling weight to Dr. Lustgarten's opinion, the ALJ still would have committed legal error because he did not discuss or analyze "[the requisite] 'factors' to determine *how much* weight to give to the opinion." *Halloran,* 362 F.3d at 32 (*citing* 20 C.F.R. § 404.1527(d)(2)) emphasis added); [10] *see also Schaal,* 134 F.3d at 504–05 (2d Cir.1998) (ALJ's

failure to provide "good reasons" for discounting a treating physician's medical opinion constitutes legal error); *Pierre v. Astrue,* No. 09–CV–1864 (JG), 2010 WL 92921, at *10 (E.D.N.Y. Jan.6, 2010) ("[A]n ALJ is required by the regulations to explain the degree a treating source's opinion deserve when it is found not to be controlling, and consider specified factors in that determination."). These factors are:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA's] attention that tend to support or contradict the opinion.

*Halloran,* 362 F.3d at 32 (*citing* 20 C.F.R. § 404.1527(d)(2)). [11] The regulations also specify that the ALJ "will always give good reasons in [his] notice of determination or decision for the weight [he] give [s] [claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *accord id.* § 416.927(c)(2).

In reaching his decision, the ALJ undertook no such analysis with regard to the findings and opinions of Dr. Lustgarten, nor did he specify how much weight he granted to that opinion (the decision suggests it was very little). Rather, he simply asserted that Dr. Lustgarten's opinion "cannot be given special consideration," and that Dr. Rupp–Goolnick's deserved "greater weight." (Tr. at 19). There was no assessment, for example, as to why one or another test result or observation was more or less credible than another. The ALJ's declared conclusion, standing alone, does not satisfy the standards described in the regulations, and constitutes legal error.

## IV. The ALJ Failed to Adequately Evaluate Other Source Evidence

On yet another front, the ALJ failed to properly evaluate the opinions of the non-medical experts that treated Mitchell at NYPCC. These include licensed mental health counselor Jorge Niveyro, Mitchell's therapist who saw her on a weekly basis for over two years, and licensed clinical social workers Paul Ney, Werner Perlman, Arthur Counts, John Montalto, and Angel Maldonado. (*See* Tr. at 220, 312–323). Although they are not "acceptable medical sources," therapists and social workers are "other sources" whose opinions must be considered by an ALJ. *See* 20 C.F.R. § 416.913(d) (defining "other sources");

*White v. Comm'r of Soc. Sec.,* 302 F.Supp.2d 170, 176 (W.D.N.Y.2004) (holding that "the ALJ erred by not giving appropriate weight to the opinion of plaintiff's social worker"); *Schaal v. Callahan,* 993 F.Supp. 85, 94 (D.Conn.1997) (holding similarly); SSR 85–16, 1985 WL 56855, at *4 (S.S.A.1985) (other sources, including social workers and mental health centers, "may play a vital role in the determination of the effects of impairment"). "In fact, '[a]n opinion from a "non-medical source" who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source.' " *Kitt v. Astrue,* No. 10–CV–839S, 2012 WL 1038627, at *5 n. 7 (W.D.N.Y. March 27, 2012) ((quoting SSR 06–03p, 2006 WL 2329939 at *4 (Aug. 9, 2006)).

**\*9** Here, the ALJ all but ignored the evaluations of Niveyro, Perlman, Counts, Montalto, and Maldonado in his opinion. Collectively, these individuals' names appear on approximately 40 pages worth of reports that were part of the record. (*See* Tr. at 220, 180–87, 293–323). ALJ Fier devoted only one paragraph to "medical records from New York Psychotherapy and Counseling Center," cited to only three of the 40 pages, [12] and made no reference to any of the individual non-medical sources or their actual judgments about Mitchell's impairments and functioning. (Tr. at 17). The ALJ gave short shrift to potentially crucial evidence by glossing over these reports. That was legal error, *see, e.g., White v. Comm'r of Soc. Sec.,* 302 F.Supp.2d 170, 176 (W.D.N.Y.2004) (holding that "the ALJ erred by not giving appropriate weight to the opinion of plaintiff's social worker"); *Schaal v. Callahan,* 993 F.Supp. 85, 94 (D.Conn.1997) (holding similarly); that error was magnified by the affiliation of these disregarded non-treating sources with NYPCC, where Dr. Lustgarten was based.

Moreover, to the extent the ALJ *did* address reports by NYPCC personnel, his evaluation was deficient. The single paragraph in which he considered these reports consists primarily of cherry-picked observations that supported his ultimate finding of no disability, such as the fact that "claimant's grooming was appropriate," that "her memory was considered to be fair," and that she was "cooperative." (Tr. at 17). At the same time, escaping the ALJ's gaize was the wealth of contrary findings included in these reports, such as Ney's conclusion that Mitchell was "minimally able to function in her normal life affairs

let alone in a work setting," the significant amount of help she needed from her neighbors in completing basic tasks, and reports of Mitchell's persistent anxiety, distress that something bad would happen to her, and fears of simply walking in her neighborhood. (*See, e.g.,* Tr. at 220, 312 318–319). Again, an ALJ "cannot simply selectively choose evidence in the record that supports his conclusions." *Gecevic,* 882 F.Supp. at 286. The ALJ in this case acted in exactly such a manner-it was improper, it is legal error and it makes a remand for further proceedings inescapable.

V. Proceedings on Remand

Plaintiff requests that her case be remanded solely for calculation of the monthly benefits payable to her. (Compl. at 16). Such a remedy is only appropriate "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Pratts v. Harris,* 626 F.2d 225, 235 (2d Cir.1980). However, "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the Second Circuit has], on numerous occasions, remanded to the Commissioner for further development of the evidence." *Rosa,* 168 F.3d at 82–83. In this case, the ALJ failed to adhere to the treating physician rule with regard to Dr. Lustgarten's opinion and did not give proper consideration to the non-medical source evidence adduced at the hearing. Because it is the role of an administrative law judge and the Commissioner,

and not the Court, to consider such evidence in accord with the legal standards governing the evaluation of such evidence, further evidentiary proceedings are warranted, and remand solely for calculation of benefits is inappropriate. But, it is compelling from the Court's review of the existing record and what the administrative decision revealed of the analytical process on the first go-round that ALJ Fier, the "undersigned," reached his own conclusions about plaintiffs disability and then searched the evidentiary record for support. Remand for further proceedings before a different administrative law judge other than ALJ Fier is, thus, also warranted.

*Conclusion*

**\*10** For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied. Mitchell's cross-motion is granted to the extent that the final order of the Commissioner is vacated, the administrative decision is reversed and the matter remanded for further proceedings consistent with this Memorandum and Order and a rehearing before a different ALJ.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5676289

Footnotes

1   As of February 14, 2013, Carolyn W. Colvin replaced Michael Astrue as the Acting Commissioner of Social Security. As a result, Carolyn W. Colvin is substituted as a party to this action. *See* Fed.R.Civ.P. 25(d). The caption is ordered amended to reflect the substitution.

2   Citations to the underlying administrative record are designated as "Tr.".

3   GAF stands for Global Assessment of Functioning Scale. A score of 41–50 indicates serious symptoms or impairment in social, occupation, or school functioning. (PL's Mem. (Dkt. No. 12, Att.3) at 5 n. 3). A score of 51–60 indicates moderate symptoms, and a score of 61–70 indicates mild symptoms, but allows the patient to function relatively well and have meaningful social relationships. (*Id.*)

4   NOS is an abbreviation for "not otherwise specified." (Pl.'s Mem. at 3 n. 1). The phrase refers to disorders that do not meet the criteria for any specific type of anxiety disorder (*Id.*)

5   "Marked limitations" are "serious limitation[s]" indicating "a substantial loss in the ability to effectively function." (Tr. at 226).

6   At the hearing, plaintiff also stated that she had previously received treatment from a physician she recalled was named Dr. Wesner and a therapist named Peter. (Tr. at 27–28). She provided no other identifying information with regard to either individual.

7   A number of physicians also discussed Mitchell's physiological health. Apart from hypertension and a single instance of leg pain (possibly the result of conversion disorder), no report of physiological abnormalities appears in the record. (*See* Tr. at 172–75, 218, 220, 285–86, 289).

2013 WL 5676289

8    Under the regulations, "past relevant work" is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1).

9    The Second Circuit has "left open" the question of whether the Commissioner bears the burden of proving residual functional capacity if the claimant's onset of disability is earlier than August 26, 2003. *Mancuso v. Astrue,* 361 Fed. App'x 176 (2d Cir.2010). However, district courts in the Second Circuit have consistently applied the old *Curry* standard when the claimant's onset of disability precedes that date. *See Cataneo v. Astrue,* No. 11–CV–2671, 2013 WL 1122626, at *22 (E.D.N.Y. Mar. 17, 2013) (collecting cases). Though interesting, that questions is academic here since the onset of disability occurred in 2005.

10   This regulation has since been renumbered 20 C.F.R. § 404.1527(c)(2).

11   *See* n. 14, *supra.*

12   The ALJ cites to "Exhibit 20–F, pages 7, 10, 27, 46 and 47." (Tr. at 17). The latter three pages correspond to Tr. at 293 (the first page a report by Niveyro) and 312–13 (a report signed by Counts and Maldonado). He cites to no reports signed by Ney, Perlman, or Montalto.

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2573638
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Wilfredo MOLINA, Plaintiff,
v.
Carolyn W. COLVIN, Acting Commissioner
of Social Security, Defendant.

No. 13 Civ. 4701(GBD)(GWG).
|
Signed May 14, 2014.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate
Judge.

**\*1** Plaintiff Wilfredo Molina brings this action *pro se*
pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain
judicial review of the final decision of the Commissioner
of Social Security ("Commissioner") denying his claim for
Supplemental Security Income ("SSI") under the Social
Security Act. The Commissioner has moved for judgment
on the pleadings pursuant to Rule 12(c) of the Federal
Rules of Civil Procedure. Molina has not responded to the
motion. For the reasons stated below, the Commissioner's
motion should be granted.

I. *BACKGROUND*

A. *Molina's Claim for Benefits and Procedural History*
Molina applied for SSI benefits on October 18, 2010,
alleging that he became disabled on June 1, 2003. *See*
Administrative Record, filed Nov. 6, 2013 (Docket # 13)
("R"), 89–97. Molina contends that he is entitled to SSI
benefits because he became disabled after he was involved
in a motor vehicle accident in April 2003. R. 89; 151–55. In
response to an SSI application question that asked Molina
to list all of the physical conditions that "limit your ability
to work," Molina wrote "chronic backache." R. 108.

On January 21, 2011, the Commissioner denied Molina's
application for SSI benefits. R. 43–47. Molina requested
a hearing before an administrative law judge ("ALJ").
R. 48–50. A hearing before an ALJ was held on April

26, 2012. R. 20–42. On May 14, 2012, the ALJ issued a
decision finding that Molina was not disabled. R. 5–16.
The Appeals Council denied Molina's request for review
on May 6, 2013. R. 1–4. On July 3, 2013, Molina filed the
instant *pro se* lawsuit seeking review of the ALJ's decision
under 42 U.S.C. §§ 405(g) and 1383(c)(3). *See* Complaint,
filed July 3, 2013 (Docket # 2). On November 6, 2013,
the Commissioner moved for judgment on the pleadings.
*See* Notice of Motion, filed Nov. 6, 2013 (Docket #
14); Memorandum of Law in Support of Defendant's
Motion for Judgment on the Pleadings, filed Nov. 6,
2013 (Docket # 15) ("Comm'r Mem."). When Molina
failed to respond to the Commissioner's motion, or submit
any other correspondence since the case was filed, the
Court issued an order requiring him to inform the Court
whether he sought additional time to oppose the motion.
*See* Order, dated Jan. 16, 2014 (Docket # 20). Molina
sent a letter to the Court on February 3, 2014, indicating
that he was requesting additional time to file opposition
papers because he had "not been able to obtain legal
representation." *See* Letter, dated Feb. 3, 2014 (Docket
# 22). The Court thereafter extended Molina's time to
respond to the Commissioner's motion until February
28, 2014. *See* Order, dated Feb. 7, 2014 (Docket # 23).
Notwithstanding this extension of time, Molina has filed
no papers in opposition to the Commissioner's motion.

B. *The Administrative Record Before the ALJ*
The Commissioner has provided a summary of
the medical evidence contained in the administrative
record. *See* Comm'r Mem. at 2–8. Molina has not
contested the Commissioner's summary of this evidence.
Having examined the administrative record, the Court
incorporates by reference the Commissioner's summary as
accurate and complete.

C. *The April 26, 2012 Hearing*
**\*2** Molina appeared without representation for his
hearing before an ALJ on April 26, 2012. R. 22. Molina
testified that he had not had any substantial earnings
since 1993 and that he had been working as a banquet
houseman at the Loews New York Hotel at that time.
R. 31. He testified that he stopped working there because
he "was trying to find some other work" but has "not
worked since then." R. 32. The ALJ asked why Molina
had not worked since then, and Molina responded, "[w]ell,
I actually—my son came in to the picture. I became a

single parent taking care of the child, and difficulty with the mother and stuff." *Id.*

With regard to his alleged disability, Molina testified that his main impairments concerned his "lower back," his "upper back," and his "neck." *Id.* He explained that he was in a motor vehicle accident in 2003 and "went through the whole process ... MRI's and stuff and therapy and stuff." *Id.* He testified that he had undergone MRI's in 2003 and 2011, R. 33, and that he has "had many treatments," *id.* These included "physical therapy" and "pain management," but Molina stated, "basically they have not been able to do anything for me. So I have been basically taking Advil's, and Motrin's and stuff of that nature." *Id.* The ALJ asked if Molina had undergone any surgical procedures, and Molina responded that after the 2011 MRI was taken, "the doctor then suggested that I either take surgery or injections, and I refused to take both of them." *Id.* With respect to Motrin and ibuprofen, Molina stated, "[t]hey seem to work a lot better, and the symptoms are not as bad as the drugs that I've taken." *Id.* He stated that he did not take any other medications besides the ones he mentioned. *Id.*

The ALJ asked Molina if he suffered from any other conditions, aside from his back problems, and Molina stated that he had "been suffering for the past few years of sinusitis and sinus infection," and that he had sought treatment for these issues and was "presently under the same medication." *Id.* He added, "[t]hat seems to be working fine for me." R. 33–34. The ALJ noted that the record contained a diagnosis of high blood pressure, and Molina stated that he did have high blood pressure. R. 34. The ALJ asked if he was on medication for that condition, and Molina responded, "[o]n and off. I really —I really didn't like the symptoms of the medications that I've been taking." *Id.* The ALJ then asked if Molina suffered from any other conditions not yet discussed, and Molina responded, "[t]here is one treatment that I've been neglecting a lot, and been neglecting to see a doctor is extreme depression, you know. I've been a single parent with this child since he was born, and I've really gone through a lot, you know." *Id.* The ALJ sought clarification on this condition, and Molina confirmed that he had not received any treatment for depression, but he was "thinking about seeking some type of treatment." *Id.* Molina also confirmed that nobody had diagnosed depression, but added, "I, I, I can feel it, you know. I can feel depressed. I'm segregating myself sometimes from my

family. I'm basically a loner, and I don't go out very often." *Id.*

**\*3** The ALJ then asked Molina to describe his daily activities. *Id .* Molina began by stating, "[w]ell, I basically stay home a lot, Your Honor." *Id.* The ALJ asked if, after waking up in the morning, Molina showers, bathes, and has breakfast, and Molina responded, "[y]eah. The normal things." R. 34–35. Molina then added that his son "has a condition where he is hyperactive. He is MR. He has mental problems as well." R. 35. He testified that his son requires special care, like "monitoring home, you know, and just going and taking him places, and he basically helps me with everything in the house." *Id.* The ALJ asked what kind of places Molina takes his son to, and Molina responded, "[w]ell, you know, we go to the supermarket. He will help me with the groceries. He will help carry the groceries. Sometimes a friend of his comes over and, you know. He is a loner. He doesn't associate with people too much and he has—he is also on SSI, and I'm his—presently, I'm his payee." *Id.* The ALJ then sought clarification on Molina's other life activities, including laundry and cooking. R. 35–36. Molina said he has family members do laundry for him and that he does not cook often because he is "not a very good cook." R. 36. He stated, "I either order out pizza, a lot of pizza, and order out in restaurants, Chinese restaurants." *Id.* In response to additional questions posed by the ALJ, Molina testified that he goes to the doctor "[o]nly when it's really urgent" and that he traveled to the hearing in a cab, but "normally travel[s] on the bus." *Id.*

The ALJ then heard testimony from Raymond Cestar, a vocational expert. *Id.* The ALJ asked the vocational expert to assume a hypothetical individual with the same age, education, and work experience as Molina with the following residual functional capacity: the person could perform up to a light exertional limitation, meaning he could lift up to 20 pounds occasionally and lift or carry up to 10 pounds frequently, stand or walk for approximately six hours per eight hour work day, sit for approximately six hours for an eight hour work day with normal breaks, and unlimited pushing and/or pulling including the operation of hand and/or foot controls. The person could not climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, with occasional balancing, stooping, kneeling, crouching, and crawling, with no manipulative limitations, no visual limitations, and no communicative or environmental limitations. *Id.*

The ALJ asked the vocational expert if there would be work in the regional or national economy that such a person could perform. *Id.* In response, the vocational expert testified that such a person could perform the jobs at the "light" level of exertion and that there were jobs available locally and nationally such as cleaner/ housekeeper, folder of laundry, and dry cleaning bagger. R. 37–38.

### D. *The ALJ's May 14, 2012 Decision*

**\*4** On May 14, 2012, the ALJ issued a decision denying Molina's request for SSI benefits. R. 8–16. First, the ALJ found that Molina had not engaged in substantial gainful activity since October 18, 2010, the date on which he applied for benefits. R. 10. The ALJ found that Molina suffered from degenerative disc disease of the cervical spine with disc herniation and degenerative disc disease of the lumborsacral spine, both of which are "severe" impairments within the meaning of governing regulations. *Id.* The ALJ found that Molina's sinusitis and hypertension were "non-severe" impairments because they did not have "more than a minimal impact on his ability to do work like activities." *Id.* The ALJ determined that Molina's impairments did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P., Appendix 1. *Id.*

The ALJ assessed Molina's residual functional capacity and found that Molina had "the residual functional capacity to perform light work ... except [he] is unlimited in pushing or pulling with his upper extremities and with the operation of bilateral foot controls." *Id.* at 11. The ALJ further found that Molina could never climb ladders, ropes, or scaffolds; that he could occasionally climb ramps or stairs; that he is limited to occasional balancing, kneeling, crouching, stooping, and crawling; and that he has no limitations in gross or fine manipulations, as well as no visual limitations, communicative limitations, or environmental limitations. *Id.*

The ALJ noted that Molina alleged that he had stopped working in 2003 "due to his conditions" but that a review of Molina's earnings record showed that he had not had any substantial earnings since 1993. R. 12. The ALJ also summarized Molina's account of his daily activities, which include helping his son with his homework, cleaning, and doing laundry without assistance. *Id.* The ALJ noted that Molina said he had no difficulty with basic activities of daily living, including bathing, grooming, feeding himself,

and making meals, and that Molina said he leaves home approximately three times per week and that he travels by himself via public transportation. *Id.* The ALJ then noted that despite Molina's account of his lifestyle, he "also alleges that he cannot lift, that he can only stand for seven to eight minutes, that he can only walk one to three blocks, but that sitting helps his back" and that he "has to take his time climbing stairs and has difficulty kneeling or squatting." *Id.* He added that Molina said he has "no difficulty using his hands or reaching." *Id.*

The ALJ then recounted relevant portions of Molina's hearing testimony and noted several inconsistencies between that testimony and Molina's prior allegations, as well as inconsistencies that arose within the hearing testimony itself. The ALJ noted that Molina testified that he had not worked since 1993 "contrary to his prior allegations," *id.*—apparently referring to the statement in his application that he had stopped working in 2003. Molina testified that he stopped working in 1993 "because he was looking for other work," but he also testified that he has "not worked since 1993 since he had to care for his son." *Id.* Regarding Molina's treatment history, the ALJ noted that Molina "testified to having several different types of treatment for his pain, including pain management and physical therapy. However, he then testified that he is now only taking over-the-counter medications." *Id.* Molina had also refused surgery or injections, which were offered by his doctors, and testified that the over-the-counter medications "do help with his pain." *Id.* The ALJ noted that Molina "testified that his son is mentally handicapped, but that his son helps him shop for groceries and do things around the house" and that "[c]ontrary to his prior allegations, [he] testified that he does not cook often and he has family members that do his laundry." *Id.* Similarly, the ALJ highlighted Molina's October 22, 2010, visit with Dr. Prajna Latika at Bronx–Lebanon Hospital, during which Dr. Latika noted that he came "to the clinic for purposes of [a] letter of disability as patient suffer[s] from chronic lower back pain which started after an automobile accident in 2003 and is worse since [November] 2009 when he used to lift heavy boxes." R. 13 (alterations in original). The ALJ noted that "this is drastically different from [Molina's] testimony that he has not been able to work since being involved in a car accident in 2003" and that Molina "did not make any mention of reinjuring his back in 2009." *Id.*

**\*5** The ALJ concluded that, with respect to Molina's alleged spinal impairments, "the medical evidence of record does not fully support the severe limitations" alleged by Molina. R. 12. The ALJ noted that MRI's had showed various impairments but that "at a January 12, 2009, evaluation at FEGS, [Molina] denied any barrier to employment" and "[c]uriously ... expressed an interest in doing maintenance work." R. 12–13. The ALJ also stated that "[n]otably, a February 2011 MRI of [Molina's] lumbosacral spine shows no evidence of significant disc herniations or spinal stenosis ." R. 13. The MRI did show "moderately prominent degenerative changes of the lumbar spine, but no other significant abnormalities." *Id.*

The ALJ also considered the opinion evidence contained in the record. The ALJ gave no weight to the opinion of Rafael Mastov, a physical therapist who had opined on October 22, 2010, that Molina was not a candidate for employment but should be reevaluated in six weeks. *Id.* The ALJ found that Mastov was "not an acceptable medical source," meaning that his opinion was not entitled to any special weight, and that substantial medical evidence of record also directly contradicted the "extraordinary limitations" described by Mastov. *Id.* In particular, Mastov's opinion was contradicted by "Dr. Latika's unremarkable physical examination" of Molina. *Id.* Additionally, the ALJ found that Mastov's opinion was contradicted by Molina's own allegations and testimony that he was able to travel independently, go grocery shopping, and perform activities of daily living without incident. *Id.* The ALJ gave "great weight" to the opinion of Dr. William Lathan, who performed an internal medicine consultative examination on Molina. R. 13–14. Dr. Lathan had concluded that Molina was moderately limited in bending, lifting, pushing, pulling, or strenuous exertion. R. 14. This opinion was based on a "direct examination" of Molina and was "consistent with Dr. Latika's examination and with [Molina's] most recent MRI." *Id.* As for Dr. Amos Alabi from Doctors Medical Group, who had opined on February 11, 2011, that Molina's "back pain does not permit [him] to be employed," the ALJ gave this opinion no weight. *Id.* Despite finding that Molina was not employable, Dr. Alabi "also described [his] back pain as moderate" and stated that "physical therapy has helped manage" the pain. *Id.* The ALJ found that Dr. Alabi's opinion was contradicted by the physical examinations performed by Drs. Lathan and Latika, and that his opinion was not consistent with the most recent MRI of Molina's lumbar spine. *Id.*

The ALJ concluded that Molina's medically determinable impairments could "reasonably be expected to cause the alleged symptoms" but that Molina's "statements concerning the intensity, persistence and limiting effects of these symptoms" were not fully credible. *Id.* The ALJ concluded that Molina could sit for up to six hours in an eight-hour day, stand and/or walk for six hours in an eight-hour day, lift up to ten pounds frequently and twenty pounds occasionally, except that he could never climb ladders, ropes, or scaffolds; he could occasionally climb ramps or stairs; he is limited to occasional balancing, kneeling, crouching, stooping, and crawling; he has no limitations in gross or fine manipulations; and he has no visual limitations, communicative limitations, or environmental limitations. *Id.*

**\*6** The ALJ found that Molina had no past relevant work within the meaning of governing regulations. *Id.* Considering Molina's age, education, work experience, and residual functional capacity, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that he could perform. R. 15. The ALJ found that Molina's ability to perform all or substantially all of the requirements of "light work" was impeded by additional limitations, and relied on the vocational expert's testimony to determine the extent to which these limitations erode the unskilled light occupational base. *Id.* Considering all relevant factors, the vocational expert found that Molina could perform the requirements of housekeeper, folder of laundry, and dry cleaning bagger. *Id.* Thus, in light of the vocational expert's testimony as well as Molina's age, education, work experience, and residual functional capacity, the ALJ concluded that Molina has not been under a disability, as defined in the Social Security Act, since October 18, 2010, the date of Molina's application. R. 15–16.

## II. *APPLICABLE LAW*

A. *Scope of Judicial Review under 42 U.S.C. § 405(g)*
A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir.2013) (citation and internal quotation marks omitted); *accord Burgess v.*

*Astrue,* 537 F.3d 117, 127 (2d Cir.2008); *see generally* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...."). Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)); *accord Burgess,* 537 F.3d at 127–28; *Matthews v. Leavitt,* 452 F.3d 145, 152 n. 9 (2d Cir.2006); *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." *Johnson v. Astrue,* 563 F.Supp.2d 444, 454 (S.D.N.Y.2008) (citing *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir.2012) (citation omitted). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise." Id.* (emphasis in original) (citation and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." *Johnson,* 563 F.Supp.2d at 454 (citations and internal quotation marks omitted). Importantly, it is not a reviewing court's function "to determine *de novo* whether [a claimant] is disabled." *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998) (citation omitted).

B. *Standard Governing Evaluation of Disability Claims by the Agency*

*7 The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. *See* 20 C.F.R. § 404.1520(a)(4); *see also Burgess,* 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," *id.* § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities ...," *id.* § 404.1520(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. *Id.* § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's residual functional capacity ("RFC") to determine if the claimant is able to do work he or she has done in the past, *i.e.,* "past relevant work." *Id.* § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. *Id.* Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity permits the claimant to do other work. *Id.* § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. *Id.* The claimant bears the burden of proof on all steps except the final one—that is,

proving that there is other work the claimant can perform. *See Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009) (per curiam).

### III. *DISCUSSION*

**\*8** Molina does not specify in his complaint the grounds on which he seeks reversal of the ALJ's decision. Nor has he submitted any papers in opposition to the Commissioner's motion for judgment on the pleadings. Nonetheless, we will undertake to review the decision by determining whether the Commissioner correctly applied the "treating physician" rule and whether the decision is supported by substantial evidence as required by statute.

### A. *Treating Physician Rule*
In general, the ALJ must give "more weight to opinions" of the claimant's treating physician when determining if a claimant is disabled. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician"). Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations ...." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ must accord "controlling weight" to a treating physician's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record ...." *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Inversely, the opinions of a treating physician "need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.2002) (citations omitted). Thus, the general rule of deference does not apply where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran,* 362 F.3d at 32; *see also Veino,* 312 F.3d at 588 (citations omitted).

If an ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide "good reasons" for the weight given to that opinion. *Halloran,* 362 F.3d at 32–33 (citing *Schaal,* 134 F.3d at 505). When

assessing how much weight to give the treating source's opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include: (i) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant evidence. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c) (2); *see also Ellington v. Astrue,* 641 F.Supp.2d 322, 330–31 (S.D.N.Y.2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. § 404.1527(c)(2)). Courts "do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [should] continue remanding when [they] encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran,* 362 F.3d at 33.

**\*9** In this case, the ALJ accorded no weight to the opinion of Rafael Mastov, a physical therapist who opined on October 22, 2010, that Molina was "not fit for employment" but "should be reevaluated in six weeks time." R. 13; 212. This was proper. "A physical therapist is not an 'acceptable medical source' as defined in the regulations." *Cascio v. Astrue,* 2012 WL 123275, at \*3 (E.D.N.Y. Jan. 17, 2012) (citing 20 C.F.R. § 404.1513). Indeed, as the Second Circuit has noted, "Section 404.1513(a) lists five categories of 'acceptable medical sources.' " *Diaz v. Shalala,* 59 F.3d 307, 313 (2d Cir.1995). Physical therapists are not included in this list. *See* 20 C.F.R. § 404.1513(a). Thus, "under no circumstances can the regulations be read to require the ALJ to give controlling weight to [an other source's] opinion." *Diaz,* 59 F .3d at 314 (emphasis omitted); *accord Genier v. Astrue,* 298 F. App'x 105, 108 (2d Cir.2008) (Commissioner's argument that "physician's assistant" and "nurse practitioner" were not "acceptable medical sources" under the treating physician rule was "compelling" and therefore "their assessments [did] not warrant the same deference as a physician's opinion"); *Proper v. Astrue,* 2012 WL 1085812, at \*9 (N.D.N.Y. Feb. 28, 2012) ("Since physical therapists cannot provide medical opinions, their opinions are not subject to the treating physician rule, and consequently there is no

'hard and fast rule' governing the weight which an ALJ must give a physical therapist's opinion.") (citation omitted). Therefore, the ALJ was not required to give controlling weight to Mastov's opinion. "Rather, the ALJ has discretion to determine the appropriate weight" to accord to a physical therapists' opinion "based on all the evidence" before the ALJ. *Proper,* 2012 WL 1085812, at *9 (citations and internal quotation marks omitted). In this case, the ALJ properly declined to give any weight to Mastov's opinion for several reasons. Mastov's opinion was directly contradicted by Molina's own statements and testimony about his activities of daily living. Additionally, the limitations described by Mastov were directly contradicted by the opinion of Dr. Lathan, who found only a "moderate restriction for bending, lifting, pushing, pulling and strenuous exertion." R. 175. When Dr. Lathan examined Molina on November 8, 2010, he found that Molina had a "normal" gait, that he could walk on his heels and toes without difficulty, that he had a normal stance, and that he used no assistive devices. R. 174. Molina needed no help changing for the examination or help getting on and off the examination table, and he was able to rise from his chair without difficulty. *Id.* Dr. Lathan's report explicitly recognized Molina's history of "back syndrome" and "cervical disc herniation." R. 175. Nonetheless, he assessed no other physical limitations. Dr. Lathan's opinion, moreover, was consistent with that of Dr. Latika, whose only diagnosis on October 22, 2010, had been "backache NOS [not otherwise specified]" with "[n]o red flags" and "no neurological deficits or alarm signs." R. 166. Dr. Latika also noted that Molina's "pain [was] controlled by motrin." *Id.* Dr. Latika assessed no significant physical limitations even though her report explicitly took account of Molina's 2003 car accident and stated that Molina "[came] to the clinic for purpose of letter for disability." R. 164. In sum, the ALJ did not commit legal error in according no weight to the opinion of physical therapist Rafael Mastov.

**\*10** Dr. Alabi opined on February 11, 2011, that Molina's "back pain ... still does not permit employability" but that Molina should follow up in three months. R. 205. The ALJ gave no weight to Dr. Alabi's opinion because it was "contradicted by the physical examinations performed on [Molina] by Drs. Lathan and Latika." R. 14. This was permissible. We begin by noting that the Commissioner is not bound by a physician's opinion that a claimant is disabled. *See, e.g., Snell v. Apfel,* 177

F.3d 128, 133 (2d Cir.1999) ("[T]he ultimate finding of whether a claimant is disabled and cannot work—[is] reserved to the Commissioner.") (citation and internal quotation marks omitted); *Francois v. Astrue,* 2010 WL 2506720, at *5 (S.D.N.Y. June 21, 2010) (citing 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.")). Thus, it was proper for the ALJ to decline to give controlling weight to Dr. Alabi's statement that Molina could not work. Next, as 20 C.F.R. § 404.1527(e)(2)(iii) makes clear, ALJs have the authority to "ask for and consider opinions from medical experts on the nature and severity of [the applicant's] impairment(s)." And as the Second Circuit has squarely stated, "[i]t is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence ... and the report of a consultative physician may constitute such evidence." *Mongeur,* 722 F.2d at 1039 (internal citation omitted). In this case, Dr. Alabi's opinion was inconsistent with other substantial evidence in the record, particularly the opinion of Dr. Lathan, which itself was consistent with that of Dr. Latika. The record does not indicate any worsening of Molina's impairments between October and November 2010, the period in which he saw Drs. Latika and Prajna, and February 2011, when he saw Dr. Alabi, such that a determination of unemployability would have become warranted.

Additionally, the report in which Dr. Alabi made this assessment appears to rest in substantial part on Molina having reported that he was "exempted from employment" as a result of his chronic back pain. R. 205. Such an "exemption" is not supported by any record evidence. As a result, the ALJ did not commit error when he assigned no weight to Dr. Alabi's opinion that Molina was unemployable given that this opinion was contradicted by the physical examinations of Drs. Lathan and Latika. *See generally Halloran,* 362 F.3d at 32 (treating physician's opinions not entitled to controlling weight where they were "not particularly informative and were not consistent with those of several other medical experts"); *see also Van Dien v. Barnhart,* 2006 WL 785281, at * 13 (S.D.N.Y. March 24, 2006) (the "ALJ appropriately gave less than controlling weight to [the treating physician's] opinion and relied more heavily on the evidence provided in the consultative opinions" where treating physician did not indicate what medical techniques were used in arriving at conclusion).

**\*11** Finally, we note that although the ALJ did not explicitly refer to the factors in 20 C.F.R. § 404.1527(c) (2), this omission does not require remand. The failure to explicitly list each of these factors does not constitute legal error requiring remand where the ALJ "applied the substance of the treating physician rule." *See Halloran, 362 F.3d at 31–32* (affirming ALJ opinion which did "not expressly acknowledge the treating physician rule"). As in *Halloran,* our review of the record indicates that "the substance of the treating physician rule was not traversed." *Id.* at 32; *accord Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir.2013)* (rejecting challenge to ALJ's "failure to review explicitly each factor provided in 20 C.F.R. § 404.1527(c)(2)" because Second Circuit "require[s] no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear") (citation omitted); *Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir.2007)* (no rule requiring "an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion"); *Botta v. Barnhart, 475 F.Supp.2d 174, 188 (E.D.N.Y.2007)* ( "Although the ALJ should 'comprehensively' set forth the reasons for the weight assigned to a treating physician's opinion, the failure to do so does not require remand if it can be ascertained from the entire record and the ALJ's opinion that the ALJ 'applied the substance' of the treating physician rule.") (citations omitted); *Hudson v. Colvin, 2013 WL 1500199, at \*10 n. 25 (N.D.N.Y. March 21, 2013)* ("While [the ALJ] could have discussed the factors listed in the regulations in more detail, this does not amount to reversible error because the rationale for his decision is clear and his ultimate determination is supported by substantial evidence.") (citation omitted).

**B.** *Substantial Evidence Test*

We next turn to the question of whether the ALJ's decision was supported by substantial evidence. Molina has not responded to the Commissioner's motion, and thus has not made arguments as to specific findings that he believes are improper. Accordingly, we examine the findings that were material to the ALJ's determination and that appeared to be contested by the claimant at the hearing. *See, e.g., DeJesus v. Colvin, 2014 WL 667389, at \*18 (S.D.N.Y. Feb. 18, 2014).* In this case, Molina testified that he had pain in his back and neck and that doctors "have not been able to do anything" for him. R. 32–33.

We begin by finding that the ALJ could properly discount Molina's testimony as to the severity of his impairments and the effect of these impairments on Molina's ability to work. R. 14. "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health and Human Servs., 728 F.2d 588, 591 (2d Cir.1984)* (some alterations in original) (citation omitted). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility ... may decide to discredit the claimant's subjective estimation of the degree of impairment." *Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir.1999).* However, where an ALJ rejects witness testimony as not credible, the basis for the finding "must ... be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260–61 (2d Cir.1988)* (citing *Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643 (2d Cir.1983)*); *accord Snell, 177 F.3d at 135.*

**\*12** In this case, the ALJ's opinion highlighted Molina's hearing testimony that he has not worked since 1993. R. 12; 31. However, in his application for SSI benefits, Molina alleged that he stopped working on June 1, 2003, "[b]ecause of [his] conditions." R. 108. More significantly, the ALJ properly relied on Molina's testimony regarding his activities of daily living—including housekeeping and taking public transportation—to find that Molina's testimony about his limitations was not credible. Additionally, the reports of the consultative physicians further justified the ALJ's ruling, as did Molina's own statements during a social services evaluation, in which he "denied any barrier to employment" and "expressed an interest in doing maintenance work." R. 12–13. Accordingly, ALJ was justified in concluding that Molina's subjective allegations as to the limitations engendered by his conditions were not credible to the extent alleged.

In light of this finding, and in light of the significant medical evidence that justified the ALJ's rejection of the treating physicians' opinions already discussed, the ALJ's conclusions were supported by substantial evidence.

**IV.** *CONCLUSION*

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings should be granted.

**Molina v. Colvin, Not Reported in F.Supp.3d (2014)**
Case 7:14-cv-09733-VB   Document 25   Filed 07/21/16   Page 82 of 88
2014 WL 2573638

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. George Daniels, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Daniels. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2573638

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 294727
United States District Court, E.D. New York.

Leonidas L. ROSARIO, Plaintiff,

v.

Kenneth S. APFEL, Commissioner
of Social Security Defendant.

No. 97 CV 5759.
|
March 19, 1999.

**Attorneys and Law Firms**

Binder & Binder (Charles E. Binder, of counsel), New
York, for plaintiff.

Zachary W. Carter, United States Attorney, Eastern
District of New York (James F. Doyle, of counsel),
Brooklyn, for defendant.

MEMORANDUM AND ORDER

NICKERSON, District J.

 *1 Plaintiff Leonidas L. Rosario brought this proceeding
to review a final determination of the Commissioner
of Social Security denying plaintiff disability insurance
benefits under Title II of the Social Security Act. 42 U.S.C.
§§ 401 et seq., 1381 et seq. This court has jurisdiction
under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). The
Commissioner now moves for judgment on the pleadings.
Plaintiff cross-moves for judgment on the pleadings.

Plaintiff, who applied for benefits March 16, 1994, says
that she is disabled physically and mentally and that
she has been disabled since June 1, 1989 due to asthma,
allergies, and lung problems caused by pneumonia.
Plaintiff met the special insured status earnings
requirement of the Social Security Act for purposes of
establishing entitlement to disability insurance benefits
through March 31, 1995.

After plaintiff's application was denied initially and
on reconsideration at the administrative level, an
Administrative Law Judge, David Z. Nisnewitz, held a
hearing on July 5, 1995, at which plaintiff was represented
by an attorney. The hearing was translated in Spanish and

English. On January 24, 1996, the Administrative Law
Judge found that plaintiff was not disabled. On August 8,
1997 the Appeals Council denied review, and this action
followed.

I

The Administrative Law Judge made the following formal
findings. Plaintiff, 37 years old on the date she was last
insured, has not worked since June 1, 1989. The medical
evidence establishes that plaintiff suffers from a history of
asthma, sinusitis, essential hypertension and obesity, and
although her physical impairments are severe, she did not
have an impairment or combination of impairments listed
in or medically equal to one listed in the social security
regulations, 20 C.F.R. § 404, App. 1, Subpt. P. No. 4.

Plaintiff's mental impairment was not severe.

Plaintiff's subjective complaints regarding pain and other
symptoms were not credible. She has the residual
functional capacity for work except for lifting or carrying
more than twenty pounds. She can occasionally climb,
bend, and use her hands and feet for repetitive movements.
Plaintiff is able to perform her past relevant work as a
sewing machine operator, and is not "disabled."

II

*Medical Evidence through March 31, 1995*
Plaintiff testified she had been seeing Dr. Luis Locuratolo,
a psychiatrist, approximately twice per year since 1989. An
x-ray taken on August 14, 1989 of her paranasal sinuses
showed chronic sinusitis.

Plaintiff received post-partum gynecological care at
Flushing Hospital Medical Center (Flushing) in 1991.
A 1992 Flushing clinic record noted that plaintiff
complained of pain on the left side of her body, that
she related a history of asthma and allergies, and that
she reported that her most recent asthma attack had
been two years earlier. Examination findings were normal.
Plaintiff's lungs were clear. The physician's impression
was that she had no organic disease and that she
was "probably depressed." The physician recommended
routine blood tests and a psychiatric examination, and
prescribed Motrin.

Rosario v. Apfel, Not Reported in F.Supp.2d (1999)
Case 7:14-cv-09733-VB   Document 25   Filed 07/21/16   Page 84 of 88
1999 WL 294727, 61 Soc.Sec.Rep.Serv. 150

**\*2** A chest x-ray of December 30, 1993 showed right lower lobe infiltrate, but the examiner ruled out pneumonitis. The next day plaintiff was admitted to Flushing complaining of cough, fever, and blood-tinged sputum. She said that her last asthma attack was in 1991. Plaintiff was not taking any medications at that time. Physical examination was normal, except chest auscultation showed rhonchi. Laboratory tests showed plaintiff had pneumonia, and the discharge diagnosis was pneumonia and bronchial asthma. She was given antibiotics, Proventil for her asthma, advised to resume her regular diet and activity, and released on January 6, 1994.

An x-ray taken at Flushing on January 21, 1994 of plaintiff's paranasal sinuses showed possible frontal sinusitis. She complained of cough, but had no fever and her lungs were clear. The examining physician found mild tenderness around her left eyebrow, noted her history for frontal sinusitis, and prescribed Seldane and Proventil for her allergies and asthma. The physician also noted that plaintiff was "feeling well" and had no complaints of pain.

On January 31, 1994, plaintiff went to Flushing complaining of pain around the eyebrows. The examining physician found mild tenderness in the frontal region and diagnosed frontal sinusitis. Plaintiff's asthma was stable. A chest x-ray was negative.

On March 15, 1994, plaintiff went to the Flushing pulmonary clinic complaining of sore throat. The examining physician determined that she was clinically stable and suggested x-ray and routine tests. An x-ray showed clear lungs and no active disease.

Nine days later, on March 24, 1994, plaintiff went to Flushing for evaluation at the primary care clinic. Plaintiff's lungs were clear, and other examination findings were unremarkable. The examining physician found her asthma stable and advised her to continue taking Seldane and Proventil.

Dr. Locuratolo's report of April 18, 1994 listed plaintiff's history of complaints of backaches, fatigue, daily headaches, anxiety, depressive disorders, "frequent asthma attacks," allergies, sinusitis, and obesity, and noted that she had recently been hospitalized for pneumonia.

His psychiatric examination was anxiety and depressive disorder, and prescribed Atarax and Doxedin. He concluded that plaintiff appeared unable to hold a job and had been unemployed for one year.

On May 13, 1994 Dr. Herbert M. Lachman, who according to plaintiff is a consultative physician for the Commissioner, examined plaintiff and found left-sided conjunctivitis and rhinitis in both nostrils. Her lungs had equal expansion and were clear to percussion and auscultation. She had bilateral wheezing and rhonchi. She had no limitation of joint motion, and neurologic examination was normal.

Her pulmonary function tests were essentially normal. The clinician who performed the test noted that the low FEV.5 rating suggested a poor initial effort on plaintiff's part. A chest x-ray was negative.

**\*3** Dr. Lachman diagnosed asthma and noted that plaintiff said her home ventilator helped reduce the frequency of her visits to the emergency room. Plaintiff stated that she had asthma attacks twice a week, she averaged about one or two visits to the emergency room each year, and claimed three hospital admissions since 1989 for asthma, plus one for pneumonia. Other than noting that plaintiff is taking Atarax, Dr. Lachman does not mention anything about her mental or emotional condition.

Dr. Locuratolo submitted a noted to the Social Security Administration on June 30, 1994, stating that plaintiff was disabled.

*Medical Evidence after March 31, 1995*
Dr. Locuratolo wrote a letter to plaintiff's attorneys dated April 17, 1995 in which he reiterated plaintiff's complaints noted on his April 18, 1994 report. Dr. Locuratolo said that plaintiff had chronic sinusitis, allergies, and asthma which was severe at times. He recorded plaintiff's hospitalizations for pneumonia, heart palpations, and high blood pressure. He stated that plaintiff was obese, anemic, short of breath, and had gynecological disorders, that she was nervous, tense, tired, sad, and had crying spells and trouble sleeping, that plaintiff appeared unable to hold a job, and that she had been able to work only until June of 1993.

On June 8, 1995, Dr. Azariah Eshkenazi, a neurologist and psychiatrist who is an Assistant Professor of Psychiatry at Mount Sinai School of Medicine, evaluated plaintiff's mental status at the request of plaintiff's attorneys. He said plaintiff reported to him that she last worked two years earlier, at which time her asthma became much worse, her asthma attacks became "extremely frequent," she had headaches and pain in her left arm, and that as a result of her physical condition, she felt very depressed. She spends most of her days crying, wishes she were dead, has no social life, and mostly stays at home and tries to take care of her children.

Dr. Eshkenazi conducted a mental status examination and found plaintiff's speech to be slow but coherent, and her appearance was one of depression and anxiety. Her thought processes were goal directed and productive, and her affect appropriate. Her memory was fair and sensorium clear, though she had some difficulty concentrating. He diagnosed dysthymic disorder secondary to asthma and generalized anxiety. Dr. Eshkenazi opined that plaintiff was disabled from a psychiatric point of view, but that if her physical condition were to improve, her psychiatric condition might also improve.

On Dr. Eshkanazi's mental residual functional capacity assessment of plaintiff he checked boxes indicating that she was markedly limited in her ability to complete a normal workweek without interruptions from psychologically based symptoms, moderately limited in her abilities to remember and carry out detailed instructions and maintain concentration for extended periods, to perform activities within a schedule, and to make independent plans. He found mild limitations in plaintiff's abilities to respond appropriately to criticism from supervisors and get along with co-workers without distracting them. He determined that plaintiff's ability to understand, remember, and carry out one or two step instructions was not limited, and he found no limitations in plaintiff's ability to remember work-like procedures, ask questions, or maintain socially appropriate behavior.

*Evidence Submitted to the Appeals Council*
**\*4** Dr. Locuratolo submitted a letter dated March 14, 1996 reiterating plaintiff's various conditions that he mentioned in his prior report and letter, and added that plaintiff recently injured her left ankle and had chronic

gastroenteritis. He opined that she was unable to hold a job.

*Vocational and Other Evidence*
Plaintiff was born in the Dominican Republic, where she reached the second or third year of high school. She worked as a sewing machine operator from 1983 to 1989. She quit because of chronic sinusitis and allergies, but resumed work for six months in 1993. Thereafter, she cared for her sister-in-law's young child for an unspecified six month period.

She is separated and has three children at home with her. Her husband contributes some money to support the children, and she sees him weekly, but she testified that "he doesn't love me," and she does not wish to resume the relationship.

As a sewing machine operator, plaintiff was required to sit for eight hours, stand or walk for one hour, lift up to ten pounds, and occasionally bend and reach.

She testified that she has been nervous "all the time" since she stopped working, and that she was hospitalized at Flushing in 1991 for pneumonia, and in 1993 and 1994 for asthma.

Plaintiff reported that she cooks and shops with the help of a neighbor, washes dishes, and sweeps up a bit, and that she becomes fatigued after walking about one block. She testified that she stays at home and does not like to do anything, and that she has had crying spells every day for three years.

III

The court reviews the Commissioner's findings only to determine whether they are "supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir.1997); *see* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla," which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420 (1971).

*Physical disability*

Based on the medical evidence for the claimed period of disability, the Commissioner could reasonably conclude that plaintiff was not physically disabled.

Plaintiff's numerous chest examinations and x-rays, in addition to her pulmonary function test, all indicate that her asthma was controlled. She received minimal medical treatment for her asthma. Contrary to her complaint of frequent asthma attacks, there is no record of any hospitalizations for asthma, and in 1992, plaintiff said she had not had an asthma attack in two years. Except for when she had pneumonia in December, 1993, each time she was examined her lungs were clear, and she admitted that her home ventilator reduced the frequency of asthma attacks.

Plaintiff claims that the Administrative Law Judge gave insufficient weight to the opinion of her treating physician, Dr. Locuratolo, who said that she was disabled and unable to work.

 *5  The regulations provide that the Commissioner will give controlling weight to a "treating source's opinion on the issue(s) of the nature and severity" of a claimant's impairments, but only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(d)(2). See Schisler v.. Sullivan, 3 F.3d 566 (2d Cir.1993).

The Administrative Law Judge found that Dr. Locuratolo's opinion was not supported by objective medical evidence. Except for a radiographic report he ordered that indicated chronic sinusitis, Dr. Locuratolo's conclusions about her physical condition appear to have been based on plaintiff's own subjective complaints, not on objective clinical data. Although the Commissioner attempted to secure detailed records from plaintiff's doctors, Dr. Locuratolo's letters were not accompanied by clinical or laboratory reports to demonstrate how he arrived at his conclusions. Because of substantial medical evidence to the contrary, the Administrative Law Judge could reasonably reject Dr. Locuratolo's finding of disability as to plaintiff's physical complaints.

*Mental disability*

The Administrative Law Judge found that plaintiff's mental condition was not "severe." Specifically, he concluded that "the evidence fails to show that [plaintiff's]

anxiety or depression contains sufficient signs and symptoms as to satisfy the criteria found in paragraph A of Listing 12.04. It also fails to reveal the severe degree of functional loss as required by paragraph B of such Listing." See 20 C.F.R. § 404, App. 1, Subpt. P, No. 12.04.

It is not clear from the Administrative Law Judge's report whether he made a threshold finding of "not severe" at the second level of the five-step sequential evaluation process required by the regulations, or whether he skipped step two and proceeded directly to step three, where plaintiff's impairment is evaluated in terms of the listed impairments. 20 C.F.R. 1520(a). In any event, the court finds that the Administrative Law Judge did not have substantial evidence to conclude that plaintiff's mental impairment was "not severe," either at the second or third level of inquiry.

An impairment is not "severe" at step two if it does not significantly limit the plaintiff's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521. A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process. 20 C.F.R. § 404.1520(c).

According to the Commissioner's own policy, the threshold severity test should only be used as a *de minimis* screening device to eliminate frivolous claims. *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). A finding of "not severe" should be made if the medical evidence establishes only a "slight abnormality" which would have "no more than a minimal effect on an individual's ability to work." Social Security Ruling 85–28, 1985 WL 56856 at *3 (S.S.A.1985), *quoted in Bowen v. Yuckert,* 482 U.S. 137, 154 n. 12 (1987).

 *6  The Administrative Law Judge's statement that "no reference as to any mental or emotional problems were made while the claimant was treated at Flushing Medical Center" is incorrect. There was a report from the hospital that mentioned she was "probably depressed," and the examiner recommended a psychiatric work-up. There is no evidence that such a work-up was performed.

The absence of other reports on her mental condition from her many examinations at Flushing hospital does not necessarily mean that she did not have a severe mental problem. It appears from the record that she went

there primarily for physical complaints. In any event, according to a Social Security Ruling, the absence of medical evidence "is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all of the evidence." Social Security Ruling 96–7p, 1996 WL 374186 at *6 (S.S.A. July 2, 1996).

Although the Administrative Law Judge's finding that a claimant is not credible is entitled to considerable deference, see McVey v.. Shalala, 1994 WL 764194 (E.D.N.Y. Oct. 19, 1994), he must set forth his reasons for that conclusion "with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir.1984). The Administrative Law Judge could reasonably conclude on the basis of substantial evidence in the record that plaintiff's subjective complaints about her physical condition are not credible, but there is not substantial evidence for the same conclusion as to her mental condition.

Plaintiff consistently complained to Dr. Locuratolo, Dr. Eshkenazi, and in her own testimony, of anxiety and emotional problems, including crying spells and trouble sleeping. See Social Security Ruling 96–7p, 1996 WL 374186 at *4–5 (S.S.A. July 2, 1996) (consistency of individual's own statements is one strong indication of credibility, especially those made to treating or examining medical sources).

Of course, plaintiff's subjective statements cannot be the sole basis for a finding of disability. 20 C.F.R. § 404.1528(a). There must be objective medical evidence, such as mental status examinations and psychological tests, which reveal a medical impairment that could reasonably be expected to produce the conditions alleged, and which, when considered with all the evidence, indicates that the plaintiff is disabled. Id.

Dr. Eshkenazi's mental status examination of plaintiff conducted a little over two months after her special insured status expired reported that her "mood is one of ... depression and anxiety," though he did find plaintiff oriented to time and place, her speech coherent, thought processes goal directed and productive, her affect appropriate, her memory fair and sensorium clear. There is no evidence that Dr. Eshkenazi conducted psychological tests.

His mental residual functional assessment of plaintiff provides additional evidence that plaintiff's mental disability might preclude her from working. While he indicates plaintiff was not limited or only mildly limited in some categories, he found her "markedly limited" in her ability to complete a normal workweek without interruptions from psychologically based symptoms. "Markedly limited" is defined on the form as "Effectively precludes the individual from performing the activity in a meaningful manner."

*7 Dr. Eshkenazi also found moderate limitations in her ability to understand, remember, and carry out detailed instructions, sustain concentration for extended periods, perform activities within a schedule, maintain regular attendance and punctuality, interact appropriately with the general public, respond to changes in the work place, use public transportation or travel to unfamiliar places, and set goals or make plans independently. "Moderately limited" is defined on the form as "Significantly affects but does not totally preclude the individual's ability to perform the activity."

The Administrative Law Judge must be permitted some flexibility in evaluating the significance of an impairment that affects some, but not all, of the work related functions, Goodermote v. Secretary of Health and Human Services, 690 F.2d 5, 8 (1st Cir.1982).

But findings of markedly and moderately limited in the ability to carry out the kind of basic work activities that are described in the regulations, 20 C.F.R. § 404.1521(b), indicate that the impairments have "more than a minimal effect" on plaintiff's ability to work, and thus a threshold finding of "not severe" is not warranted. See also Figueroa v. Heckler, 1984 WL 139 at *5 (S.D.N.Y. April 4, 1984) (listing cases finding no severity only where no more than "moderate" impairment was rated in any category).

The Administrative Law Judge referred to Dr. Eshkenazi's report selectively, and did not even mention the category checked "markedly limited."

As for the treating physician's evidence, while the objective clinical evidence was sufficient to override Dr. Locuratolo's determination that plaintiff was physically disabled, there is no comparable weight to counter his evaluation of plaintiff's mental condition, especially in

view of the length of time of the treating relationship, the fact that Dr. Locuratolo's specialty was psychiatry and he prescribed for her Atarax and other medications for anxiety, and the lack of objective medical evidence to the contrary. *See* C.F.R. § 404.1527(d)(2).

The Administrative Law Judge did not cite any medical opinion or objective medical evidence to counter the opinions of Dr. Locuratolo and Dr. Eshkenazi and plaintiff's own subjective testimony regarding her mental disability. The one consultative physician, Dr. Lachman, made no mention of plaintiff's mental condition.

There is insufficient evidence in the record to conclude that plaintiff's mental condition does not significantly limit her basic work activities, and there is some evidence to conclude that it does.

The court finds that the Commissioner did not have substantial evidence to conclude that plaintiff's mental condition was not severe, whether it be at the second or third levels of the evaluation process, and remands the case for a more complete determination of plaintiff's

mental condition, including seeking a consultative doctor who will examine plaintiff and review the medical records regarding plaintiff's mental impairment. The court is especially interested to know how plaintiff could return to her past work as a sewing machine operator with findings of "markedly limited" and "moderately limited" on her mental residual assessment form.

IV

**\*8** The case is remanded for further administrative proceedings.

Both the Commissioner and the plaintiff's motions for judgment on the pleadings are denied.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 294727, 61 Soc.Sec.Rep.Serv. 150

---

End of Document                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.